UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHONDA FERNANDEZ
        Plaintiff,

-against-

WENIG SALTIEL LLP, IRA GREENE, JEFFREY L. SALTIEL, MERYL L. WENIG
        Defendants.

Civil Action No.: 19cv1979

AFFIDAVIT IN SUPPORT

Meryl L. Wenig, being duly sworn, hereby deposes and says the following allegations are true under the penalty of perjury:

1. I am a named Defendant as well as a partner in Wenig Saltiel LLP, and admitted to practice law before the Courts of the State of New York as well as the Federal Courts in the Southern and Eastern Districts and fully familiar with the facts at bar.

2. I submit this affidavit in support of Defendant Wenig Saltiel LLP, Meryl L. Wenig and Jeffrey L. Saltiel's (collectively "Moving Defendants") motion for summary judgment on the issue of race discrimination and retaliation and make this affidavit based on my personal knowledge.

3. I have read the Complaint filed by Shonda Fernandez, as well as her response to Defendant's First Set of Interrogatories and to say I am outraged by her outrageously false claims would be an understatement.

4. I have known Jeffrey Saltiel for more than twenty-five (25) years, have been a law and business partner with him for more than twenty (20) years and consider him a close friend. We know and

have spent time with each other's immediate family members.

5. I have also known Ira Greene for more than twenty five (25) years, was my former partner in the Firm from January 2004- January 2009 and for a short time thereafter worked on cases in which he was involved and I consider him a friend as well.

6. The claim in paragraph 15 of the Complaint; to wit: "following a hostile takeover of the business, Mr. Greene was stripped of his title and demoted to "of Counsel"" is Shonda Fernandez' invention to bolster the false claims that make up her complaint.

7. Ira Greene was never stripped of his title or demoted. The Firm parted ways with Ira Greene based on a mutual, amicable agreement at a time when he felt it was time for him to semi-retire.

8. Equally fallacious and untrue is the claim in paragraph 16 of the Complaint that "Mr. Greene was one of Plaintiff's supervisors and had authority over all aspects of her employment."

9. From the time I joined the Firm in January 2004 as partner, in terms of supervisory roles, I have always been responsible for the preparation of litigation paper, and Jeffrey L. Saltiel has always been responsible for the administration and finances. At no time has Ira Greene ever had a supervisory role of any kind in the Firm.

10. Further, he had no involvement whatsoever in the hiring (or firing) of Shonda Fernandez by the Firm.

11. After Ira Greene left the partnership in January 2009, he occupied an office in the same building

as the Firm and was a frequent visitor to our office. In 2015 after the landlord declined to renew Ira Greene's lease as it needed the space, Ira Greene was given a small office in our suite as he was a respected senior member of the Bar whose aspirations consisted of going to the office each day to practice his craft and serve his clients as well as act as a fiduciary for the Court. I believe that the term for this is "paying it forward".

12. At that time, continuing into the time of Shonda Fernandez's employment in July 2018 and through her firing in March 2019, the majority of the employees at the Firm were of African-American or of Caribbean descent.

13. From the time I joined the Firm through the present day, the office manager has always been charged with the responsibility to monitor certain case files that are not active but which files are not ready to close.

14. Shonda Fernandez' claim that in January 2019 she was demoted from office manager and forced to take on vital responsibilities for these cases is false. Monitoring cases has always been a function of the office manager, not a demotion. Likewise, her claim that she "faithfully and competently did her job" is not accurate.

15. When Shonda Fernandez was hired, the Firm was compromised of Jeffrey Saltiel, Meryl L. Wenig, six associates, and more than a dozen employees. To effectively supervise employees, the office manager had to be familiar with the data base program used by the Firm, and the deadlines for court filings.

16. During her interviews and on her resume, the Plaintiff professed to have these skills. Her race

never came into consideration when she was hired, during her employment, or when she was fired.

17. My office practice has always been to walk up and down the hallways several times each day stopping to speak to staff and the lawyers who were working on various papers which is how I came to receive verbal complaints from Nate Farley, James Elliot and Natasha Laughton (all black) that she was speaking to and treating the employees in the office with disrespect.

18. When I spoke with Shonda Fernandez about the complaints that she was rude and abusive in speaking with employees, she told me that they were not used to supervision, had enjoyed too much freedom and needed to be more "corporate". Annexed hereto as Exhibit 1 is the 10/2/18 documentation of the verbal warning to James Elliot from Shonda Fernandez.

19. I also received complaints from employees including Carleen Freckleton and Brendan O'Sullivan that Shonda Fernandez was re-assigning work that the partners had assigned to her.

