UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHONDA FERNANDEZ,

                                Plaintiff,

              -against-

WENIG SALTIEL LLP, IRA GREENE,
JEFFREY L. SALTIEL, and MERYL L. WENIG,

                                Defendants.

**DECLARATION IN SUPPORT**

Civil Action No.: 19-cv-1979

Jeffrey Saltiel, being duly sworn, represents as follows under penalty of perjury:

1.      I am one of the Defendants in this action and the Managing Member of Wenig Saltiel LLP (WS) which is a law firm and a defendant in this action. I make this declaration in support of Defendants' motion for summary judgment dismissing this action in its entirety.

2.      As the evidence unequivocally demonstrates, the Plaintiff was not racially harassed nor discriminated against at any time during her employment but was terminated for her inability to perform as the office manager, the job for which she was hired.

3.      Plaintiff commenced this action one (1) month after her seven (7) month employment as office manager at Wenig Saltiel LLP was terminated.

4.      The claims of this lawsuit are fabrications concocted by Plaintiff after her termination for failing to do the job for which she was hired for the sole purpose of extorting monies

1

from WS when no legal claims lie.

5.   This entire lawsuit was a complete surprise as Plaintiff, on the day of her termination, sought desperately to have the decision to terminate her employment reversed so she could come back to work.

6.   Neither Ms. Wenig, I or any of our previous partners ever tolerated bigotry. Our staff has always included people of different races, cultures, religions, and sexual orientations.

7.   Until Ms. Fernandez began this action, not one employee has ever complained about being treated inappropriately or differently than other employees as a result of being a member of any protected class.

8.   I have been an attorney since 1995, admitted in the State of New York, and State of New Jersey, as well as the Eastern District of New York, Southern District of New York, and District of New Jersey, and the Second Circuit Court of Appeals. I have been a partner in my present firm since 2003 and have been the managing partner for a majority of that time.

9.   Wenig Saltiel LLP originated in 2003 as Ginsberg and Saltiel LLP. The Firm practices primarily in the areas of landlord tenant and real estate litigation. Ira Greene, Esq. was a partner from 2003 until 2009 when he semi-retired from the practice of law. Thereafter, he proceeded to occupy a suite separate from our firm, but in the same building, for many

years with other solo practitioners.

10.     In 2015 when their lease ended, and each of those attorneys went their separate ways, Ira Greene asked to rent a space in our office. Ms. Wenig and I, based on our relationship with Mr. Greene, and out of respect for the legal work and service to the public and the Courts that he has done for so many years and given his advanced age and much smaller practice, felt it more appropriate to provide him with an office without the obligation to pay monthly rent. In consideration of being given space, Mr. Greene agreed to refer all landlord tenant and real estate business to the Firm.

11.     In late 2018, the Firm had a disagreement with Mr. Greene with regard to a client that he referred to the firm and we informed him that it would be best if we terminated our business relationship. It is worth mentioning that because Plaintiff was the office manager, she was made aware of the issues that led to the termination of the relationship and had a number of conversations with Ira Greene as to when he would be relocating his office. A copy of the emails from the Plaintiff regarding the matter are annexed as Exhibit 1.

12.     It should be noted that in her emails to Ms. Wenig and me, the Plaintiff addressed the subject at hand; to wit: the departure of Mr. Greene from our suite, and NEVER made any mention of any discriminatory treatment, racial issues or anything similar to what is described in the complaint in this action. See Exhibit 2.

13.     While Ms. Fernandez emailed us in January 12, 2019 about Mr. Greene being mad about

3

having to leave our office, her lengthy email makes no mention of any hostile work environment, racial issues, or the like. The reason for that is very simple – there was no discrimination of any kind during Plaintiff's employment by the Firm - not by any employee of Wenig Saltiel LLP and not by Ira Greene.