20. I spoke to Shonda Fernandez on multiple occasions about not re-assigning work which the partners had assigned her to do, as the staff had specific other work assigned to them. Each time she would tell me she understood, but it became clear that it was nothing more than appeasement as she continued to ignore my repeated direction to not re-assign work given to her.

21. Unfortunately, the situation worsened and staff and attorneys began to quit employment with the Firm. In particular, Natasha Laughton (a black person of African descent), Ming Davis (a black person of African descent), and Valerie Pagan (a person of Hispanic descent) all quit citing Shonda Fernandez as the reason. See Resignations from Natasha Laughton, and Ming Davis

annexed hereto as Exhibit 2.

22. Although I routinely walked up and down the hallways in the office, at no time did I ever hear music emanating from the office occupied by Ira Greene much less "slave marches", or loud music.

23. Equally, I never observed any videos from Mr. Greene's office that would cause any business owner to take any action or cause any employee, including Plaintiff, to complaint. Of note is that when walking down the hallway, you cannot see the screen of the computer monitor in Mr. Greene's office as it was facing away from the door.

24. Not once while I went up and down the hallways did Plaintiff ever complain to me of any racial or discriminatory issues, or of noise from Mr. Greene's office. Nor did I ever witness Plaintiff in Mr. Greene's office or him in her office.

25. When I would ask Shonda Fernandez to update the case information that I wrote for her on the "CTA" reports (which needed to be done the same day or at the latest the next day so information on cases would be accurate), I began to observe in the weekly reports that she was not doing so Annexed hereto are the following redacted CTA reports: January 30, 2019 as Exhibit 3, February 14, 2019 as Exhibit 4, February 28, 2019 as Exhibit 5.

26. More than once I advised Shonda Fernandez that her failure to timely update the marked up weekly reports was causing me double and triple work as it resulted in my making the same markups week after week. The inaccurate information in the database regarding deadlines and paper deadlines also caused me and the staff to do additional unnecessary or duplicative work

which wasted time. As an Office Manager, these were the types of things that were to be eliminated as a result of her supervision, yet they were not.

27. Her continued failure to timely update the reports made it readily apparent to me that she had failed to familiarize herself with the use of the computer database system, and had no familiarity with the underlying files that she was to monitor, despite her claims to the contrary.

28. This failure to properly document activity on cases was problematic as it meant inaccurate information was given to clients when they called for updates, and deadlines were being missed.

29. As my health was an issue, having to do Shonda Fernandez' job of ensuring that the database was properly updated, and accurately informing staff of what deadlines had to be met, resulted in my having to essentially do her job as well as mine.

30. On November 10, 2018 my health dramatically worsened and I was hospitalized for more than ten (10) days for a life threatening exacerbation of my asthma and Respiratory syncytial virus ("RSV"). After my discharge I was on bed rest for a few weeks. When I was finally able to return to work, I had an oxygen tank due to breathing issues and was on a very restricted work schedule.

31. Shonda Fernandez' claim that from January 2019 through the end of her employment in March 2019, I regularly yelled at her is fictitious. Not only do I not yell at employees, but due to my breathing issues for the early part of 2019 I was incapable of yelling and could barely speak at normal volume. Further, I was on a restricted work schedule and rarely in the office.

32. My hospitalization brought home the fact that Shonda Fernandez was inept and was not

performing her job as she had no idea of various deadlines for papers that were due, or of the necessary filings. In short, she failed to keep track of deadlines throughout the office, or the papers assigned to be drafted by attorneys which was the primary focus of the job for which she was hired.

33. Any claims that her subordinates ignored or disrespected her was a result of her own behavior towards them – but does not give rise to the causes of action alleged in this case. Termination of Shonda Fernandez' employment was based on nothing other than her own repeated failure of job performance. Contrary to her claims, her duties did not increase during her employment and she was never blamed for anyone else's mistakes – only her own failure to perform her duties.

34. Shonda Fernandez' claim that she repeatedly asked Jeffrey L. Saltiel to block Mr. Greene's internet sites or internet usage to prevent him from accessing "certain sites" is specious. I know that Jeffrey Saltiel had set up the computer system with a Sonicwall router with content filter that prevented any of the users in the office, including the Partners, from accessing certain websites based on keywords and subject. I have a specific recollection of this as I recall not being able to get onto certain websites. The types of material Shonda Fernandez claims Mr. Greene accessed would not be accessible in the office due to the content filter.

35. Shonda Fernandez' recollection in paragraph 36 of the Complaint of what transpired on December 10, 2018 during a meeting of the partners is false. To the contrary, all that Mr. Greene indicated during the meeting in a calm and surprised manner, was that he discussed politics, not race, and that he did not realize anyone would take offense at such a discussion. There was no "ranting" whatsoever by anyone in the meeting.