14.    Ira Greene is an upstanding gentle man, who is over 80 years of age. He is always well-dressed, articulate and willing to help someone. He is an avid Civil War reenactor and was a high school history teacher before he became an attorney. He is highly regarded and respected by the attorneys who know him, and the Judges he appears before.

15.    We have never had a complaint of racism prior to Ms. Fernandez's. Over the years, approximately 50% of our staff has consisted of people of color and while employees have resigned or were fired and may not have liked the office environment, there was never a complaint that anyone was discriminated against or was subjected to a hostile work environment based upon their race or any other demographic.

16.    A majority of the employees of color disliked Ms. Fernandez and her attitude and demeanor caused many to quit and take jobs elsewhere as a result. The departing employees always either emailed us or told us that they were leaving as a result of Ms. Fernandez. See copies of resignation emails annexed as Exhibits 3, 4, and 5. Additionally, other quality employees threatened to quit if she remained in the Firm's employment.

4

17.     The office was laid out over 7000 square feet in an L shaped pattern at 26 Court Street, 12th Floor, Brooklyn, NY. The outer perimeter was primarily individual attorney, office manager, and bookkeeper offices and the interior was cubicles occupied by support staff.

18.     As the attached document (Exhibit 6) is an accurate description of our office layout to the extent it shows the location of Plaintiff's and Ira Greene's office and Natasha Mitchell's desk, it shows Ira Greene's office was adjacent to Shonda Fernandez's office. Natasha Mitchell's desk was directly outside of both offices, enabling her to see and hear anything that took place between the two offices. As Ms. Mitchell's affidavit makes clear, she observed none of the outrageous claims made by Ms. Fernandez.

19.     Our office was equipped with a Voice Arrest sound masking system during the entire time Ms. Fernandez worked for the firm, installed in all the hallways and individual offices to maximize privacy.

20.     The system created "white noise" which made it impossible to hear the content of speech and sounds from room to room or discussion within an office from the hallway. Consequently, while someone would be aware that somebody was speaking or a sound was being made in an office, it would be impossible to discern what was actually being said if one was not in the same room.

21.     Additionally, the firm maintained a Sonicwall router and content filtering subscription the entire time that Ms. Fernandez worked for the firm. The content filter prohibited access

from any of the computers on our network or that used our Wi-Fi, to certain websites designated by the content filter or that I added including all content that contained any mention of the following subjects, as well as others: violence/hate/racism, pornography, weapons, adult/mature content, cult/occult, drugs/illegal drugs, illegal skills/ questionable skills. A copy of the exact content filter rules is annexed to the affidavit of Benjamin Serebin as Exhibit 7.

22.     A review of the Complaint in this matter causes me to respond to the plethora of false allegations as follows. No complaints were ever made by Ms. Fernandez, to me, whether oral or written, regarding any of the outrageous claims in paragraph 21. Likewise, I did not make the outrageous responses alleged in paragraph 22.

23.     Similarly, Ms. Fernandez never complained to me about Mr. Greene watching any videos.

24.     I did not make the outrageous responses that Plaintiff fabricated in paragraphs 26 and 27. In fact, I had and continue to have a very cordial relationship with the Firm's receptionist even though she is no longer in the Firm's employ. It was Ms. Fernandez, who had issues with her and her performance to the point that she decided she had to "write her up". See copy of document verbal warning Gail Brown annexed hereto as Exhibit 7.

25.     The allegations in paragraph 29, to my knowledge, did not happen. I never heard such conversations taking place, and Ms. Fernandez never advised me that any such comments were made to her by Mr. Greene.

26.     The spurious and specious allegations in paragraph 30 through 35 of the complaint are not only untrue, but in my opinion constitute Ms. Fernandez taking the minor occurrence of December 10, 2019 which was properly addressed, and essentially creating this entire lawsuit around it with false facts.

27.     On December 10, 2018 (not December 5, 2018, as alleged by the plaintiff) Ms. Fernandez raised an issue with me and Ms. Wenig regarding a discussion that Mr. Greene had in the lobby of the building and the elevator. (Exhibit 8 - letter dated December 11, 2018, which refers to the discussion "yesterday"). Contrary to Ms. Fernandez's claims, Mr. Greene did not have any tirade.