36. Other than that one meeting, Shona Fernandez never complained, orally or in writing, never sent an email never submitted a complaint in writing regarding any racist comments, music, videos, or hostile work environment.

37. Other than the meeting referenced in paragraph 36 being held concerning an issue that Shonda Fernandez had with Ira Greene, every other claim in the paragraph is not only fictitious but perjurious. In short, it never happened.

38. What happened in the partners meeting is exactly what should have happened when an employee raises an issue to a partner about a conversation which offends them. Here, the conversation between Plaintiff and Mr. Greene, which Javon Blackmon allegedly witnessed, was discussed with Mr. Greene and Plaintiff who indicated she was offended by the statements, and the resolution was that Mr. Greene should apologize for any offense he may have caused.

39. Markedly, the conversation with Ira Greene that Plaintiff alleged to the partners at the end of the day on December 10, 2018 (not December 5) was nothing like the conversation she alleged in the complaint.

40. At that time Plaintiff merely advised that earlier that morning Mr. Greene engaged her in a political conversation in the lobby while waiting for the elevator about the current lack of leadership in the current Civil Rights movement which conversation he continued as she was walking down the hallways. Plaintiff told us she believed the conversation needed to be addressed as she thought Javon Blackmon heard it and was offended by the comments and that it was inappropriate for the office as it was a political discussion.

41. Mr. Moccia never made any statement as referenced in paragraph 37 concerning Ira Greene's behavior, and certainly did not indicate Mr. Greene should be removed or "stripped of authority" as he had absolutely no authority. These claims in paragraph 37 are fictitious and never happened.

42. I spoke with Jovan Blackmon on December 10, 2018 following the partners meeting and inquired of his recollection as to what he observed of the discussion Ira Greene and Shonda Fernandez had earlier that day. He advised me the conversation was nothing of concern to him and that he had not given the conversation much thought.

43. Every month we would have partner meetings out of the office regarding important issues in the office which management needed to discuss. Shonda Fernandez typed, circulated the agenda and attended the partners meetings with Jeffrey Saltiel, Nicholas Moccia and me. Not one of her agendas had on it any complaint regarding Ira Greene playing loud or offensive music or Ira Greene making racist comments, nor did Shonda Fernandez ever raise any of those concerns about Ira Greene at the partners meeting or at any other time during her employment.

44. The first time I learned that Shonda Fernandez was complaining of "racist behavior" and "racist comments" was after her employment was terminated when I read the lies that comprise the complaint filed in this case.

45. Starting in January 2019 the Firm's Junior Partner, Nicholas Moccia, started advocating for termination of Shonda Fernandez' employment as her job performance was lackluster and her managerial style was causing the troubling loss of many good employees for the Firm.

46. At the same time my administrative assistant, Carleen Freckleton was emailing the partners that she was upset that Shonda Fernandez was not performing or doing her job. Annexed hereto as Exhibit 6 is an email dated February 14, 2019 from Carleen Freckleton re: "why isn't Shonda in the file room with staff filing party".

47. By February 2019 the issues with Shonda Fernandez' lack of job performance and the issues she was causing in the office had only worsened.

48. In mid-February 2019 Nicholas Moccia, the Firm's Junior partner gave the Firm notice that either she be terminated or he would withdraw from the Firm.

49. Then, towards the end of February 2019, my administrative assistant Carleen Freckleton urged the Firm to terminate Shonda Fernandez' employment due, *inter alia*, to her lack of performance in tracking litigation paper, failure to update case snapshots, and issues she was causing with the staff.

50. Only after the Firm terminated Shonda Fernandez' employment did she come forward with these baseless lies of "hostile work environment" and "racial bias". She first raised these slanderous lies after her termination to shame and humiliate the Firm in the hopes of extorting monies from us.

51. Significantly, there is no evidentiary support for any of the Plaintiff's outlandish claims; instead, each of these absurdities rest on nothing other than her own self serving statements.

52. Jeffrey Saltiel and I fired Ms. Fernandez' because she was incompetent as an office manager and

for no other reason. Her claims that her termination was in retaliation for her complaints regarding "hostile work environment" and "racial bias" complaints is baseless since there were no claims made by her during her employment.

53.  The averments in the complaint of "hostile work environment" and "racial basis" are delusional fabrications and nothing more than a transparent attempt to extort moneys from the Firm to which she is not entitled as her firing was based on her inability to do the job as office manager for which she was hired.

Wherefore, based on the foregoing it is submitted that the instant motion should be granted in all respects together with such other and further relief which this Court deems just in the circumstances.

Dated: January 16, 2023

_____
Meryl L. Wenig