28.     Likewise, the comments in the Complaint in paragraphs 32 and 33 never happened, except that the office manager came to me on December 10, 2018 and alleged an inappropriate conversation had occurred. The Firm conducted an investigation and came to a resolution based upon the information presented by each person we interviewed.

29.     What Ms. Fernandez obviously has forgotten is that December 10, 2018 was the day of our annual Kris Kringle potluck lunch in the office. Ms. Fernandez organized and participated in that event, together with all staff members. See redacted timesheets of

other employees for 12/10/18 annexed hereto as Exhibit 9. The entries on all of the employees' timesheets are entered into the ProLaw system by the individual employees within 1 day of the work being done. (The meeting with partners took place at approximately 5 PM)

30. I have reviewed the self-entered contemporaneous billing records of the Plaintiff and other employees of the firm, as well as other documents created by the Plaintiff in December 2018, together with her actions on December 10, 2018 and December 11, 2018.

31. What is even more indicative of Ms. Fernandez's falsification of the facts surrounding the December 10, 2018 date, is her own contemporaneous timesheet entries that she entered that day **which are devoid of any reference to a meeting or discussion with regard to the outrageous claims made in the complaint surrounding that day** – or from December 5, 2018. See redacted timesheet for Shonda Fernandez for December 5, 2018 to December 11, 2018 (Exhibit 10).

32. During the meeting on December 10, 2018, Ms. Fernandez did not say that Mr. Blackmon complained about the conversation she had with Mr. Greene. Rather she said that Mr. Greene spoke with him and **she thought that he was offended**. When I asked Mr. Blackmon the next day about the incident, he told me he "did not give it much thought".

33.    Of note is that there was a regularly scheduled partner's meeting on December 11, 2018, the very next morning. In accord with the usual practice, Ms. Fernandez prepared and circulated the agenda. While the agenda included the previously scheduled discussion about Mr. Greene moving from the office due to the business issue, there was no discussion whatsoever regarding the alleged incident that took place the day before.

34.    The annexed copy of the agenda (Exhibit 11) is Ms. Fernandez's own copy with her handwritten notes from the meeting and conspicuously missing is any indication that there was an issue with regard to Mr. Greene's alleged behavior the day before. Also, Plaintiff's notes indicate that she agreed to meet with Mr. Greene after the partner meeting regarding the day he would be vacating.

35.    Interestingly, while Ms. Fernandez claims in paragraph 25 of the complaint that Mr. Greene's internet access should have been blocked, it demonstrates her lack of knowledge regarding the job for which she was hired.

36.    The Firm has always blocked the Internet for certain types of websites and content. I heard Ms. Fernandez mention this many times in front of staff and the procedure for requesting the unblocking of a specific website needed for our business. Not only were the types of content that Mr. Greene was accused of exhibiting in the office on his computer not accessible as a result of the Sonicwall content filter, an exhaustive review of all of the websites that he did access over the period of time that Ms. Fernandez was

9

employed by the firm, shows that no websites of the type complained of were ever accessed by him. See Exhibit 4 annexed to the affidavit of Benjamin Serebin.

37.    The Plaintiff's claim that she was not supported by her employers cannot be further from the truth. As Ms. Fernandez's direct supervisor, I supported her in her efforts to organize the staff. I met with her almost daily in order to make suggestions, so as to maximize the possibility of her success at the Firm.

38.    Plaintiff's action and conduct during her employment and in the days that followed her termination highlight that the claims of wrongdoing and racial harassment asserted in the Complaint never happened and were only created AFTER her employment ended.

39.    Shonda Fernandez came to work for Wenig Saltiel LLP in August 2018 as an employee of Essex Temporary Services. She was personally interviewed in our offices, her race was known to us prior to her employment, and did not dissuade us in any way from asking her to join the Wenig Saltiel LLP team.

40.    A resume was presented to us by Essex and then an identical copy was given to me by Ms. Fernandez during her interview. What we did not know at the time, was that Plaintiff's resume contained significant false information regarding her prior employment. Specifically, while Ms. Fernandez represented on her resume that she worked for Cindy Sanchez for five (5) years, it was untrue.

41.     I learned during this lawsuit from the Firm' prior counsel, who had a relationship with a former employer of Plaintiff, was that she did not work in a law firm that was owned or operated by Cindy Sanchez. Contrary, and which became abundantly clear during Plaintiff's examination is that instead of being employed by Cindy Sanchez, she had been employed by the Law office of David Hernandez in the same building we occupied.

42.     More troubling to me is that when I asked for references prior to hiring the Plaintiff, Cindy Sanchez was one of the references I was given. When I spoke with Ms. Sanchez, she represented (falsely) to me that Ms. Fernandez was employed by her thus concealing the employment by the law offices of David Hernandez.

43.     Ms. Fernandez's practice of false and deceptive information in her resumes apparently has gone beyond her employment at Wenig Saltiel LLP. On a subsequent resume, Ms. Fernandez represented when she was employed at Wenig Saltiel LLP, she performed the following duties: manage day to day operations of the firm, onboarding/offboarding of all employees, addressing all credit hold issues in light of work duties, payroll with bookkeeper, maintain office manual, reviewing retainers making sure retainers are done timely and properly on all cases, generating task spreadsheet, maintain trial spreadsheet, tracking malpractice list, liaison between clients and staff, managing/overseeing the process of bookkeepers collecting monies due, monthly partners meetings to determine the status of the firm and which change is needed, managed business functions for the firm, security of the firm, assigning work to support staff, forecasting/advising firms partner on financially feasible decisions on the firm's needs. Exhibit 12. In fact, she did

not perform any of these duties, nor were they part of her job description at Wenig Saltiel LLP. See Exhibit 13

44.    Ms. Fernandez' allegation that she was not supported by her employers, and was discriminated against based upon her race, is fanciful fiction. One need only look at the situation with her hiring that took place during the first few weeks to know that nothing could be farther from the truth.

45.    Our arrangement with Essex Temporary Services, the Agency that referred Ms. Fernandez to us, was that the firm would pay Essex and Essex would pay Ms. Fernandez for the services that she rendered to the Firm. At the time of the first pay period two situations presented themselves. First, Essex charged the firm more than the agreed-upon amount. Secondly, Ms. Fernandez advised me that she was not being paid by Essex. I contacted the representatives at Essex to inquire as to why Ms. Fernandez was not being paid as I did not approve of anyone in our employ being expected to perform job duties while not being timely compensated.

46.    As the Firm was unable to immediately resolve either situation with Essex, I made the decision to subsequently pay Ms. Fernandez directly, so that she would not be without a weekly paycheck, and then to sort out any financial issues with Essex at a later time. In order to do this, I asked Ms. Fernandez to write and sign a statement that she was not paid by Essex for the period that she worked. I used this statement as the basis to justify paying her directly. While she prepared and signed such a statement, which I saw, upon

her termination the statement was missing from her personnel file.

47.     Within the first few weeks of Ms. Fernandez's hiring, Ms. Wenig and I were receiving verbal complaints from several employees (who happened to be black) who felt they were being treated with disrespect. When we spoke with Ms. Fernandez regarding these complaints, she said that the staff had enjoyed too much freedom and needed to be more "corporate".

48.     As I observed, her issues with staff often stemmed from the manner in which she spoke to them as her management style was somewhat aggressive and often not well received. One thing that is clear is that any discord she had with employees at the firm was as a result of her tone and attitude and had nothing whatsoever to do with race or any other discriminatory factor.

49.     We lost several good employees starting in October 2018, specifically, because of Ms. Fernandez as the emails and the other evidence show. Not one of those persons, most of whom were black, mentioned anything other than the behavior of Ms. Fernandez as the reason for leaving.

50.     During Plaintiff's hiring interview, every partner meeting she attended, and other meeting that I or Ms. Wenig had with Ms. Fernandez both Ms. Wenig and I made it abundantly clear that the office manager's primary responsibility was to ensure that our staff timely completed the work of the Firm and the duties assigned to them.

51.     To accomplish this goal, Plaintiff had at her disposal numerous reports which were automatically emailed to her on a daily or weekly basis, as well as several meetings per week with Ms. Wenig and myself in order to answer questions and clarify issues. Her failure to accomplish this efficiently and timely was one of the major reasons for her termination of employment.

52.     In 2018, employment laws were changed to the extent that they required sexual-harassment training to take place annually in the workplace. After discussing these new requirements with Ms. Fernandez and how we would comply with them, she took it upon herself to be trained as a trainer so that she could conduct the harassment training with our employees. As a result, I am personally aware that she was familiar with the applicable employment laws and all of our office policies regarding harassment.

53.     In preparing the harassment training, the office policy, and the related forms, Ms. Fernandez did not limit the scope to sexual-harassment issues, but rather made a full circle presentation with supporting materials to cover all employment discrimination issues.

54.     I have reviewed our files as well as the documents produced by the Plaintiff during this lawsuit. Although Plaintiff was aware of the office procedures as the result of preparing the harassment training, procedures which included clear and mandatory policies of putting complaints in writing, and despite personally conducting a thorough search of our

records, I did not find one single written complaint from plaintiff. See Exhibit 12 – Harassment procedures created by Plaintiff.

55.     Ms. Fernandez knew the policy and procedure for reporting complaints since she created it herself. Notably, she delivered written warnings to several employees, and inserted them in their personnel files.

56.     I was present during the entire harassment training session and heard everything that took place. Ms. Fernandez's claim that Mr. Greene made discriminatory comments is false and an outright lie. Had Mr. Greene made even one of the comments that Ms. Fernandez attributed to him, I would have taken swift and appropriate action to deal with it. However, given that no such comments as Ms. Fernandez describes were made, there was no reason to take such action.

57.     Although not an employee, Ms. Fernandez invited Mr. Greene to participate in the training because, given his age he could present a different perspective as to what society previously accepted as appropriate as opposed to what many of the younger staff members have experienced. His comments were strictly academic in nature, and the only opinion he expressed was that modern-day standards were more appropriate than what was acceptable many years ago; to wit: discriminatory treatment of minorities and females.

58.    Despite Ms. Fernandez's claim that Ms. Wenig assigned her more than 30 cases, such only highlights her lack of job performance. I was the one who assigned the cases to her and met with her and repeatedly reminded her verbally, in emails, and during meetings that one of her primary duties for which she was hired was to keep track of the outstanding papers and follow up on them so deadlines were not missed, which she was not doing. She was assigned those cases by me to track down missing information which she repeatedly failed to do. The cases needed administrative follow-up and not legal work.

59.    After some time it became clear that Ms. Fernandez did not know how to use the computer system and was delegating her tasks to avoid having to deal with them. When she was given reports to correct wrong entries, and despite explicit directions to do so promptly, Ms. Fernandez failed to do so week after week. As a consequence of her failure to correct the entries, information in our case management system remained wrong for many weeks at a time.

60.    As the notes in my notebook (which is kept contemporaneously when I meet with people or take calls) from August 22, 2018 and January 22, 2019 show, I had several conversations with Ms. Fernandez and advised her that she was failing to correct entries, delegating her tasks, and not properly discharging her duties as office manager. See copies of Jeffrey Saltiel's notebook entries as Exhibit 14 which references performance deficiencies. However, her performance did not improve.

61.     In fact, after several months, it became more apparent that Ms. Fernandez was not properly discharging her obligations and I scheduled a meeting with her, Ms. Wenig and Ms. Freckleton for January 28, 2019. We discussed many issues at that meeting, and at the conclusion, I asked Ms. Fernandez to draft a summary with the takeaways from the meeting and to distribute it to the 4 people who attended.

62.     By February 12, 2019, Plaintiff still failed to draft a summary which forced me to do so myself. A copy is annexed as Exhibit 15. The primary objective for her, as detailed in the meeting and the synopsis thereof, was for her to follow up on employee tasks so that they would be performed promptly and efficiently.

63.     Subsequent to that meeting, I met or spoke with Plaintiff on February 5, 2019, February 15, 2019, February 18, 2019, and February 27, 2019 to advise her that she still was not meeting the goal of updating records and having staff perform their duties.  See Exhibit 16.  Despite those meetings, the situation did not improve.

64.     Of note is that by this time many of our staff were emailing us that Ms. Fernandez was not doing her job. See email of February 14, 2022 annexed as Exhibit 17.

65.     Additionally, rather than perform work in her job description as office manager, and contrary to the directions given by myself and Ms. Wenig, Ms. Fernandez would repeatedly assign her duties to clerks in the office. See emails annexed hereto as Exhibits 18 and 19.

66.    A weekly report would automatically generate and be emailed to the partners and Ms. Fernandez that we referred to as the non–CTA report (Because it would list all undone tasks in the office, except court appearances). Ms. Fernandez would review the reports with Ms. Wenig weekly and handwritten mark-ups were made that needed to be made in the case management system to the events contained in the report.

67.    Unfortunately, week after week, the updates were not made by Ms. Fernandez, as is shown by the marked up reports from week to week. See Exhibits 3, 4 and 5 annexed to the affidavit of Meryl Wenig.  Ms. Fernandez's failure to correct case information, her continued failure to follow up on court filings and to not know the basics of the case management system became more evident and problematic.

68.    Ms. Wenig objected to the fact that she regularly had to correct Ms. Fernandez's mistakes. I spoke with Ms. Fernandez and impressed upon her the serious nature of her constant failure perform her responsibilities accurately and timely but the situation did not improve.

69.    A significant part of the failure of Ms. Fernandez's performance as office manager during the end of 2018 and in the beginning of 2019, was her failure to update case notes in the office database.

72.    Ms. Fernandez was also told during her December 2018 performance review that she was

18

not performing the job sufficiently and needed to really focus on her duties and arrange for extra training as necessary. She was also told that her way of talking to people was often condescending. It should be noted that she raised no issue of any hostility or racial issue, or any complaints about Mr. Greene during her performance review.

73. Likewise, during her employment, although Ms. Fernandez sent me numerous emails, not one of these emails had a complaint or any claim of racial discrimination, or improper activity by anyone.

74. Additionally, at the end of the year, Ms. Fernandez began a practice of leaving the office for many hours in the afternoon at times when Ms. Wenig and I were not present, and then on other days unilaterally decided to work from home without permission, thereby preventing her from properly supervising staff in the office.

75. The Plaintiff's claim that Ms. Wenig was on the 'warpath' in January 2019 is an exaggeration of the numerous reiterations by me and Ms. Wenig regarding our displeasure with her lackluster job performance and failure to understand the Firm's database.

76. The firm conducted monthly partner meetings during Ms. Fernandez's employment as the office manager. She would confirm the date and time, arrange an off premises location for each meeting, and then circulate the agenda. While the agendas at times mentioned a discussion regarding Ira Greene, these were about the date he would be moving out of the

office as a result of the aforementioned business issue. Not one of the agendas, including the agendas which bear Ms. Fernandez's handwritten notes from the meeting, list any of the specious claims which are alleged in the instant lawsuit. See Exhibit 11.

79.    Despite this, Ms. Fernandez's claims that there was hostility or racial discrimination in the office are belied by the February 2019 text and email communications between Ms. Fernandez and Ms. Wenig regarding some health concerns of Ms. Fernandez.

80.    As the communications evidence, Ms. Wenig responded to Ms. Fernandez' questions and offered advice and support regarding a claimed medical issue. Markedly, Ms. Wenig made it a point when leaving for vacation on February 22, 2019 to email Ms. Fernandez from the airport to wish her luck at the doctor.

81.    The text messages between Ms. Wenig and Ms. Fernandez up until the date of firing evidence the support Ms. Fernandez received from her employer.

84.    Given her failures in performance, Ms. Wenig and I made the decision to terminate Ms. Fernandez's employment as of March 1, 2019 (and not on February 27th 2019, as alleged in the complaint) and since she chose to not come to work that day, unilaterally deciding that she would work from home, the conversation took place by phone.

85.    When I advised Plaintiff her employment was terminated, she repeatedly urged me to change my mind and let her continue as office manager as she loved the job and had no

doubt that she could "turn it around" and make it succeed. I refused to change our decision.

86.     Immediately prior to the conversation, as she was not present in the office, I terminated her remote access to the office computer system.  During our conversation, she informed me that she had some notes regarding some work that she did over the last day and just wanted to add them into the office computer system so that our records were accurate. What she did was convince me to restore her access for a portion of that day.  What a mistake I made!

87.     Several days after terminating her access again, I learned that during the period on March 1, 2019 when she was allowed back into the system, she proceeded to send 228 emails to her personal email address (Shondafernandez2389@gmail.com) and deleted every single document in her directory and 9410 emails in her email account.  (See affidavit of Benjamin Serebin).

88.     Although Ms. Fernandez claimed, when deposed, that she did not send these emails from the office to her personal account, the documentary evidence shows they were all sent from her law firm email address to her personal email on March 1, 2019, the day her employment ended.

89.     As Ms. Fernandez was undoubtedly aware, and because it had been discussed many times, the office computer system had both on-site and off-site backup systems in place.

As such, we were able to not only restore all of the emails and documents that she deleted, but viewed the proof of how she attempted to destroy the Firm's data. See affidavit of Benjamin Serebin.

90.   Upon restoring the emails I noticed that most of the emails she would receive while at work or sent out during her employment or forwarded to her personal email account on March 1, 2019, were for shopping or real estate investments.

91.   Ms. Fernandez and I had considerable text exchanges in the days subsequent to her termination, which focused upon outstanding vacation days and severance pay but do not refer to any of the claims made in this action.  See Exhibit 20.

92.   Plaintiff's claim of not properly receiving notice of COBRA insurance is baseless. Notification must be sent to the terminated employee within 30 days of the date of termination, and then they have a 60 day window period to opt into the COBRA insurance.

93.   The Firm timely sent notification to Ms. Fernandez by certified mail on March 14, 2019. See Exhibit 21.  It is absolutely appropriate to terminate health insurance coverage on the day an employee's employment is terminated.  Thereafter insurance can be reinstated retroactively during the 60 day window period under COBRA rules.  Contrary to Ms. Fernandez's claim, the firm never pays for 30 days of insurance for any employee after termination.

94.   Plaintiff's action and conduct during her employment and in the days that followed her
      termination highlight that the claims of wrongdoing and racial harassment asserted in the
      Complaint never happened and were only created AFTER her employment ended.

95.   It is painfully apparent from the numerous fictions that comprise the complaint that
      Plaintiff is desperate to embarrass and humiliate the Firm for terminating her
      employment.

96.   The laws regarding hostile work environment and racial discrimination were designed to
      protect employees from unscrupulous employers, not to embolden Plaintiff, an employee
      whose employment was properly terminated for poor job performance, to create works of
      fiction for financial remuneration.

      Wherefore, based on the foregoing it is submitted that the instant motion should be
granted in all respects together with such other and further relief which this Court deems just in
the circumstances.

Dated: March 24, 2023                          /s     Jeffrey Saltiel
                                                     _____
                                                      Jeffrey Saltiel