UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHONDA FERNANDEZ
                    Plaintiff,

            -against-

WENIG SALTIEL LLP, IRA GREENE, JEFFREY L.
SALTIEL, MERYL L. WENIG
                    Defendants.

Civil Action No.:19cv1979

Movant's Rule 56.1
Response to Plaintiff's Counter
Statement of Facts

Pursuant to Local Rule 56.1 of the United States District Court for the Eastern District of

New York, Defendants Wenig Saltiel LLP, Jeffrey L. Saltiel, and Meryl L. Wenig ("Moving

Defendants") submit that the following responses to Plaintiff's Rule 56.1 Counter Statement of

Facts.


**PLAINTIFF STATES:**

1. Plaintiff was hired as an office manager and began working at Defendant Wenig Saltiel in or

around August of 2018. (Exh. A, Fernandez Dep. 53:11)


    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** for the purposes of the motion for Summary Judgment. Technically, she

    was initially hired by a third party staffing agency. [Fernandez 3/8 39:17-23]. She became

    a directly employee in September of 2018.


**PLAINTIFF STATES:**

2. At all times relevant, Plaintiff was employed at Wenig Saltiel as an Office Manager (Exh A.

Fernandez Dep. 75:14).

**DEFENDANTS RESPOND:**

**NOT DISPUTED** for the purposes of the motion for Summary Judgment. See Answer to Number 1 Regarding her start date. She was terminated on or about March 1, 2019. Throughout her employment her title was office Manager.

**PLAINTIFF STATES:**

3. Defendants' law firm was previously called "Wenig, Saltiel and Greene" and Defendant Ira Greene was a partner therein (Exh E., Saltiel Depo. 14-15). Defendant Greene ceased being a partner with the firm in the year 2009 (Id.)

**DEFENDANTS RESPOND:**

**NOT DISPUTED**.

**PLAINTIFF STATES:**

4. A few years later, Defendant Greene returned to the Wenig Saltiel firm looking for an office (Exh E., Saltiel Depo. 17:18 - 18). As per Defendant Saltiel, "*we told him, 'we won't rent you an office, we will give you an office' and we made an arrangement where [Defendant Greene] would refer work to the firm*." (Id. 18)

**DEFENDANTS RESPOND:**

**NOT DISPUTED** for the purposes of the motion for Summary Judgment.

**PLAINTIFF STATES:**

5. In the year 2015, Defendant Greene entered into a contract with Defendant Wenig Saltiel

wherein the parameters of his employment relationship were clearly laid-out (Exh. N, Wenig Saltiel Agreement with Greene, dated 5/28/2015)

**DEFENDANTS RESPOND:**

**NOT DISPUTED** that Defendant Green and Wenig Saltiel LLP entered into a letter agreement dated 5/28/2015. The Agreement speaks for itself. (Plaintiff's Exxon, Wenig Saltiel Agreement with Greene, dated 5/28/2015)

**PLAINTIFF STATES:**

6. The Agreement "*accurately reflected*" the business relationship between Defendants Wenig Saltiel and Defendant Greene at the time relevant to the Complaint in this Action (Exh E., Saltiel Depo. 17:18 - 18).

**DEFENDANTS RESPOND:**

**NOT DISPUTED** for the purposes of Summary Judgment that this agreement was intended to govern the relationship between Defendants Wenig Saltiel LLP and Defendant Greene. However, Plaintiff's own exhibits demonstrate that the relationship had broken down by February 12, 2019. (Plaintiff's Ex. O). As demonstrated therein, Jeff Saltiel and Meryl Wenig became aware of the fact that Defendant Greene was not acting in compliance with the agreement.

**PLAINTIFF STATES:**

7. Defendant Greene agreed to "**come work for**" Wenig Saltiel as "Of Counsel" to Wenig Saltiel (Exh N, Wenig Saltiel and Greene Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 61:11 and 62:18).

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel. **NOT DISPUTED** that the words "come work for" were included letter agreement dated 5/28/2015. The Agreement speaks for itself. (Plaintiff's Ex.N, Wenig Saltiel Agreement with Greene, dated 5/28/2015).

**PLAINTIFF STATES:**

8. When Defendant Greene Refereed foreclosures, which he did on a regular basis, Defendant Greene shared his fee with the Wenig Saltiel firm. (Exh B. Greene depo., 4/27/2021, 34:18 – 35:7). Defendant Greene stopped sharing fees with Wenig Saltiel after he *"stopped working with them."* (Id. 36:3) As per Defendant Greene, "I gave my former partners their share" whenever he earned legal fees for guardianship proceedings (Id. 39:4)

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment. As previously discussed in Defendants' response to number 6, Defendants eventually

discovered that Defendant Greene had not been complying with the terms of the Agreement. In addition, the agreement did not require him to share referee fees for any pre-existing work.

**PLAINTIFF STATES:**

9. As per Defendant Greene's testimony and admissions, Defendant Greene was "**working for [Wenig Saltiel]**."   (Exh B. Greene depo., 4/27/2021, 36:6).

> **DEFENDANTS RESPOND:**
>
> **NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** the Defendant Green testified in this manner.

**PLAINTIFF STATES:**

10. As per their agreement, Wenig Saltiel paid for all of Defendant Greene's overhead expenses (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 37:24 – 38:4).

> **DEFENDANTS RESPOND:**
>
> **NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment. However,

Plaintiff does misstate what the 5/28/2015 letter agreement actually states. It states that his office overhead would be covered and certain other expenses would be covered.

**PLAINTIFF STATES:**

11. As per their agreement, Wenig Saltiel Defendant Green brought clients into the firm and the parties agreed that Defendant Greene would be "exclusively" bringing clients into the firm (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 38:5).

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment. However, this is just one example of Plaintiff putting quotes around a word (and not even the version of the word quoted here) that only appears in a question Plaintiff's counsel asked Defendant Greene in the deposition. The word "exclusive" or "exclusively" does not appear in the letter agreement. The word "exclusive" does appear on line 38:5 of the deposition, however, that was not Mr. Greene speaking, it was Plaintiff's Counsel. This is not the only time in the statement of facts that Plaintiff quotes Plaintiff's Counsel's question from the Deposition in a manger that suggests it is quoting the person being deposed. The fact that Plaintiff felt the need to mislead the Court about the record in order to survive summary judgment evidences the weakness of support in the record for her claims.

**PLAINTIFF STATES:**

12. Defendant Greene could not bring in clients for other attorneys at other firms, nor could he bring in clients for himself, as per the agreement. Defendant Green could only work for Wenig Saltiel. (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 38:5-12).

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment. However, this is not a good faith interpretation of the letter agreement. For example it states, "If you're appointed as a fiduciary by the court after June 1, 2015, and a member of WS is appointed your counsel, then you shall receive 100% of the commission paid and WS shall receive 100% of all legal fees paid." Clearly this envisions his working as a

**PLAINTIFF STATES:**

13. As per the agreement between Wenig Saltiel and Defendant Greene, "any legal work (including fiduciary appointments) in which you are involved shall be brought to the firm where the firm is attorney of record and no other firm"(Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 64:12).

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that

Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment.

## PLAINTIFF STATES:

14. With regard to Defendant Greene's cases, Defendant Green gave Wenig Saltiel 80% of the proceeds earned from his cases. (*infra*) According to Defendant Greene, he gave Wenig Saltiel the proceeds from his cases and would "*only keep 20 percent of it.*" (Exh B. Greene Depo 4/27/21, 64:4 – 65:2). Defendant Greene explained, as an example: "*So I got a thousand dollars fee, I only kept 20 percent of it, that all.*" (Id.)

### DEFENDANTS RESPOND:

**NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment.

As previously discussed in Defendants' response to number 6, Defendants eventually discovered that Defendant Greene had not been complying with the terms of the Agreement. In addition, the agreement did not require him to share referee fees for any pre-existing work.

Furthermore, this was not true in all cases even under the letter agreement. For example the letter agreement states, "Any existing files you have where you are the court appointed fiduciary you shall continue to receive 100% of the commissions paid. If you're appointed as a fiduciary by the court after June 1, 2015, and a member of WS is appointed your

counsel, then you shall receive 100% of the commission paid and WS shall receive 100% of all legal fees paid." (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015).

**PLAINTIFF STATES:**

15. Wenig Saltiel paid for all of Defendant Green's continuing legal education (CLE) costs/expenses (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 38:13).

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

16. All of Defendant Greene's own existing cases at the time of the execution of the agreement had to be transferred to Wenig Saltiel. (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 38:25 - 39).

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment.

However, as the letter agreement states, this did not apply to cases that in which he was a court appointed fiduciary. "Any existing files you have where you are the court appointed fiduciary you shall continue to receive 100% of the commissions paid." (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015).

**PLAINTIFF STATES:**

17. Wenig Saltiel provided copying capabilities to Defendant Greene (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 39:14).

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

18. Wenig Saltiel provided a computer, with internet access, to Defendant Greene (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 40:14). Indeed, all of Defendant Greene's equipment in that office was supplied by Wenig Saltiel (Id. 40:18)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of

Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment**.**

**PLAINTIFF STATES:**

19. Wenig Saltiel paid for Defendant Greene's phone bill as well (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 40:25).

> **DEFENDANTS RESPOND:**
>
> **NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

20. As per their agreement, Defendant Green agreed "***to abide by all [Wenig Saltiel's] current office policies, including billing, as set forth in [their] office manual***." (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 41:25). Defendant Greene confirm that he was obligated to follow Wenig Saltiel's procedures and policies (Exh B. Greene Dep. 4/27/2021, 42:7).

> **DEFENDANTS RESPOND:**
>
> **NOT DISPUTED.**

**PLAINTIFF STATES:**

21. Defendant Green performed work, "editing services," for Wenig Saltiel with regard to their

legal documents and paperwork (Exh N, Wenig Saltiel and Green Agreement, dated 5/28/2015; Exh B. Greene depo., 4/27/2021, 62:21). Defendant Green admits that he may have performed this "editing services" work for the Wenig Saltiel firm (Exh. B, Green Depo. 4/27/2021, 62:6-10)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment.

The letter agreement with Defendant Greene provided for this, however in actuality Defendant Greene had stopped providing these services before Plaintiff joined the firm. (Plaintiff's Ex. B, Green Depo. 4/27/2021, 34:19-23)

**PLAINTIFF STATES:**

22. Defendant Greene also "*made court appearances for Wenig Saltiel if there was no one available to do it*." (Exh C., Greene Depo. 135:2)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment.

However, the record is clear that this didn't actually happen. For example in the Deposition, immediately after Mr. Greene stated the above he added, "but I can't even

remember doing that now." (Plaintiff's Ex. C, Green Depo 9/23/21, 135:6-7).

This is also disputed in three affidavits: Ira Greene Affidavit in Support ("Greene Aff") ¶¶ 9-10; Nicholas Moccia Affidavit in Support ("Moccia Aff") ¶¶ 8, 31; Natasha Mitchell Affidavit in Support ("Mitchell Aff") ¶ 18.


**PLAINTIFF STATES:**

23. The Agreement between Wenig Saltiel and Defendant Greene ended in the year 2019, after Plaintiff stopped working at Wenig Saltiel (Exh O, email from M. Wenig to Greene, dated 2/12/2019; *see also*, Exh E., Saltiel Depo. 20).


**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Defendants accept for the purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel and the specifics of that relationship are not necessary for the Court to determine in order to reach a conclusion on any of Plaintiffs claims. **NOT DISPUTED** for the purposes of Summary Judgment that the Agreement may technically have gone past the end of Plaintiff's employment.

However, Plaintiff again radically misconstrues the record she cites to support this "fact." As is clear from Plaintiff's Exhibits O and P, the functional relationship between Defendant Greene and Wenig Saltiel ended on or before February 12, 2019, while Plaintiff was still employed. Moreover, nothing that Defendant Saltiel testified to on page 20 of his deposition supports this statement of fact. Also see Plaintiff's 24 which affirmatively agrees with the position that the Agreement effectively ended on February 12, 2019 and Plaintiff did not dispute Defendants Number 23 which stated that Plaintiff was terminated on March 1, 2019. Thus, Plaintiff agrees the Ira Greene's relationship with Defendants

ended prior to her termination.

**PLAINTIFF STATES:**

24. The Agreement ended on February 12, 2019 only because Defendant Greene did not comply with the terms of the agreement. Specifically, according to Defendant Saltiel: "*Mr. Greene was taking on legal work outside of the firm. In other words, the obligation under the agreement was to refer all cases to the firm, of which he would have a participation fee. We learned that that was not happening. That part was breached.*" (Exh E., Saltiel Depo. 21:9 – 22; Exh O, email from M. Wenig to Greene, dated 2/12/2019).

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** the Defendant Greene's effective relationship with Wenig Saltiel ended on February 12, 2019.

**PLAINTIFF STATES:**

25. While Plaintiff was interviewing for the office manager position at Wenig Saltiel, Plaintiff appeared at the Wenig Saltiel office on three separate occasions and engaged in three separate interviews. (Exh A., Fernandez Dep. 71 – 72)

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL** as none of Plaintiff's claims relate to the interview process. **NOT DISPUTED** for the purposes of summary judgment.

**PLAINTIFF STATES:**

26. During the first interview, Plaintiff met/interviewed with Defendant Saltiel alone (Exh A. Fernandez Dep. 71 – 72). During her second interview, Plaintiff met/interviewed with Defendants Jeffery Saltiel and Meryl Wenig together. (Exh. A 72:2-6).

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL** as none of Plaintiff's claims relate to the interview process. **NOT DISPUTED** for the purposes of summary judgment.

**PLAINTIFF STATES:**

27. During Plaintiff's third interview with Wenig Saltiel, Plaintiff met/interviewed with Defendants Jeffery Saltiel and Ira Greene (Exh A. Fernandez Dep. 72:18-23 and 271-272; Exh. AA, Fernandez Declaration ¶¶3-7).

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL** as none of Plaintiff's claims relate to the interview process. **NOT GENUINE.** Plaintiff's claim here is completely unsupported outside of her own claim. Defendant Greene has stated that he did not interview Plaintiff. Greene Aff ¶ 6. Both Ms. Wenig and Mr. Moccia affirmed that Defendant Greene was not involved in the hiring process. Meryl Wenig Affidavit in Support ("Wenig Aff") ¶ 10. And most telling, even when Ira Greene was a partner, he did not interview a candidate for the position of his own assistant, instead Ms. Wenig did. Mitchell Aff ¶ 16.

**PLAINTIFF STATES:**

28. During the interview involving Defendant Greene, Defendant Green, "*was holding Plaintiff's resume, he was reviewing it and the final thing he said to [Defendant Saltiel], right before he removed his glasses, he said, 'She looks real good'*" (Exh A. Fernandez Dep. 272-273) Defendant Greene was an active participant in the interview (Id. at 273)

     **DEFENDANTS RESPOND:**

     **NOT MATERIAL** as none of Plaintiff's claims relate to the interview process. **NOT GENUINE.** See Defendant's response to Number 27.

**PLAINTIFF STATES:**

29. Plaintiff did not meet with any other members or employee of the Wenig Saltiel law firm during these interviews. (Id., *see also,* Exh. AA, Fernandez Declaration ¶¶3-7)

     **DEFENDANTS RESPOND:**

     **NOT MATERIAL** as none of Plaintiff's claims relate to the interview process. **NOT DISPUTED** for the purposes of summary judgment. As it turns out, Defendants reviewed their records and found that a third interview was conducted by a Junior Partner at the time, Jason Fink. The records indicate that he conducted this interview alone. However, as that evidence is not in the record and this is not material to the resolution of the claims, the Court can accept this statement as true.

**PLAINTIFF STATES:**

30. After the third interview meeting involving Defendant Greene, Plaintiff was hired the next day.

(Exh A. Fernandez Dep. 274:14; Exh. AA, Fernandez Declaration ¶7)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as none of Plaintiff's claims relate to the interview process. **NOT GENUINE.** See Defendant's response to Number 27.

As stated in response to Number 28, the third interview was conducted by Jason Fink. Defendant's records do support the contention that the day after this third interview, Mr. Saltiel informed the staffing company that they should arrange to hire Plaintiff to provide services to Wenig Saltiel.

**PLAINTIFF STATES:**

31. When Plaintiff met with Messrs. Saltiel and Greene, Defendant Saltiel introduced Defendant Greene to Plaintiff as, "*one of the original owners of the firm.*" (Exh A. Fernandez Dep. 73:5 – 74:12)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as none of Plaintiff's claims relate to the interview process and Plaintiff alleges this occurred during the interview process. **NOT GENUINE** as Plaintiff alleges this occurred during an interview that did not happen. See Defendant's response to Number 27.

**PLAINTIFF STATES:**

32. The alleged "timesheets" upon which Defendants rely in their motion has the name "Wenig Saltiel & Green LLP" thereon. Some of Defendants' own documents reference Defendant Green

as a Partner. (See Exh Z, "Wenig Saltiel & Green LLP, Employee Timesheet Analysis")

**DEFENDANTS RESPOND:**

**NOT DISPUTED**.

**PLAINTIFF STATES:**

33. During her employment, it was Plaintiff's understanding that Defendant Greene, "*is basically the same level as [Defendants Wenig and Saltiel] as far as running the office*." (Exh A. Fernandez Depo. 248:3 – 249:6)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as even if this was true, it would not effect the determination of the Court on the issues presented in Summary Judgment, as whether Defendant Greene's role at the firm is not dispositive on any issue before the Court. **NOT A GENUINE DISPUTE OF FACT.** This claim is belied by the testimony of every witness in the case besides Ms. Fernandez. See e.g. Carleen Freckleton Affidavit in Support ("Freckleton Aff") ¶¶ 19-20 ("The claim that Ira Greene had a supervisory role at the firm and was involved with the interview process is simply false. He had no role whatsoever. All administrative matters were directed to Jeff Saltiel and all court and paper issues were directed to Meryl Wenig All of the staff knew and had been advised that Ira Greene simply occupied an office and that they did not work for him and were to take no direction from him."); Mitchell Aff ¶¶ 16-18 ("I never saw Ira Greene act in any manner to suggest that he had authority in the office"); Greene Aff ¶¶ 9-10; Wenig Aff ¶¶ 8-9; Moccia Aff ¶¶ 7-9.

Plaintiff's testimony on Defendant Green's role in the firm during her deposition

contradicts the knowledge she previously demonstrated. Plaintiff testified in her deposition

as follows:

Q. Would you agree with me [Saltiel] did not refer to [Greene] as a member because, in
fact, Mr. Greene wasn't a partner or a shareholder in Wenig Saltiel LLP?
A. I do not agree.
Q. What was he then?
A. Jeffrey Saltiel explained to me that Ira Greene was one of the original owners of the
firm.
Q. Did he at some point in time give up being a member of the firm and become of counsel
to the Law Office of Wenig Saltiel?
MR. CALLISTE: Objection, you can answer if you know, obviously.
A. I have no knowledge of this.
Q. When you were working at Wenig Saltiel, you were the office manager; correct?
A. Yes.
Q. While you were, working as the office manager at Wenig Saltiel, was it your
understanding that Ira Greene was of counsel to the Law Office of Wenig Saltiel?
A. No.
Q. That was not your understanding?
A. No.
Q. Were you responsible for updating the letterhead of Wenig Saltiel as office manager?
A. Yes, I was.
Q. Do you recall actually updating the letterhead while you were employed as the office
manager?
A. I'm sorry, I don't recall.
Q. If I told you that the letterhead during that tenure listed Ira Greene as of counsel, does
that refresh your memory?
A. No, it does not.

(Plaintiff's Ex. A, Fernandez Dep 3/15/2021 74:22 – 76:15).

This testimony is contradicted my information she was clearly aware of when the

Complaint was drafted:

"Mr. Greene is Wenig Saltiel LLP's former owner and partner." Complaint ¶14.

"Following a hostile takeover of the business, Mr. Greene was stripped of his title and

demoted to 'Of Counsel.' In this capacity, he answered (and continues to answer)

exclusively to Mr. Saltiel and/or Ms. Wenig." Complaint ¶15.

Moreover, Plaintiff's Exhibits O and P belie the argument that she didn't know that Mr.

Greene was not treated on the same level as a Wenig and Saliel.

The various contemporary records attached Plaintiff's Motion for Summary Judgment demonstrate that no one in the office believed that Ira Greene was a partner. For example he is not included on the email of either resignation letter sent while he was there, one of which Plaintiff was cc'd on. See Jeffrey Saltiel Affidavit in Support ("Saltiel Aff") Exhibits 3 and 4. He did not occupy one of the larger corner offices in the firm. Salitel Aff Exhibit 6. Defendant Greene did not partner meetings nor performance reviews for Plaintiff. See e.g. Saltiel Ex. 11 and 15. See also Plaintiff's Ex. A, Fernandez Dep 3/15/2021, 257: 16 – 19.

**PLAINTIFF STATES:**

34. During her employment, Plaintiff was told/warned, by Defendant Saltiel, "*[Defendant Greene] is a fixture here. He is not going anywhere. [Defendant Wenig] will never allow that to happen. Be very careful because if he gets in the ear of [Defendant Wenig], then [Wenig] will put you out.*" (Exh A. Fernandez Depo. 250:2-16).

**DEFENDANT RESPONDS:**

**NOT MATERIAL** as even if this was true, it would not effect the determination of the Court on the issues presented in Summary Judgment, as whether Defendant Greene's role at the firm is not dispositive on any issue before the Court. **NOT A GENUINE DISPUTE OF FACT** for the same reasons as provided in response to Number 33.

**PLAINTIFF STATES**:

35. To Plaintiff, Defendant Saltiel's warning to Plaintiff was "*very, very clear . . . as to who [Defendant Greene] was inside the firm.*" (Exh A. Fernandez Depo. 250:23 – 251:3).

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as even if this was true, it would not effect the determination of the Court on the issues presented in Summary Judgment, as whether Defendant Greene's role at the firm is not dispositive on any issue before the Court. **NOT A GENUINE DISPUTE OF FACT** for the same reasons as provided in response to Number 33.

**PLAINTIFF STATES:**

36. Defendant Greene was also able to affect who remained employed at Wenig Saltiel and caused other employees to be terminated (Exh A. Fernandez Depo. 252-255).

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Plaintiff admits in Number 24 that Defendant Greene's relationship ended prior to Plaintiff's termination. **NOT A GENUINE DISPUTE OF FACT** for the same reasons as provided in response to Number 33.

**PLAINTIFF STATES:**

37. Defendant Greene also gave Plaintiff work and assignments to complete during the workdays, "*everyday*," including "*calling the banks, speaking with his clients, the list just went on and on and on, as far as his cases were concerned.*" (Exh A. Fernandez Depo. 256).

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as even if this was true, it would not effect the determination of the Court on the issues presented in Summary Judgment, as whether Defendant Greene's role at the firm is not dispositive on any issue before the Court. **NOT A GENUINE DISPUTE**

**OF FACT** for the same reasons as provided in response to Number 33. In addition this is belied by the only time sheets of Plaintiff that are in the record, in which the words "Greene" "Ira" and/or "IG" do not appear once. Saltiel Aff. Ex. 10. Moreover, the document discussing the takeaways from the January 28, 2019 meeting about Plaintiff's shortcomings do not mention Defendant Greene once. Saltiel Ex. 15.

**PLAINTIFF STATES:**

38. Plaintiff did not work with, or for, other attorneys in the office as much as she worked for Defendant Greene (Exh. A, Fernandez Depo, 257:3)

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL** as even if this was true, it would not effect the determination of the Court on the issues presented in Summary Judgment, as whether Defendant Greene's role at the firm is not dispositive on any issue before the Court. **NOT A GENUINE DISPUTE OF FACT** for the same reasons as provided in response to Number 33 and 37.

**PLAINTIFF STATES:**

39. Plaintiff sat in an office right next door, directly next to Defendant Greene's office, a few feet away. There were no offices in between Plaintiff's and Defendant Greene's (Exh A. Fernandez Dep. 275:13; Exh C., Green Depo. 9/23/2021, 7:15-22)

    **DEFENDANTS RESPOND:**

    **Not Disputed**.

**PLAINTIFF STATES:**

40. During Plaintiff's first week working at Wenig Saltiel, "*[Defendant Greene] sat in [Plaintiff's] office and began to tell [Plaintiff] about his relatives who, to this day, sat on their porch in Virginia with their shotguns just like the good old days, they're 'good old boys' is what he called them. And [Defendant Greene] continued to talk about what goes on there in the south.*" (Exh. A, Fernandez Depo 259 – 260). Plaintiff felt the need to stop Defendant Green from discussing that subject at that time (Id.)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT**. Plaintiff's claims that Defendant Greene engaged in such blatant racism is disputed by every other witness who is prepared to testify at trial. For example, Natasha Mitchell, Nathaniel Farley, Angelyn Johnson, and Carleen Freckleton are all former employees of Wenig Saltiel who are black and dispute having every observed the type of behavior described by Plaintiff in this and each other paragraph alleging racist behavior by Defendant Greene. See e.g. Mitchell Aff ¶ 13 ("I never heard Ira Green make any racial or ethnic slurs or comments of the type set forth in the complaint."), Nathaniel Farley Affidavit in Support ("Farley Aff") ¶ 13 ("In the decade I worked for the Firm, I have never witnessed any of the racial behavior that Shona Fernandez claims existed and believe she crafter these claims after she was fired simply to extort monies."); Angelyn S. Johnson Affidavit in Support ("Johnson Aff") ¶ 14 ("At no time did I ever witness Ira Green engage in any of the conduct that Plaintiff describes in her complaint."); Freckleton Aff ¶ 9 ("I have read the Complaint and find the claims of hostile work environment based on race and her description of events to be lies.").

And of course, Defendant Greene absolutely denies that these events took place. Greene

Aff ¶ 13-14.

**PLAINTIFF STATES:**

41. Plaintiff did not want to discuss "*racism or race*" with Defendant Greene. So, she ended the discussion (Exh. A, Fernandez Depo. 260).

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons as stated in response to Number 40.

**PLAINTIFF STATES:**

42. Plaintiff then immediately spoke to Defendant Saltiel about Defendant Greene's statement as Plaintiff believed they had racial connotations (Exh. A, Fernandez Depo 260:17-23).

    **DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons as stated in response to Number 40. Additionally, other than the one incident in early December, nothing supports the contention that Plaintiff spoke to Defendant Saltiel about any other alleged incidents. Moreover, because Mr. Saltiel responded to Plaintiff's complaint in early December – holding a meeting with the partners and Mr. Greene and Plaintiff to investigate and resolve the incident, it further supports the contention that his supposedly flippant responses to Plaintiff's alleged prior complaints never occurred. Mr. Saltiel directly disputes this allegation in paragraph 22 of his Affidavit in support.

**PLAINTIFF STATES:**

43. Plaintiff raised concerns with Defendant Saltiel and, "*reiterated exactly what [Defendant Greene] said . . . and told him . . . that was very disturbing and I didn't understand what was going on.*" (*infra*) In response, Defendant Saltiel told Plaintiff to "*just put [Defendant Greene] out of your office . . . I'll speak to him but you will get to know old Ira'*." (Exh. A, Fernandez Dep. 261:6)

      **DEFENDANTS RESPOND:**

      **NOT A GENUINE DISPUTE OF FACT** for the same reasons as stated in response to Number 40 and 42.

**PLAINTIFF STATES:**

44. Plaintiff wanted Defendant Saltiel to ensure her that Defendant Greene would not have such discussions with Plaintiff again. Instead, Defendant Saltiel "*laughed and downplayed it.*" (Exh. A, Fernandez Dep. 262:11 - 263) To Plaintiff, Defendant Saltiel "*did not take it seriously.*" (Id. 263)

      **DEFENDANTS RESPOND:**

      **NOT A GENUINE DISPUTE OF FACT** for the same reasons as stated in response to Number 40 and 42.

**PLAINTIFF STATES:**

45. Plaintiff explained that she told Defendant Saltiel: "*that was very offensive to be told that people are sitting on porches with shotguns like the good old days. It's very offensive to me. Speaking about the confederate flag flying high. I told Jeffrey, 'that's unacceptable',*" It's

*unacceptable. And the only thing that I was told, while laughing, was to put him out of your office.*

*Put him out of your office, is what I was told*." (Exh. A, Fernandez Dep. 264:5)


**DEFENDANTS RESPOND:**

Plaintiff did testify to as stated but her testimony is **NOT A GENUINE DISPUTE OF FACT** for the same reasons as stated in response to Number 40 and 42.


**PLAINTIFF STATES:**

46. When asked about other instances of Defendant Greene's discriminatory conduct, Plaintiff responded: "*There were just so many. I mean, there was just so much that was going on*." (Exh. A, Fernandez Dep. 265:5)


**DEFENDANTS RESPOND:**

Plaintiff did testify to as stated but her testimony is **NOT A GENUINE DISPUTE OF FACT** for the same reasons as stated in response to Number 40 and 42.


**PLAINTIFF STATES:**

47. Plaintiff and Defendant Greene had non-work-related discussions about politics, including discussions about (then) President Trump and also about a senator from New Jersey (Exh C., Greene Depo 9/23/2021, 139:25 - 141)


**DEFENDANTS RESPOND:**

**NOT DISPUTED** that Ira Greene testified as follows:

Q. Okay. You ever have those discussions with Ms. Fernandez on any other occasions other than that first time that you just described?

A. No. There was something that was in the news about the upcoming election or whatever, and she talked about she wanted to know my opinion about a senator from New Jersey, and I said he's got a good future. That's what I said, you know. And we talked a little bit about that. We both didn't like Donald Trump very much, and that was that.

**PLAINTIFF STATES:**

48. When asked if he ever made derogatory comments to Plaintiff about foreign attorneys and their (alleged) lack of skill in certain areas of law, Defendant Greene responded: "***I don't think I ever said that directly to her***." (Exh C., Greene Depo. 143:17 and 144:5-10)

**DEFENDANTS RESPOND:**

**TESTIMONY OUT OF CONTEXT.** Below is the context by which Mr. Greene made this statement:

Q. Okay. And earlier you described a conversation you had with Ms. Fernandez about landlord-tenant being a complex area of law. Do you recall just talking about that a moment ago?
A. Yes.
Q. Okay. And was the subject of attorneys who may not be -- withdrawn.
Had the subject about foreign attorneys or attorneys born in other countries come up during those discussions about how complex landlord-tenant law is?
MS. FISHER: Objection.
THE WITNESS: I said I live in a neighborhood that's a very interesting neighborhood. It's the largest neighborhood of Indians from Gujarat in India. They're business-oriented people, and there are quite a few lawyers that practice in the area and they do everything for their clients. They offer full services in all kinds of areas, including landlord-tenant.
BY MR. CALLISTE:
Q. Okay. And did you tell Ms. Fernandez whether you had an issue with those attorneys and their skill sets?
MS. FISHER: Just hold on. There's a lag.
THE WITNESS: I never had an issue with any attorney there.
BY MR. CALLISTE:
Q. Okay. My question, did you discuss the skill of those, we'll just say, East Indian attorneys and their ability to practice in landlord-tenant court?
MS. FISHER: Objection.
THE WITNESS: I said that when I started practicing many years ago, you could be a jack of all trades, but it's pretty hard to do that today.
BY MR. CALLISTE:
Q. Okay.

A. And that sometimes lawyers take on landlord-tenant cases when they don't know the law very well, and Wenig Saltiel winds up inheriting a lot of these cases because the initial lawyers have made mistakes, and we would either try to correct them if we could or start a new case if the landlord wasn't precluded from bringing it because of what happened originally.

Q. Did you tell Ms. sorry, did you tell --

A. I told her a lot of attorneys send us cases because they knew that Wenig Saltiel was very good at this area of law.

Q. Okay. Did you ever tell Ms. Fernandez that the I'm not going to try to spell that -- but did you ever tell Ms. Fernandez that those attorneys were deficient in their practices of law?

A. I told her people make mistakes.

Q. Did you tell her that those -- that those -- I'll just refer to them as East Indian

MS. FISHER: I'll spell that for you. It's G-U-J-R-A-T-I, Gujrati.

BY MR. CALLISTE:

Q. Okay. Did you ever advise Ms. Fernandez that you believed that Gujarati attorneys were lacked skill in the practice of landlord-tenant law or in any other area of law for that --

A. I don't think I ever said that directly to her.

Q. Did you ever say that indirectly to her?

A. I have -- I have Gujarati friends, children socialize together, we talk to everybody. We get along very well on our block. And my block is mostly immigrants from different places.

MS. FISHER: Answer the question.

THE WITNESS: That's it.

BY MR. CALLISTE:

Q. All right. And my question is, did you ever tell Ms. Fernandez that Gujarati -- Gujarati attorneys had problems when it came to practicing in any particular area of law?

MS. FISHER: Objection.

THE WITNESS: I don't think I ever said that directly.

BY MR. CALLISTE:

Q. Did you ever say that indirectly to Ms. Fernandez or something --

A. I don't think I said it indirectly.

Q. Did you ever say anything similar in sum and substance to Ms. Fernandez about Gujarati attorneys?

A. I said landlord-tenant law is very technical, and if you don't do it every day, it's easy to make mistakes.

Q. All right. And did you tell Ms. Fernandez that Gujarati attorneys made those mistakes often or anything similar to that?

A. No.

Q. Okay. Did you ever have discussions about attorneys of other races with Ms. Hern- -- with Ms. Fernandez?

A. Absolutely not.

Q. Okay. You ever have discussions with Ms. Fernandez where you told her that attorneys let's say African American attorneys were not as skilled as attorneys of other races?

A. Absolutely not.

(Plaintiff Ex. C Greene Dep 9/23/21 141:9 – 145:8).

**PLAINTIFF STATES:**

49. Defendant Greene may have discussed history with Ms. Fernandez and cannot recall (or does not know) if he did (Exh C., Greene Depo. 147:13)

> **DEFENDANTS RESPOND:**
>
> **NOT MATERIAL. NOT DISPUTED** that when asked if he had discussed history with Plaintiff, Defendant Greene stated "I don't remember. I don't know."

**PLAINTIFF STATES:**

50. Defendant Greene was "*very interested in the period of the Civil War.*" (Exh C., Greene Depo. 148:2-7). Defendant Greene admits that he "*may have*" discussed the Civil War with other employees at Wenig Saltiel (Id. 155:23)

> **DEFENDANTS RESPOND:**
>
> **NOT MATERIAL. NOT DISPUTED**.

**PLAINTIFF STATES:**

51. Defendant Greene also engages in Major Civil War reenactment events "*one or two*" times a year and "*minor events*" frequently every year (Exh C., Greene Depo. 157:23 - 158:5)

> **DEFENDANTS RESPOND:**
>
> **NOT MATERIAL. MISTATES THE TESTIMONY.** Defendant Greene testified to attending events at that frequency when he was involved in the hobby, but that by 2018 "I might have gotten out of the hobby before that time. I'm not sure…. If I did, it's one event

at the most but I'm not sure." Plaintiff's Ex. C, Green Dep. 9/23/2021 158:13 – 18. He later testified that he hadn't attended any events in the last five years (which would have been 2016). Id. at 159:20 – 160:2.

**PLAINTIFF STATES:**

52. During these Civil War reenactment events, Defendant Green "*usually*" played a "*southern soldier*" or confederate soldier and wore a "*grey suit*" for the Confederacy (Exh C., Greene Depo. 162:22 – 163:10; *see also*, Greene Depo. 6/1/2022 19:6-10).

**DEFENDANTS RESPOND:**

**NOT MATERIAL. NOT DISPUTED.** Although this is accurate, it may be helpful to the Court's consideration of the relevance of this information that Defendant Greene testified that he primarily wore a southern uniform because the only nearby re-enactment group when he got involved in the hobby was a confederate group. And the reason it was a confederate group is because it made it cheaper to participate in the hobby as re-enactments in upstate New York couldn't get people from the south to travel, so they would subsidize confederate units to attend in order to have a balance between northern and southern soldiers. See Greene Depo. Plaintiff's Ex. C, Green Dep. 9/23/2021 164:7 – 165:3. Additionally, Greene testified that despite dressing as a confederate soldier, "basically we're all feds" by which it's clear from context, he means people who would have supported the north in the war. Id. 163: 21.

**PLAINTIFF STATES:**

53. Defendant Greene frequented Facebook on his office computer at Wenig Saltiel. Defendant

Greene's Facebook interests are wrought with Confederate materials, groups and images (Exh T, Greene Facebook printout). Plaintiff noticed this.

**DEFENDANTS RESPOND:**

**NOT DISPUTED** that Greene frequented Facebook. Greene Facebook interest speak for themselves. **NOT GENUINE DISPUTE OF FACT** that Plaintiff noticed Greene's Facebook interests. First there is no cite to the record for that claim. Second, Natasha Mitchell states the following in her Affidavit:

"My desk was directly outside the offices occupied by Shonda Fernandez and Ira Greene… I did not see [Plaintiff] enter [Greene's] office during her entire employment. The majority of interactions between them was in passing in the hallway, in the lunchroom or standing in the doorway of each other's office. Any claim that Ms. Fernandez viewed offensive material on Mr. Greene's computer is not only false, but impossible. That is because his computer screen did not face the doorway." Mitchell Aff ¶¶ 10 – 12.

**PLAINTIFF STATES:**

54. Defendant Wenig Saltiel had a "Cyber Policy" in place that forbid nonbusiness related internet usage and limited internet use to "use within the scope of employment or job duties" (Exh. H, "Wenig Saltiel's "Cyber Policy").

**DEFENDANTS RESPOND:**

**NOT DISPUTED.**

**PLAINTIFF STATES:**

55. Nevertheless, Defendant Greene accessed Facebook from his computer at work "***almost every day to see what messages came in.***" (Exh D, Green Depo. 6/1/2022, 16:6-9; Exh T, Greene Facebook printout). Defendant Greene frequented content dealing with "*politics and history*." (Exh. D. Greene Depo, 6/1/2022, 16:12).

**DEFENDANTS RESPOND:**

**NOT DISPUTED.** Although, this assumes that Defendant Greene couldn't have been checking his messages on Facebook for work related reasons.

**PLAINTIFF STATES:**

56. Defendant Greene is aware that the Confederacy and its symbols (such as the confederate flag) are being removed from public property all of the country today (Exh. D, Greene Depo 6/1/2022, 50:21- 51:3) Defendant Greene is aware that Confederate, "***monuments bring back bad memories to black people and they don't want to look at them every day. They don't want to see them***." (Id. 62:8-12)

**DEFENDANTS RESPOND:**

**NOT MATERIAL**. This relates to Defendant's Greene's understanding of what was happening in 2022 not at the time relevant to Plaintiff's complaints and whether or not this was his understanding has no materiality to any of the issues below the Court. **NOT DISPUTED.**

**PLAINTIFF STATES:**

57. Defendant Greene is offended that some Confederate symbols, such as the "**Silent Sam**"

statute, were taken down from public places due to its racial insensitivities to African Americans

(Exh. D, Greene Depo 6/1/2022, 83-84)


**DEFENDANTS RESPOND:**

**MISTATES TESTIMONY.** Defendant Greene did not say he was offended that

confederate symbols were taken down.   The below is his testimony:

Q. It's a three-page document. It's an article titled "Hundreds of UNC students protest plan to relocate toppled Confederate statue Silent Sam." Can *you* see that?
A. Yes.
Q. Do you recall reading this article while you were working for Wenig Saltiel in their offices?
A. Well, I read lots of articles about Silent Sam and I probably read it in the office, too. It was front page news when it happened in this country.
Q. Do you recall reading other articles than this one while you were working for Wenig Saltiel still addressing Silent Sam?
A. Yes. I don't see it.
Q. Okay. And the reason why you were reading this particular article, if you recall?
A. First of all, it was not taken down in a lawful manner. It was toppled by hundreds of students. It's vandalism. Silent Sam is very common in the South. It's a mourning statue. It's statue representing the hundreds of thousands of southern men who died in the war. That's a mourning statue. It doesn't glorify the war and it doesn't glorify any of the leaders, like people on horseback and stuff like that. No, this is a mourning statue. And they're common. There's many of them in the south. And they represent the unknown man who came and died in that war. And I thought what the kids did wasn't proper. It's not the way to deal with it. Those guys were victims. That's all.
Q. Do you recall reading in the article that according to Bill Keys, he had provided a quote for this article, and he said, "This monument is a reminder that black people were owned by white people as property, and that the institution of slavery was enforced by unconscionable brutality." Do you remember reading that?
A. I don't see the Silent Sam statues as glorifying anything. I really don't. They don't compare to the type that show Generals on horseback, which have been taken down all over the South. This is a sad thing, Silent Sam, that ordinary white people –
Q. What does the statue mean to you?
A. Well, to me, and surely, these were the ordinary people who were convinced to follow bankrupt cause from the beginning. They fought the United States. They fought their own country. It was the worst mistake in the history of our country and it's sad. It's a sad statute.
Q. Do you recall why this particular statue was taken down?
A. No, I don't recall.

Q. Do you recall why the movement with taking down Confederate statues started?

A. I understand why -- I understand why things that glorify the Confederate secession bother a lot of people. I understand that. But this statue is different, this is a mourning statue. That's a statue of an infantryman with his head down, lost everything. That's what it is. That's Silent Sam. It's not a glorification of anyone. Not to me anyway. I know people look at things differently. We're seeing things differently, but that was my reaction. I've seen lots of Silent Sam statues in the South as I traveled. They're the most common statue in the South from the Civil War.

Q. What was your takeaway after reading this particular article, if you remember?

A. I really don't. I just - - the whole thing makes me sad, because I don't like to see students do what these guys did. I mean, throwing things on the ground, breaking things, doing stuff 1ike that. You want to get something taken down, you do it lawfully. And that's what's been done all over the south, things have been taken down lawfully.

Plaintiff's Ex. D, Greene Dep. 6/1/2022, 83:2 – 85:19.

**PLAINTIFF STATES:**

58. Defendant Greene understands "***why things that glorify the Confederate Secession bother a lot of people***," but Defendant Greene remains offended that some symbols, such as the Silent Sam statue, were taken down because, to Greene, Silent Sam is not offensive. (Exh. D, Greene Depo 6/1/2022, 85-86) Greene selectively supported some symbols of the confederacy that were sentimental **to him personally**. (Id. 86:7)

**DEFENDANTS RESPOND:**

**MISTATES TESTIMONY.** See full testimony in context in response to Number 57.

**PLAINTIFF STATES:**

59. Defendant Greene listened to confederate songs out loud in his office and Ms. Fernandez was able to recognize and hear it. (Exh. A, Fernandez Dep. 265:5-14)

**DEFENDANTS RESPOND:**

**NOT GENUINE DISPUTE OF FACT** that Fernandez could hear any songs played by Mr. Greene. See Mitchell Aff. ¶ 10 ("my desk was directly outside the offices occupied by Shonda Fernandez and Ira Greene. Had Ira Greene played music loud enough for Shonda Fernandez to hear it as she claims, I would have also heard it and I never heard such."); Freckleton Aff. ¶ 17 ("Shonda Fernandez' claim that she regularly heard loud music from Ira Greene's office is also false. I regularly walked up and down the hallways, and have never heard music emanating from his office."); Johnson Aff ¶¶ 22 -23 (Shonda Fernandez' claim that she regularly heard loud music from Ira's office is also false. I know there was sound proofing between the walls, and a sound masking system installed in every office to ensure privacy and to prevent anyone outside the room from hearing the content of the speech taking place within the room. This was a major focus during the construction. Even if he did play loud music, it would be impossible for Shonda to have heard loud music from Ira Greene's office much less the words that could be heard, understood or "within earshot of the staff."); See also Moccia Aff ¶ 23; Wenig Aff ¶ 22; Green Aff ¶¶ 15-16; Saltiel Aff ¶ 19-20.


**PLAINTIFF STATES:**

60. As per Defendant Greene, the "*unofficial anthem*" of the Confederacy is a song named "*Dixie*." (Exh C., Greene Depo. 167) Ms. Fernandez referred to "Dixie" as the "slave song," and she heard Defendant Greene playing that song in the office.


**DEFENDANTS RESPOND:**

**NOT MATERIAL. MISTATES TESTIMONY.** Defendant Greene actually testified "I

don't know if Dixie is like the unofficial anthem."

**PLAINTIFF STATES:**

61. Defendant Greene admitted that he searched for and "***tried to find the Slave Anthem***" while in his office at Wenig Saltiel. (Exh. D, Greene Depo 6/1/2022, 89:18-24)

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL.** Defendant Greene testified that he tried to find the "Slave Anthem" when he read the Complaint in this action, not when he and Plaintiff were at Wenig Saltiel. Plaintiff Ex. D. Greene Dep. 6/1/22 98:11 – 99:2.

**PLAINTIFF STATES:**

62. Defendant Greene admitted that he played "*popular songs of that [Civil War] era*" while in the Wenig Saltiel office. (Exh C., Greene Depo. 168:16 - 169)

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL** as Plaintiff could not have heard songs Greene played in his office. See Response to Number 59. **MISTATES TESTIMONY.** Defendant Greene stated that he listened to "19th century music" from time to time in the office.

**PLAINTIFF STATES:**

63. Among other songs, Defendant Greene played the well-known Confederate anthem, named "*Dixie*" (Exh C., Greene Depo. 169)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Plaintiff could not have heard songs Greene played in his office. See Response to Number 59. **MISTATES TESTIMONY.** Greene testified in contradictory ways about whether he played this song. Testifying that he didn't think he had (Plaintiff's Ex. C, Green Dep. 9/23/2021 167:16 – 19), and then testifying that he may have (Id. 169:4-6). And then testifying that the last time he heard it was probably at a re-enactment which was he had previously testified he hadn't been to since at least 2016. (Plaintiff Ex. D. Greene Dep. 6/1/22 79:4-13).

**PLAINTIFF STATES:**

64. Defendant Green understood that the song "*Dixie*" was the "*unofficial Anthem*" of the Confederacy, which was used in "*minstrel shows [that] made fun of blacks*." (Exh. D, Greene Depo 6/1/2022, 77:6 - 78) Defendant Greene knows that "***how [Dixie] was used in minstrel shows was very, very insulting***" to black people. (Id. 78)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Plaintiff could not have heard songs Greene played in his office. See Response to Number 59. Moreover, this testimony regards Greene's explanation of information contained in an article. There is no testimony that he played Dixie after learning this information.

**PLAINTIFF STATES:**

65. Among other things, the words of the song "Dixie" states: "***Oh, I wish I was in the land of cotton, old time they are not forgotten. Look away, look away, look away Dixieland***." (Exh. D,

Greene Depo 6/1/2022, 78:5)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Plaintiff could not have heard songs Greene played in his office. See Response to Number 59. **NOT DISPUTED** that Plaintiff's counsel read this lyric into the record.

**PLAINTIFF STATES:**

66. Defendant Greene, in no uncertain terms, knew that the Dixie song is offensive to "*a lot*" of African American and Black people. (Exh. D, Greene Depo 6/1/2022, 78:14)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Plaintiff could not have heard songs Greene played in his office. See Response to Number 59. Moreover, this testimony regards Greene's explanation of information contained in an article. There is no testimony that he played Dixie after learning this information.

**PLAINTIFF STATES:**

67. Defendant Greene is aware that "*a great majority of [Wenig Saltiel's] employees were African American*." (Exh. D, Greene Depo 6/1/2022, 20:17-21) Yet Defendant Greene played these confederate songs in his office wherefrom African American employees (such as Plaintiff) heard same.

**DEFENDANTS RESPOND:**

 **NOT MATERIAL** and **NOT GENUINE** as Plaintiff could not have heard songs Greene played in his office. See Response to Number 59. See also the Response to Number 64.

**PLAINTIFF STATES:**

68. Defendant Greene also played a song known as "*Bonnie Blue Flag*," which is a well known Confederate marching song. (Exh C., Greene Depo. 143:17; *see, also*, https://en.wikipedia.org/wiki/The_Bonnie_Blue_Flag)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Plaintiff could not have heard songs Greene played in his office. See Response to Number 59.

**PLAINTIFF STATES:**

69. Defendant Greene admits that he accessed these songs and played them from his office "*desktop*" computer at the Wenig Saltiel Office (Exh C., Greene Depo. 170) As per Defendant Greene, he would "*take a break*" during the day and play these songs on his computer at work (Id. 170 – 171)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as Plaintiff could not have heard songs Greene played in his office. See Response to Number 59. **MISTATES TESTIMONY.** Defendant Greene said he rarely played songs and only very late in the day.

**PLAINTIFF STATES:**

70. Defendant Greene did not store these files on his computer. Instead, Defendant Greene would watch "*movies*" and/or could "*call up the scene and look at it and listen to it*" via the internet. (Exh C., Greene Depo. 171:10).

   **DEFENDANTS RESPOND:**

   **NOT MATERIAL** as Plaintiff could not have heard songs Greene played in his office. See Response to Number 59.

**PLAINTIFF STATES:**

71. When asked if he played the confederate song for other employees in the office, Defendant Greene answered, "*I don't recall*." (Exh C., Greene Depo. 172).

   **DEFENDANTS RESPOND:**

   **NOT MATERIAL** as Plaintiff could not have heard songs Greene played in his office. See Response to Number 59. Defendant Greene also testified that he never played these songs for Ms. Fernandez. (Plaintiff's Ex. C, Green Dep. 9/23/2021 168:5 – 11).

**PLAINTIFF STATES:**

72. Defendant Greene made racially tinged comments related to (then) President Trump. (Exh. A, Fernandez Dep. 265:5-14)

   **DEFENDANTS RESPOND:**

   **NOT MATERIAL** as racially tinged comments is a meaningless statement. (e.g.

"Trump's policies are terrible for Black people" is a racially tinged comment.) **NOT DISPUTED** for the purposes of Summary Judgment.

<u>**PLAINTIFF STATES:**</u>

73. Defendant Greene watched videos in his office, which Plaintiff found offensive (Exh. A, Fernandez Dep. 118:6)

<u>**DEFENDANTS RESPOND:**</u>

**NOT A GENUINE DISPUTE OF FACT** for the same reasons as stated in response to Number 40. In addition Benjamin Serebin provided an affidavit establishing that he is the President of REEF Solutions which has been maintaining Wenig Saltiel LLP's computer systems since 2007. See Benjamin Serebin Affidavit in Support ("Serebin Aff") ¶ 1. During the pendency of this case he was asked to produced a list of all websites visited by Ira Greene that contained keywords based on an ESI search protocol. Id. ¶ 7. He reviewed the websites and none of them contained racially discriminatory material. Id. ¶ 8. The list was provided to Plaintiff's counsel and was attached as Exhibit 4 to the Serebin Aff. In addition, he affirmed that Wenig Saltiel uses a Sonicwall content filter that would have prevented Defendant Greene from accessing websites containing the content as alleged by Plaintiff.

<u>**PLAINTIFF STATES:**</u>

74. Plaintiff described these videos as follows:

*On numerous occasions, I witnessed Ira watching videos and also Ira calling me over and say, "Hey, come take a look at this," and it was man hanging from a tree with his testicles and his penis*

*cut off and shoved in his mouth, from a noose and they set him on fire. There were -- a woman running through the woods, pregnant, by a group of white men who gang raped her, tied her to a tree, cut the baby from her and bounced it around like a football. Another situation, this little boy, running, and I can still see what he was wearing, who were grabbed and assaulted by a group of white men. And I say, "Ira what are you doing?" I'm screaming at him. He says this is the content they post at the group.*

(Exh A., Fernandez Depo. 277:17 – 278; *see also*, Exh AA., Fernandez Declar. ¶¶13, 17, 18)

### DEFENDANTS RESPOND:

Although Plaintiff testified to this it is **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

### PLAINTIFF STATES:

75. On the first occasion, Plaintiff: "*screamed, "Ira, what are you doing? Are you crazy, what are you doing, what are you watching*?" (Exh A. Fernandez Dep. 283:12)

### DEFENDANTS RESPOND:

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

### PLAINTIFF STATES:

76. In response, Defendant Greene said: "*Oh, it's not me. It's the website. This is what they post.*" (Exh A. Fernandez Dep. 283:19)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

**PLAINTIFF STATES:**

77. Defendant Green accessed white supremacist website(s) from his office computer during Plaintiff's entire tenure at Wenig Saltiel. (Exh A. Fernandez Dep. 123:3-21 and 279:2)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

**PLAINTIFF STATES:**

78. Plaintiff began noticing that Mr. Greene was accessing white supremacist websites in December 2018, a few months after Plaintiff began working at Wenig Saltiel. (Exh A., Fernandez Depo. 124:5-12; *see also* Exh AA Fernandez Declar. ¶¶13-20)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

**PLAINTIFF STATES:**

79. Defendant Green exposed Plaintiff to these videos multiple times throughout the course of her employment at Wenig Saltiel (Exh A., Fernandez Depo. 279:4; *see also* Exh AA Fernandez

Declar. ¶¶13-20)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

**PLAINTIFF STATES:**

80. According to Plaintiff, Defendant Greene called her into his office to see the video on the first occasion. On further occasions, "*more than five*" separate occasions, Plaintiff caught Defendant Greene viewing the videos in his office. (Exh A., Fernandez Depo. 279:10 - 280)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

**PLAINTIFF STATES:**

81. Defendant Greene would watch these videos with his door open (Exh A., Fernandez Depo. 282) Also, Defendant Greene's computer screen was facing the door at the time(s). (*Id.*) Plaintiff was able to see what Defendant Greene was watching when she walked by (*Id*. 283:)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

**PLAINTIFF STATES:**

82. Other employees also knew that Defendant Greene was watching these videos and would notify Plaintiff about it and ask Plaintiff to "*walk by [Defendant Greene's] office*" to see what he was watching. (Exh A., Fernandez Depo. 280-281)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

**PLAINTIFF STATES:**

83. On another occasion, Defendant Greene explained to Plaintiff that Plaintiff was black and that black people were not as smart as white people (Exh A., Fernandez Depo. 127:21-128:4)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40.

**PLAINTIFF STATES:**

84. Defendant Greene was a member of a White Supremacist organization and he watched videos and materials from their website while in his office. (Exh A. Fernandez Dep. 118)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

**PLAINTIFF STATES:**

85. Plaintiff complained to the person in charge of IT at Wenig Saltiel (Ben Serebin) to prevent Mr. Greene from accessing white supremacy sites from his computer in the office and to terminate Defendant Greene's access to same. (Exh A. Fernandez Dep. 119-120:13)

> **DEFENDANTS RESPOND:**
>
> **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 73.

**PLAINTIFF STATES:**

86. As per Plaintiff's testimony: "*when the first incident occurred and he called me over to see that man hanging from that tree is when I terminated his access and in turn, I was told that I can't do that because he needs his internet access to work.*" (Exh A. Fernandez Dep. 284:4-12)

> **DEFENDANTS RESPOND:**
>
> **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73.

**PLAINTIFF STATES:**

87. Plaintiff made the request to have Mr. Green's internet access restricted on multiple occasions, "*up until [Plaintiff's] last day of employment.*" (Exh A. Fernandez Dep. 122-123).

> **DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 73. Additionally, this testimony contradicts Plaintiff's Number 24 which acknowledges that Ira Greene's relationship with Wenig Saltiel ended before hers.

## PLAINTIFF STATES:

88. Among other things, Plaintiff reported to Mr. Saltiel that she "*passed by [Defendant Green's door and [Greene] is watching those videos again. Why can't we terminate his internet access?*" and that she would "*ask [Defendant Saltiel], 'can you please speak with [Defendant Wenig]? I can't take this anymore'.*" (Exh A., Fernandez Depo. 267, *see also* Exh AA Fernandez Declar. ¶¶19-21)

## DEFENDANTS RESPOND:

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 73. Additionally, this is disputed by Natasha Mitchell in her affidavit where she wrote: "As Mr. Saltiel's executive assistant I had access to his emails. At no time did I ever hear Ms. Fernandez orally request Mr. Saltiel to alter Mr. Greene's computer access in any way nor did I ever see such a request in writing through email." Mitchell Aff ¶ 15.

**PLAINTIFF STATES:**

89. Defendant Saltiel admits that he saw Defendant Greene with a book or picture related to the confederacy. (Exh E. Saltiel Depo. 200-201)

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL. NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

90. During a sexual harassment training being conducted by Plaintiff, While Defendant Greene was present, other employees (including an employee named "Justin") recognized that Defendant Greene "**made a comment that [Plaintiff] did not think was necessarily appropriate for the discussion, [Plaintiff] told him to shut up**." (Exh R, email from J. Saltiel to M. Wenig, dated 4/14/2019).

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

91. In December 2018, Defendant Greene told Plaintiff "*that black people, Hispanics, Middle Eastern, are not as smart as white people*." (Exh A. Fernandez Depo., 286:25 - 287)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40.

**PLAINTIFF STATES:**

92. During this conversation, Defendant Greene "*made a full statement to [Plaintiff] regarding black people, a prominent [African American] Judge in Brooklyn, and about [Plaintiff's] daughter, and [Greene] would not move from the doorway so that [Plaintiff] could pass*." (Exh A. Fernandez Depo., 288-289)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40.

**PLAINTIFF STATES:**

93. Specifically, Defendant Greene claimed that "*black people, Hispanics, Middle Easterners, Asian people are not as smart as white people. That black people, especially woman, we have to be sleeping with someone in order to get ahead. He also made this remark about the Honorable (NYS Judge) Judge Harriet Thompson in Brooklyn*." (Exh A. Fernandez Depo., 293:6)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40.

**PLAINTIFF STATES:**

94. Plaintiff proceeded right to Defendant Saltiel's office to complain about Defendant Green's statement and conduct. (Exh A. Fernandez Depo., 289)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 that Plaintiff complained about the behavior as listed in Paragraphs 91 – 93.

**NOT DISPUTED** for the purposes of Summary Judgment that Plaintiff made a complaint to Saltiel about comments made by Defendant Greene on or about December 10, 2018.

**PLAINTIFF STATES:**

95. Plaintiff complained (verbally and by e-mail) to Defendant Saltiel about Defendant Greene's discriminatory statement and conduct (Exh A., Fernandez Depo. 128:22-129:8 and 266)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** about whether or not Plaintiff emailed a complaint for the reasons articulated on pages 12-13 of Defendant's reply brief. **NOT DISPUTED** for the purposes of Summary Judgment that Plaintiff made a complaint to Saltiel about comments made by Defendant Greene on or about December 10, 2018.

**PLAINTIFF STATES:**

96. At the date/time of the incident, Plaintiff went into Defendant Saltiel's office with Defendant Green following Plaintiff close behind. (Exh A., Fernandez Depo. 186:23 – 187:3) Plaintiff went to Defendant Saltiel to complain about Defendant Green's comments (Id. 189:8-11)

**DEFENDANTS RESPOND:**

**NOT DISPUTED** for the purposes of Summary Judgment that Plaintiff made a complaint to Saltiel about comments made by Defendant Greene on or about December 10, 2018.

**PLAINTIFF STATES:**

97. Defendant Saltiel then laughed at the situation and said: "*boy, the old timer* [referring to Defendant Greene] *is really on a rampage this morning*."  (Exh A., Fernandez Depo. 186:23 – 187:3)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40.

**PLAINTIFF STATES:**

98. Plaintiff then complained to Defendant Wenig, Defendant Saltiel and another attorney, Nick Moccia, by email, about Defendant Greene's discriminatory comments/conduct. (Exh A., Fernandez Depo. 190-191)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** about whether or not Plaintiff emailed a complaint for the reasons articulated on pages 12-13 of Defendant's reply brief.

**PLAINTIFF STATES:**

99. According to Defendant Wenig, Defendants Wenig and Saltiel then met with Defendant Greene shortly thereafter, and "*made clear that [Plaintiff] was troubled by the conversation . . . and that [Defendant Greene] should avoid having such conversations*." (Exh. F, Wenig Depo. (150:8-16)

**DEFENDANTS RESPOND:**

**MISTATES TESTIMONY.** Ms. Wenig testified about this encounter as follows:

Q. Are you aware of whether Ms. Fernandez raised complaints or concerns about Mr. Greene' s behavior during that meeting?
A . No. I was not aware of any
Q. You indicated there was a December conversation with M r. G. and Ms .Fernandez that occurred in the elevator. What situation are you refer ring to, ma'am?
A .The conversation that Ms. Fernandez characterized as occurring on December 5 .
Q. What was that conversation, ma'am?
A .Well, I don't know what the conversation was. I only know what Ms. Fernandez and Mr. Greene indicated, since I wasn't part of it. Ms. Fernandez indicated that Mr. Greene had been discussing the Civil Rights Movement downstairs in the lobby. That the conversation continued when they got off the elevator. She didn't think it was appropriate for some of the commentary. And that she was offended by it in some manner.
Q. How did you come to learn that Ms. Fernandez was raising concerns about that conversation?
A .I believe it was on the 11th of December, Ms. Fernandez asked or raised it to myself or to Mr. Saltiel, and they came down to speak with me.
Q. Do you know if Ms. Fernandez raised it to you or to Mr. Saltiel, specifically?
A. I believe she spoke to Mr. Saltiel first. But I couldn't be certain.
Q. Did Ms. Fernandez speak to you about it directly?
A. When she came down to my office.
Q. Was it the 12th of December?
A. No, I believe it was the 11th.
Q. How do you recall these dates?
A. Because I didn't come to work until either the 10th or the 11th. Our pop-up was on the 10th, and then our office party was on the 11th. So it was right around that time.
Q. What, if anything, did Ms. Fernandez disclose to you about that conversation?
A. That Mr. Greene started a conversation downstairs in the lobby. I believe it was about the Civil Rights Movement and how it differed from movements of today. He continued it when he got off the elevator. She didn't think it was appropriate and that she was, in essence, troubled by it.
Q. Where did that conversation take place between you and Ms. Fernandez?
A. In my office.
Q. At the time that Ms. Fernandez disclosed that to you, what, if anything, did you do?
A. I asked her for the specifics, which I didn't really get. And I believe we said--- I think we said we would discuss it immediately with Mr. Greene. I don't recall specifics beyond that.
Q. Did you document any aspect of that conversation with Ms. Fernandez?
A. I didn't.
Q. Was anyone else present at the time that Ms. Fernandez disclosed that conversation with you?
A. I believe Mr. Moccia and Mr. Saltiel.
Q. Was this occurring in a partner's meeting or some other type of meeting?
A. No. it was Ms. Fernandez had an issue. She came down to my office since I wasn't really walking. And they broached it with me.
Q. When you say "they," who is they? The people you mentioned?

A. The people I mentioned.

Q. all three of these individuals came to your office to discuss this situation.

A. No. Ms. Fernandez came to discuss it. they came down to hear what she had to say.

Q. How did it come about that the others came down to hear what Ms. Fernandez had to say? Did you call them?

A. No. As I said, I believe I got the request from Mr. Saltiel, and they came down to my office.

Q. What request did you get from Mr. Saltiel?

A. To see Ms. Fernandez.

Q. Did Ms. Fernandez come to the office with Mr. Saltiel and Mr. Moccia at the same time?

A. I believe Ms. Fernandez came down with Mr. Saltiel. I don't remember whether Mr. Moccia walked in with them or a few minutes after. I can't tell you the timing on when the persons walked in my door.

Q. Was this meeting specific to that conversation with Mr. Greene?

A. Yes.

Q. Did you document any of this conversation at all?

A. As I said before, I didn't.

Q. When Ms. Fernandez raised concerns about her discussions with Mr. Greene – by the way, was Mr. Greene ever part of any of these discussions?

A. I believe Mr. Greene came in after. But I can't be certain.

Q. Once Ms. Fernandez explained what her experience was, can you tell me what happened next?

A. I believe we said we would address it directly with Mr. Greene. That we would make clear that she was troubled by the conversation regarding the civil rights, and that Ira should avoid having such conversations.

Q. Did that conversation with Mr. Greene actually happen?

A. Along those lines, yes.

Q. Along those lines. Can you tell me when it happened in relation to that meeting you had with Ms. Fernandez, Mr. Saltiel, and Mr. Moccia present?

A. Within a – whether it was ten minutes, a half an hour. That same time.

Q. Was Ms. Fernandez present when Mr. Greene showed up to have that conversation?

A. I don't remember specifically whether she stayed or didn't.

Q. Did you speak to Mr. Greene in particular about what you learned from Ms. Fernandez?

A. Yes.

Q. What did you specifically say to Mr. Greene?

A. I asked him what the conversation was. Mr. Greene indicated he was talking to Ms. Fernandez about the differences in the Civil Rights Movement. I indicated that Ms. Fernandez had said she was offended. Mr. Greene seemed puzzled why she would be offended by the talk of the Civil Rights Movement and Martin Luther King Junior. My comment was that people get offended for different reasons. Whether he had the conversation for history discussions, or whatever it was, that she felt offended, he should apologize for offending her in whatever manner it was. That's where we left it. And I asked him to please not to have history discussions because apparently – to avoid it.

Q. Are you aware as to whether Mr. Greene had any further history discussions in the office or with employees after that?

A. I can't tell you – if you're asking me, did Mr. Greene discuss things with employees in the lunchroom, I can't tell you that. I don't listen with spyware.

Q. My question is, are you aware if he did?

A. I have no idea.

Q. Did you give Mr. Greene any particular or specific instructions to do anything?

A. I told Mr. Greene he needed to apologize for offending somebody whether he meant to offend or not.

Q. Did you tell Mr. Greene how to go about apologizing, whether in writing or in any other way?

(Plaintiff Ex. F, Wenig Depo. 145:7 - 152:5)

**PLAINTIFF STATES:**

100. On December 11, 2018, Defendant Green submitted an apology letter to Ms. Fernandez (Exh. A, Fernandez Depo. Pp.172, 182, *See also,* Exh. K, letter from I Greene to S. Fernandez, dated 12/11/2018).

**DEFENDANTS RESPOND:**

**NOT DISPUTED.**

**PLAINTIFF STATES:**

101. In his apology letter to Plaintiff, Defendant Greene wrote: "**After yesterday's meeting, I had come to terms that I had said something hurtful to you**." (Exh. K, letter from I Greene to S. Fernandez, dated 12/11/2018). Green admitted that he "**understood why [Plaintiff] felt offended." Greene admitted to using "hurtful language that demeans people of foreign origin who now live here**." (Id.) Greene stated that "**demeaning statement about any group of professionals based on race or ethnic origin are always wrong and clearly inappropriate**." (Id. Exh K)

**DEFENDANTS RESPOND:**

**NOT DISPUTED** that Defendant Greene wrote an apology letter to Plaintiff that speaks

for itself.

**PLAINTIFF STATES:**

102. In his apology letter to Plaintiff, Greene further stated: "**I sincerely apologize for my error and will do my best to never again make statements about others that are clearly out of line, derogatory and completely inappropriate**." (Exh K)

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** that Defendant Greene wrote an apology to Plaintiff letter that speaks for itself.

**PLAINTIFF STATES:**

103. Defendant Greene then gave an apology letter to another African American employee, Javon Blackmon, who was also exposed to his discriminatory commentary and conduct (Exh A., Fernandez Depo. 197:14, *see also* Exh. L, Green Apology Letter to J Blackmon, dated 12/11/2018)

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** that Defendant Greene wrote an apology letter to Mr. Blackmon that speaks for itself.

**PLAINTIFF STATES:**

104. In his apology letter to Mr. Blackmon, Defendant Green wrote: "**Yesterday, I was told that you heard me say something in public that was personally hurtful to you**." Defendant Greene continued, "**There is no excuse for hurtful language that demeans people based on race or**

**ethnic origin or religion, period**.” (Exh L). Green concluded this apology letter by writing: “**I sincerely apologize for my error and will do my best to never again make statements about others that are clearly out of line, derogatory and completely inappropriate**.” (Exh L)

## DEFENDANTS RESPOND:

**NOT DISPUTED** that Defendant Greene wrote an apology letter to Mr. Blackmon that speaks for itself.

## PLAINTIFF STATES:

105. Mr. Blackmon began to discuss his experiences with Mr. Greene with Plaintiff wherein Mr. Blackmon disclosed to Plaintiff that he too witnessed the racist outrageous videos that Defendant Green played in his office (Exh A., Fernandez Depo. 197:13, *see also*, Exh. M, Blackmon Affidavit, dated 7/23/2019)

## DEFENDANTS RESPOND:

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73. Even if the Blackmon “Affidavit” were admissible evidence which it is not for the reasons articulated on pages 6-8 of the reply brief, it does not support the contention that he witnessed the videos described by Plaintiff. He states only that Ms. Fernandez had informed him about the videos, not that he had observed them.

## PLAINTIFF STATES:

106. As per the sworn affidavit of Javon Blackmon, “**Mr. Green routinely made deplorable remarks about people of color, despite the fact that [Mr. Blackmon] and other people of**

**color were present and/or within earshot.**" (Exh. M, Blackmon Affidavit, ¶5, dated 7/23/2019)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40. Moreover, the Blackmon "Affidavit" is not admissible evidence for the reasons articulated on pages 6-8 of the reply brief.

**PLAINTIFF STATES:**

107. As per the sworn affidavit of Javon Blackmon, "**On December 5, 2018 Ms. Fernandez advised me that Mr. Greene had insultingly told her that people of color are not smart; that people of color were taking over the legal profession and damaging it; that he didn't believe that Ms. Fernandez's daughter, who is African American, was an attorney or graduated from Harvard Law; and that he wanted this country to return to the days of the confederacy.**" (Exh. M, Blackmon Affidavit, ¶6, dated 7/23/2019)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40. Moreover, the Blackmon "Affidavit" is not admissible evidence for the reasons articulated on pages 6-8 of the reply brief.

**PLAINTIFF STATES:**

108. As per the sworn affidavit of Javon Blackmon, "**Mr. Green routinely made deplorable remarks about people of color, despite the fact that [Mr. Blackmon] and other people of color were present and/or within earshot.**" (Exh. M, Blackmon Affidavit, ¶5, dated 7/23/2019)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40. Moreover, the Blackmon "Affidavit" is not admissible evidence for the reasons articulated on pages 6-8 of the reply brief.

**PLAINTIFF STATES:**

109. As per the sworn affidavit of Javon Blackmon, "**Mr. Green approached [Blackmon] while [he] was sitting at [his] desk and went on a hateful tirade against immigrants and African Americans**." (Exh. M, Blackmon Affidavit, ¶7, dated 7/23/2019)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40. Moreover, the Blackmon "Affidavit" is not admissible evidence for the reasons articulated on pages 6-8 of the reply brief.

**PLAINTIFF STATES:**

110. Among other things, Defendant Greene claimed: **[1] Black attorneys aren't as smart a s white attorneys; [2] Black, Indian and Hispanic attorneys come into this country and practice all types of laws, and they don't know what they are doing. They run all kinds of rackets; [3] Blacks become attorneys because of quotas; and [4] Blacks don't have a head for enterprise**. (Exh. M, Blackmon Affidavit, ¶7, dated 7/23/2019)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40. Moreover, the Blackmon "Affidavit" is not admissible evidence for the reasons articulated on pages 6-8 of the reply brief.

**PLAINTIFF STATES:**

111. As per the sworn affidavit of Javon Blackmon, "**Mr. Green also told [Blackmon] that the United States needed to "bring back the confederacy," knowing . . . I am and African American male from Georgia, which . . . possess a long history of systemic racism against people of color."** (Exh. M, Blackmon Affidavit, ¶8, dated 7/23/2019)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40. Moreover, the Blackmon "Affidavit" is not admissible evidence for the reasons articulated on pages 6-8 of the reply brief.

**PLAINTIFF STATES:**

112. As per the sworn affidavit of Javon Blackmon, "**offended by Mr. Greene's overly racist remarks, that same day, [Blackmon] complained to Ms. Fernandez.**" (Exh. M, Blackmon Affidavit, ¶9, dated 7/23/2019)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40. Moreover, the Blackmon "Affidavit" is not admissible evidence for

the reasons articulated on pages 6-8 of the reply brief.

**PLAINTIFF STATES:**

113. As per the sworn affidavit of Javon Blackmon, "**Mr. Green approached [Blackmon] while [he] was sitting at [his] desk and went on a hateful tirade against immigrants and African Americans**." (Exh. M, Blackmon Affidavit, ¶7, dated 7/23/2019)

    **DEFENDANTS RESPOND:**

    **DUPLICATE OF 109.**

**PLAINTIFF STATES:**

114. Mr. Blackmon wrote that: "**on December 11, 2018," Plaintiff disclosed to him that Defendant Greene watched "horrific videos of African Americans being lynched, tortured, and burned as well as videos playing confederate anthems**. (Exh. M, Blackmon Affidavit, ¶10, dated 7/23/2019)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40 and Number 73. Moreover, the Blackmon "Affidavit" is not admissible evidence for the reasons articulated on pages 6-8 of the reply brief.

**PLAINTIFF STATES:**

115. As per the sworn affidavit of Javon Blackmon, "**based on [his] dealings with Mr. Greene in the workplace, [he] firmly believes that [Greene] is a racist and a vocal one at that**." (Exh. M,

Blackmon Affidavit, ¶14, dated 7/23/2019)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40. Moreover, the Blackmon "Affidavit" is not admissible evidence for the reasons articulated on pages 6-8 of the reply brief.

**PLAINTIFF STATES:**

116. As per the sworn affidavit of Javon Blackmon, "**Mr. Saltiel and Ms. Wenig failed to take corrective action against Mr. Greene, despite his notorious proclivity to engage in racist and bigoted behavior**." (Exh. M, Blackmon Affidavit, ¶14, dated 7/23/2019)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40. Moreover, the Blackmon "Affidavit" is not admissible evidence for the reasons articulated on pages 6-8 of the reply brief.

**PLAINTIFF STATES:**

117. Defendant Wenig testified about another incident wherein Plaintiff complained about discriminatory statements that Defendant Greene made to Plaintiff while Plaintiff was in the lobby and an elevator with Mr. Greene (Exh F, Wenig Depo. 144:6)

**DEFENDANTS RESPOND:**

**MISTATES TESTIMONY.** Ms. Wenig was discussing the same incident as

Plaintiff clearly understood since she quoted from the description of this incident in Number 99. See Response to 99 to see Ms. Wenig's full description of the incident.

**PLAINTIFF STATES:**

118. According to Defendant Wenig, "*I only know what Ms. Fernandez and Mr. Greene indicated, since I wasn't part of it. Ms. Fernandez indicated that Mr. Greene had been discussing the Civil Rights Movement downstairs in the lobby. That the conversation continued when they got off the elevator. She didn't think it was appropriate for some of the commentary. And that she was offended by it in some manner*." (Exh F, Wenig Depo., 145-146)

**DEFENDANTS RESPOND:**

Ms. Wenig was discussing the same incident as Plaintiff clearly understood since she quoted from the description of this incident in Number 99. See Response to 99 to see Ms. Wenig's full description of the incident.

**PLAINTIFF STATES:**

119. According to Defendant Wenig, Plaintiff complained to Defendant Saltiel about the incident first before coming to Defendant Wenig (Exh F, Wenig Depo., 146:11)

**DEFENDANTS RESPOND:**

Ms. Wenig was discussing the same incident as Plaintiff clearly understood since she quoted from the description of this incident in Number 99. See Response to 99 to see Ms. Wenig's full description of the incident.

**PLAINTIFF STATES:**

120. Plaintiff did not believe that her complaints were being addressed (Exh A. Fernandez Depo., 290:24 and 291:24 – 292:7)

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL.** Plaintiff's subjective belief as to whether her complaints were being addressed is not material to the Court's determination of the Summary Judgment motion.

**PLAINTIFF STATES:**

121. After the incident(s) wherein Plaintiff complained about Defendant Greene's statements about minorities not being as smart as white people, after Plaintiff's complained, Defendant Greene's behavior toward Plaintiff "*became more vulgar.*" (Exh A. Fernandez Depo., 292:19 – 293:17)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40. Moreover, besides a single vague incident about Defendant Greene inviting someone to "use the head" Plaintiff failed to articulate any way in which his became "more vulgar".

**PLAINTIFF STATES:**

122. For example, on one occasion after Plaintiff complained, while Plaintiff was standing in the reception area, Defendant Greene stopped, turned around and looked through the glass and said to

Plaintiff, "*I'm going to hit the head, you wanna join me*?" – asking Plaintiff to go to the restroom with him. (Exh A., Fernandez Depo. 293:18 – 294 and 296)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** as even according to Plaintiff's description of the incident, common sense indicates he was speaking to the man she was standing next to and not to her. **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Number 40.

**PLAINTIFF STATES:**

123. According to Plaintiff, Plaintiff was "*disgusted and appalled that [Defendant Greene began] to degrade [Plaintiff] in every way possible*" (Exh A., Fernandez Depo. 295:8)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Numbers 40 and 121.

**PLAINTIFF STATES:**

124. Plaintiff testified that she began to document the incidents related to Mr. Greene and sent her documentation to Defendant Saltiel in emails. (Exh A., Fernandez Depo. 267)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** about whether or not Plaintiff emailed Mr. Saltiel about Mr. Greene's behavior for the reasons articulated on pages 12-13

of Defendant's reply brief.

<u>**PLAINTIFF STATES:**</u>

125. Plaintiff testified that the whole office turned on her after she began complaining (Exh A. Fernandez Depo., 292:8) Defendants Wenig and Saltiel were in positions to stop the retaliation and harassment and took no action to do so (Id.)

> <u>**DEFENDANTS RESPOND:**</u>
>
> **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Numbers 40. In addition evidence from prior to the December Complaint makes it clear that Plaintiff had succeeded in engendering a strong dislike from her subordinates prior to

<u>**PLAINTIFF STATES:**</u>

126. Out of all the complaints that Plaintiff claims she made concerning Defendant Greene, Wenig Saltiel Defendants only talked to Defendant Greene on one occasion (Exh A. Fernandez Depo., 112:1)

> <u>**DEFENDANTS RESPOND:**</u>
>
> **NOT A GENUINE DISPUTE OF FACT** for the same reasons stated in response to Numbers 40 and because the record does not support the contention that Plaintiff complained on more than one occasion.

<u>**PLAINTIFF STATES:**</u>

127. Counsel for Plaintiff interviewed Nonparty Witness Morgan Mindell, who was an attorney at

Wenig Saltiel for a portion of the time relevant to the Complaint. (Exhibit G, Mindell Depo)

**DEFENDANTS RESPOND:**

**NOT MATERIAL.**

**PLAINTIFF STATES:**

128. Mr. Mindell was interviewed by Plaintiff's former counsel and Mr. Mindell provided information related to the environment at Wenig Saltiel. Plaintiff's former counsel then prepared an affidavit for Mr. Mindell, utilizing information provided by Mr. Mindell, and provide the affidavit to Mr. Mindell to sign. (Exh U., Mindell unexecuted affidavit; *see also,* Exh G, Mindell Depo. 81 – 82:7)

**DEFENDANTS RESPOND:**

**NOT MATERIAL. MISTATES TESTIMONY.** Mindell testified that he didn't "remember specifically stating certain events that took place." And agreed with the statement that he was not able to say that things included in the affidavit were things he had told the attorney. Plaintiff Ex. G Mindell Dep. 67:12 – 68:1.

**PLAINTIFF STATES:**

129. After receiving the affidavit prepared by Plaintiff's former counsel, Mr. Mindell had a change of heart and decided that he did not want to be involved as a witness in this lawsuit any longer (Exh G, Mindell Depo. 81 – 82:7) During his deposition, Mr. Mindell did not

**DEFENDANTS RESPOND:**

**NOT MATERIAL. MISTATES TESTIMONY.** Mindell did not say he had a changed of heart, rather he decided not to be involved "after thinking about it." Plaintiff Ex. G Mindell Dep. 81:4-13.

**PLAINTIFF STATES:**

130. Nevertheless, before Mr. Mindell decided to not be involved in this lawsuit, Mr. Mindell advised Plaintiff former counsel that on October 22. 2018, *the Firm held sexual harassment training class (run by Plaintiff) with all staff members present. During the meeting, Mr. Greene expressed displeasure with all discrimination laws saying, "it's ok to pat your secretary on the ass and rub her shoulders. These discrimination laws today are too extreme. Back in my day, you could do whatever you w3anted and no one complained. This is just ridiculous*." (Exh U, Mindell unsigned affidavit, ¶ 11)

**DEFENDANTS RESPOND:**

**INADMISSABLE EVIDENCE** as it is an unsigned affidavit. Nothing in the record suggests that Mindell told this to Plaintiff's Prior Counsel. See Response to Number 128.

**PLAINTIFF STATES:**

131. Mindell confirms that Defendant Saltiel "*was also present at this training, laughed and did not address or correct Mr. Greene's statements*." (Exh U, ¶ 11)

**DEFENDANTS RESPOND:**

**INADMISSABLE EVIDENCE** as it is an unsigned affidavit. Nothing in the record

suggests that Mindell told this to Plaintiff's Prior Counsel. See Response to Number 128.

**PLAINTIFF STATES:**

132. During his deposition testimony, Mr. Mindell (contrarily) denied that anything out of the ordinary occurred at the sexual harassment training, which is contrary to what he advised Plaintiff's former Counsel. (Exh G, Mindell Depo. 83:3)

**DEFENDANTS RESPOND:**

**NO DISPUTE** that he testified that nothing out of the ordinary occurred at the sexual harassment training. No evidence in the record that he told the opposite to Plaintiff's Prior Counsel. See Response to Number 128.

**PLAINTIFF STATES:**

133. When asked if Plaintiff's former counsel misrepresented Mr. Mindell's statement, or if Plaintiff's former Counsel was "*feeding Mindell information that he wanted Mindell to adopt,*" Mr. Mindell confirmed, "***no . . . he was trying to search for information that would support his client's position, like any lawyer would***." (Exh G, Mindell Depo. 83:18 – 84:5)

**DEFENDANTS RESPOND:**

**MISTATES TESTIMONY.** The testimony referenced above was not about whether the unsigned affidavit accurately quoted Mr. Mindell, it was purely about whether Plaintiff's former counsel's behavior during their conversation. Mr. Mindell testified that he couldn't recall if he had ever edited the affidavit (Plaintiff Ex. G Mindell Dep. 82:2-7) and that he didn't recall telling Plaintiff's former counsel that some of the events, that were recorded in

the affidavit, had occurred. See Response to Number 128.

**PLAINTIFF STATES:**

134. Defendant Saltiel was responsible for addressing complaints of discrimination made by Wenig Saltiel employees (Exh. E., Saltiel Depo. 74:5-18)

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED.**

**PLAINTIFF STATES:**

135. In the year 2019, Defendant Wenig advised Defendant Greene that Plaintiff made a complaint about Defendant Greene regarding discrimination. (Exh B., Green Depo. 4/27/2023, 104) During this meeting, Defendant Saltiel (and another partner, Nick Moccia) was also present (Id. 105:1)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT**, the parties agree that this event occurred in December 2018.

**PLAINTIFF STATES:**

136. Defendant Greene understood that plaintiff complained that Defendant Green had "*a poor attitude towards immigrants*" and "*immigrant attorneys*." (Exh C. Greene Depo. 184:14 - 185)

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** that this was Defendant Greene's understanding at his Deposition.

**PLAINTIFF STATES:**

137. Defendant Greene understood that Plaintiff was complaining that Defendant Greene "*thought that [immigrant attorneys] were less qualified than American Attorneys*." (Exh C. Greene Depo. 185:5)

**DEFENDANTS RESPOND:**

**NOT DISPUTED** that this was Defendant Greene's understanding at his   Deposition.

**PLAINTIFF STATES:**

138. During this meeting, Defendant Wenig read Plaintiff's complaint to Mr. Greene out loud (Exh. B., Green Depo., 4/27/2021, 106)

**DEFENDANTS RESPOND:**

**NOT DISPUTED** that this was Defendant Greene's testified this way at his deposition. However, there is **NOT A GENUINE DISPUTE OF FACT** about whether or not a written complaint was made as Plaintiff only alleges that she did so via email. The Court can conclude that no such email exists for the reasons argued on pages 12-13 of the reply brief.

**PLAINTIFF STATES:**

139. Defendant Greene denied the claims of discrimination made by Plaintiff against him (Exh. B., Green Depo., 4/27/2021, 106)

**DEFENDANTS RESPOND:**

**NOT DISPUTED.**

**PLAINTIFF STATES:**

140. After the complaint was read to Defendant Greene, without investigation, Defendant Wenig concluded that she "*believed*" Defendant Greene and opined to Mr. Greene: "***I know you didn't say anything awful to this person, you're not a racist, but you got to get this thing smoothed over***." (Exh. B., Green Depo., 4/27/2021, 119:8 – 120:8)

   **DEFENDANTS RESPOND:**

   **NOT MATERIAL** even if true, it does not violate civil rights laws to not believe an accuser. This does not demonstrate hostile work environment or retaliation especially when they required Defendant Greene to apologize to Plaintiff. **NOT A GENUINE DISPUTE OF FACT.** All parties agree that an investigation was done. The partners spoke to both Plaintiff and Defendant Greene. Additionally, no written complaint. See Response to Number 138. **TESTIMONY OUT OF CONTEXT.** Even according to Defendant Greene, Ms. Wenig stated, "You did something to hurt her feelings. You must have."

**PLAINTIFF STATES:**

141. Individual Defendants Wenig and Saltiel held a meeting with Defendant Greene about Plaintiff's complaint. Their instructions to Defendant Greene was to *"apologize and it will go away*." (Exh C. Greene Depo. 183 – 184).

**DEFENDANTS RESPOND:**

**NOT MATERIAL** even if true, it does not violate civil rights laws to not believe an accuser. This does not demonstrate hostile work environment or retaliation. Especially when they required Defendant Greene to apologize to Plaintiff.


**PLAINTIFF STATES:**

142. Despite Plaintiff's clear complaint of discrimination (Exhs K, L, M, Fernandez Complaint and Ira apology), when asked if Plaintiff ever made an internal complaint of discrimination while employed a Wenig Saltiel, Defendant Saltiel awkwardly responded, "*never*." (Exh E., Saltiel Depo. 75:24 – 76)


**DEFENDANTS RESPOND:**

**NOT MATERIAL.** Mr. Saltiel did not deny that Plaintiff raised the issue of Defendant Greene's behavior on or about December 11, 2018 with Mr. Saltiel, whether Mr. Saltiel classified that conversation as a complaint about discrimination has no bearing on the issues before the Court. **MISCONSTRUES TESTIMONY.** Plaintiff did not complain about disparate treatment, but rather about racist statements made by Defendant Greene. Although to a practitioner of employment law, racists statement may clearly fall under the category of      discrimination, there is no reason to conclude that Mr. Saltiel understood that was the question he was being asked in the Deposition. In fact when asked just a short time later whether "anyone ever ma[d]e any complaints about Mr. Greene violating any aspects of the policies?" Mr. Saltiel responded, "I'm not sure if it was considered a complaint that was made. I believe that there was a discussion that took place that was raised by Ms. Fernandez." Plaintiff Ex. E Saltiel Dep. 79:5 – 15. This testimony

demonstrates that Mr. Saltiel understood Ms. Fernandez to be raising an issue about Defendant Greene that she believed violated the firm's policies.

## PLAINTIFF STATES:

143. Despite Plaintiff's clear complaint of discrimination, Defendant Saltiel insists that **_"a complaint was never made by an employee."_** (Exh E., Saltiel Depo. 78:16)

### DEFENDANTS RESPOND:

**NOT MATERIAL** and **MISCONSTRUES TESTIMONY** for the same reasons as articulated in response to Number 142.

## PLAINTIFF STATES:

144. Defendant Saltiel refuses to accept that Plaintiff made a complaint against Defendant Greene. According to Defendant Saltiel Ms. Fernandez merely "discussed" Defendant Greene's discriminatory behavior, as opposed to complaining about same. (Exh E., Saltiel Depo. 79:5-15)

### DEFENDANTS RESPOND:

**NOT MATERIAL** and **MISCONSTRUES TESTIMONY** for the same reasons as articulated in response to Number 142.

## PLAINTIFF STATES:

145. Defendant Wenig also testified that, though she admits that Plaintiff complained about Defendant Greene's conduct being racially "_problematic or offensive_," Defendant Wenig did not think that matter was serious because Plaintiff "_didn't indicate it was discriminatory . . . she said_

*she was offended*," and since **"people get offended by all sorts of things"** Defendant Wenig did not consider Ms. Fernandez's concerns as a complaint. (Exh. F, Wenig Depo. 155:13 – 156:9)

### DEFENDANTS RESPOND:

**NOT MATERIAL.** Ms. Wenig did not deny that Plaintiff raised the issue of Defendant Greene's behavior on or about December 11, 2018 with her and Mr. Saltiel, whether Ms. Wenig classified that conversation as a complaint about discrimination has no bearing on the issues before the Court. **MISCONSTRUES TESTIMONY.** Ms. Wenig did not testify that she didn't think it was serious. She testified that she believed that if Plaintiff had believed it was serious that Plaintiff would have documented it as a complaint of discrimination as doing so was Plaintiff's job as the office manager. Plaintiff Ex. F. Wenig Dep. 157:7-13.

### PLAINTIFF STATES:

146. Defendant Wenig testified, tersely, that she did not treat Plaintiff's concerns as a complaint (Exh. F, Wenig Depo. 156) "*I treated it as, she had a conversation with Ira that she thought was inappropriate and she brought it to our attention. That's how I treated it*." (Id. 156:17)

### DEFENDANTS RESPOND:

**NOT MATERIAL.** Ms. Wenig did not deny that Plaintiff raised the issue of Defendant Greene's behavior on or about December 11, 2018 with her and Mr. Saltiel, whether Ms. Wenig classified that conversation as a complaint about discrimination has no bearing on the issues before the Court.

**PLAINTIFF STATES:**

147. Defendant Wenig did not ask that the incident be documented because Defendant Wenig did not take the complaint seriously. Defendant Wenig asked, "*Why would [Wenig] tell Ms. Fernandez to document something I didn't presume was a discriminatory complaint?*" (Exh. F, Wenig Depo. 157:19-23) Defendant Wenig: "***saw nothing that needed documentation. [Wenig] didn't believe it was a discriminatory complaint. It was an inappropriate conversation where, as she said, 'I was offended'***." (Id. 158:17)

      **DEFENDANTS RESPOND:**

      **NOT MATERIAL** and **MISCONSTRUES TESTIMONY** for the same reasons as articulated in response to Number 145.

**PLAINTIFF STATES:**

148. Defendant Wenig agreed that an employee does not have to use the word "discrimination" for the complaint to be treated as a discrimination matter.  (Exh. F, Wenig Depo. 159:7) As per Defendant Saltiel, a complaint does not have to be artfully stated in order for him to identify it as a discrimination complaint and he would not deny the employee a complaint because they did not use the word "discrimination." (Exh. E. Saltiel Dep. 76:13 – 77:5)

      **DEFENDANTS RESPOND:**

      **NOT DISPUTED.**

**PLAINTIFF STATES:**

149. Defendant Wenig does not believe that Defendant Greene would demean people of foreign

origin simply because "*his wife is Japanese and his son-in-law is Indian*." (Exh. F, Wenig Depo. 165:17 – 166:13)

**DEFENDANTS RESPOND:**

**MISCONSTRUES TESTIMONY.** Plaintiff's counsel twice tried to get Ms. Wenig to concede that this was her testimony and she twice clarified that this is not what she meant. Her fullest answer was that "People can say all sorts of things. What I said was, I would have been very surprised because Ira [Greene's] wife is of Japanese descent, she's an immigrant, and his son-in-law is Indian. I've never heard Ira make a statement about immigrants. And civil rights can be almost anything. It can include everybody of foreign origin. So I don't know why, you know, it would have a particular meaning." Plaintiff Ex. F. Wenig Dep. ¶ 166:22-167:7.

**PLAINTIFF STATES:**

150. When Defendant Wenig saw Defendant Greene's apology letter (Exh.____) wherein Defendant Greene apologized for "*demeaning people of foreign origin*" and stated: "*demeaning statements about any group of professionals based on race or ethnic origin are always wrong and clearly inappropriate*" Defendant Wenig ignored that aspect of Defendant Greene's apology and did not take that seriously (Exh. F, Wenig Depo. 167:18 - 169)

**DEFENDANTS RESPOND:**

**MISCONSTRUES TESTIMONY.** Ms. Wenig did not testify that she ignored it or did not take it seriously. Rather she testified that she did not know what it referred to as "Neither [Greene] nor Ms. Fernandez made any mention of any statement of demeaning people of foreign origin in our conversation." Plaintiff Ex. F. Wenig Dep. ¶ 167:14 – 17.

**PLAINTIFF STATES:**

151. Defendant Saltiel never asked or advised Defendant Greene to review or familiarize himself with the antidiscrimination policies of Wenig Saltiel (Exh E., Saltiel Depo. 261:2)

    **DEFENDANTS RESPOND:**

    **MISCONSTRUES TESTIMONY.** Saltiel testified that he didn't require him to review the policies "other than require[ing] him to attend the training." Plaintiff Ex. E Saltiel Dep. 261: 3 – 8.

**PLAINTIFF STATES:**

152. When asked if Defendant Greene was ever instructed about the antidiscrimination policies of Wenig Saltiel – or whether he ever had discussions with Defendant Saltiel or Defendant Wenig about the policies – Defendant Greene answered: "I don't know." (Exh B. Greene Depo, 100 - 101) Defendant Greene "does not remember" whether Defendant Wenig or Saltiel ever told him to read the antidiscrimination policy (Id. 101:21)

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** that Defendant Greene testified in that manner.

**PLAINTIFF STATES:**

153. Defendants Wenig and Saltiel prevented Plaintiff from doing her job as an office manager. (Exh. A, Fernandez Dep. 117:6)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT.** The contemporary evidence demonstrates that Defendants continued to support Plaintiff in her position up until she was terminated. See e.g. Plaintiff's Exhibit X in which Mr. Saltiel stated "she tried to go around you and I told her she need to address it with you as the direction came from you." This is supported by the affidavits of other employees. See e.g. Mitch Aff ¶ 21 ("I observed the partners give Ms. Fernandez the respect and office manager warranted through the day she was fired.") This is further supported by the fact that neither the termination emails from George Lopez or Natasha Laughton which both accused Plaintiff of poor management and inappropriate behavior resulted in Plaintiff's termination or withdrawal of support. See Saltiel Aff Exs 3 and 4. The record also demonstrates that Plaintiff was given multiple changes to improve her performance despite her subpar performance. See e.g. Saltiel Aff Exs 15, 16, 17, 18, and 19. In addition, additional affidavits speak to Plaintiffs subpar performance. See e.g. Farley Aff at ¶ 10; Freckleton Aff 12-14; Moccia Aff. 19 -22.

**PLAINTIFF STATES:**

154. Defendants Wenig and Saltiel failed to prevent retaliation against Plaintiff. (Exh A. 117:11 *see also* Exh AA Fernandez Declar. ¶¶25-33)

**DEFENDANTS RESPOND:**

**NOT A GENUINE DISPUTE OF FACT** for the same reasons as stated in response to Number 153.

**PLAINTIFF STATES:**

155. Defendants Wenig and Saltiel prevented Plaintiff from carrying out her duties, based on her race/color (exh A. Fernandez Dep. 118)

    **DEFENDANTS RESPOND:**

    **NOT A GENUINE DISPUTE OF FACT** for the same reasons as stated in response to Numbers 40 and 153.

**PLAINTIFF STATES:**

156. Plaintiff complained about the staff not respecting her and disobeying her directives (Exh E., Saltiel Depo. 91:11-18; Exh Q, "takeaways" p.1) Plaintiff raised concerns to Defendants Wenig and Saltiel about the employees intentionally being insubordinate and refusing to follow her directives (Exh. Q., p. 1)

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** that Plaintiff admitted that she was struggling to manage the staff and did not have their respect.

**PLAINTIFF STATES:**

157. Defendant Saltiel admitted that the disputes between Plaintiff and her subordinates was "*not something that would happen every day*" and were not "*something that would regularly repeat itself.*" (Exh E., Saltiel Depo. 97)

**DEFENDANTS RESPOND:**

**NOT DISPUTED.**


**PLAINTIFF STATES:**

158. Despite issue between Plaintiff and the subordinates at Wenig Saltiel, Defendant Saltiel noticed the ongoing issues and "*allowed Plaintiff to manage*." (Exh E., Saltiel Depo. 93-94) According to Defendant Saltiel, he recognized that Ms. Fernandez would complain that certain employees "*were not doing their jobs and [she] needed to get them to do their job*." (Id. 94; *see also*, Exh. Q., p. 1)


**DEFENDANTS RESPOND:**

**TAKES DEPOSITION TESTIMONY OUT OF CONTEXT.** In context it was clear that Mr. Saltiel provided significant support to Plaintiff.

Q: It was no secret that Ms. Fernandez had issues with the employees. They were having difficulties getting along. Isn't that right?
Mr. Biniakewitz: Note my objection. You can answer.
A: I think it's a fair statement to make. I mean, I don't know exactly every discussion, but I think it's a fair statement of what I've heard from different people and from Ms. Fernandez over time.
Q: Did you ever make any determination as to who in the rifts, if you will, between Ms. Fernandez and the support staff, who was at fault or what the issues were?
A. I've always determined what the issues were. When you say who is at fault, again, you're dealing with a very gray area. Because you're dealing with an office manager, who is a supervisor, and a person who is a subordinate to that office manager, who needs to take direction and so forth. What my opinion might be, sometimes, is not what everybody else's opinion might be. To some extent, you have to allow a manager to manage. It's very easy for someone to play devils advocate and say, "Well, she's not speaking to me appropriately, and so forth." But then also, at the same time, forget the substance of the discussion. Which, of course, would be, Ms. Fernandez would say, "Well, the person is not doing their job and I need to get them to do their job and so forth." Everybody, I think, can disagree on different ways to deal with employees.
Q: Did you ever see evidence from Ms. Fernandez regarding insubordination by the support staff? Did she ever show you emails and such of people refusing to do work and refusing to follow instructions by her?
A: Yes.

Q: Did you ever deal with any of those issues or any of those emails?
A: Always.
Q: Do you recall any specific situations that you may have dealt with regarding Ms. Fernandez and a support staff member who she claims was insubordinate to her?
A: I believe there was a gentleman, James Elliott, I believe was the name. That was one in particular that I dealt with. Another one was Mr. Moccia's assistant, Francis Samea.
Q: Can you tell me in particular what you recall about the situation with James Elliott and Ms. Fernandez?
A: I recall that he sent an e-mail that bordered on insubordination of not wanting to follow certain directions. I took immediate action, met with them, and gave to an understanding of how things needed to be done.
Plaintiffs Ex. E. Saltiel Aff. 92:20 – 95:14

**PLAINTIFF STATES:**

159. Defendant Saltiel was shown, and saw, evidence of the employees being insubordinate to Ms. Fernandez, refusing to follow orders or refusing to do their work. (Exh E., Saltiel Depo. 94:10-16; *see also*, Exh. Q., p. 1). Defendant Saltiel admits that he had to step in to correct employees' insubordinate behavior against Plaintiff (Id. 95:6-14). Defendant Saltiel claimed that he "*always*" addressed the issues he noticed (Id. 94:10-19)

**DEFENDANTS RESPOND:**

**NOT DISPUTED.** See Response to Number 158 for full context.

**PLAINTIFF STATES:**

160. Plaintiff raised concerns to Defendant Saltiel that the subordinate employees were refusing to follow Plaintiff's orders (Exh_Q, "list of takeaways from meeting held on 1/28/2019; *see also*, Exh E., Saltiel Depo. 112-113). Among other things, Defendant Saltiel acknowledged that "**people started complaining when they were told they had to be cross trained. They are not allowed to object to being trained on the job**." (Exh Q, p1)

**DEFENDANTS RESPOND:**

**NOT DISPUTED.**

**PLAINTIFF STATES:**

161. But when asked if he looked into the issue that Plaintiff complained about, which was the employees' refusing to take orders or instructions from Plaintiff, Defendant Saltiel answered "*No*." (Exh E. Saltiel Depo. 112)

**DEFENDANTS RESPOND:**

**MISCONSTRUES TESTIMONY.** Saltiel testified that he didn't look into whether or not people were refusing to be cross-trained as it wasn't necessary. If they refused, the office manager was empowered to take remedial actions. The full testimony was as follows:

Q. Was it accurate that people were complaining about having to be cross trained?
A. I couldn't tell you if it's accurate. I can tell you it was raised here.
Q. Did you ever look into that issue, as to whether people were complaining and were refusing to be cross-trained.
A. No.

Q. Why didn't you look into that issue at all?
A. They are not allowed to complain as to the job duties. I'm not asking them to do something illegal, immoral, dangerous, dirty. We are asking them to, instead of preparing document B in a case. That's what a legal assistant does. The employees don't get to go and say, "I have to approve every job that I do." It's an office manager's job to go and to organize the employees, assign them duties. And if they are not doing what they are supposed to do, whether by refusal or by lack of ability, to take remedial steps.
(Plaintiff's Ex. E Saltiel Dep. 112:15-113:11)

**PLAINTIFF STATES:**

162. Defendant Saltiel testified that, "*It's an office manager's job to go and to organize the employees, assign them duties. And if they are not doing what they are supposed to do, whether by*

*refusal or by lack of ability, to take remedial steps*." (Exh E, Saltiel Depo. 112 – 113). "*They are not allowed to complain as to the job duties*." (Id.)

**DEFENDANTS RESPOND:**

**NOT DISPUTED.** Full context provided in response to Number 161.

**PLAINTIFF STATES:**

163. As for the employees that were being insubordinate to Plaintiff, Defendant Saltiel claims that he spoke to these employees and disciplined them for their behaviors (Exh E, Saltiel Depo. 126:6) According to Defendant Saltiel, "*there was no room in the firm for people to go and say, 'I'm not going to listen to the office manager'. It's an unacceptable concept. [Plaintiff] knew that she had our backing. When these things came up, they were addressed immediately and they weren't tolerated*." (Id. 127:4)

**DEFENDANTS RESPOND:**

**NOT DISPUTED.**

**PLAINTIFF STATES:**

164. As for an employee named Ms. Francis, her disputes with Plaintiff was because Ms. Francis was the assistant to an attorney in the office and considered that attorney to be her supervisor. So, when Plaintiff gave Ms. Francis orders, Ms. Francis questioned who she should be taking orders from. (Exh E., Saltiel Depo. 98). The issue was resolved when it was decided that Plaintiff would be able to give orders to Ms. Francis regarding certain task (Id. 115:10)

**DEFENDANTS RESPOND:**

**NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

165. Another subordinate employee, Carleen Freckleton outright refused to follow orders from Plaintiff and outright told Defendants Wenig Saltiel that she would not do what Plaintiff instructed. (Exh X, email between Plaintiff and Saltiel, dated 2/14/2019, re: Carleen)

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** that Ms. Freckleton initially objected to doing as Plaintiff commanded as Ms. Freckleton was aware that Plaintiff should be doing the same task and was avoiding doing so.

**PLAINTIFF STATES:**

166. Plaintiff complained to Saltiel about Freckleton refusing to "*accept the [Plaintiff] was her supervisor*" and "*preventing [Plaintiff] from doing her job.*" (Exh X., *see also* Exh AA Fernandez Declar. ¶¶30, 37) Defendant Saltiel told Plaintiff to "address it with Freckleton" and did not intervene. (Id.)

    **DEFENDANTS RESPOND:**

    **MISCONSTRUES EVIDENCE.** Plaintiff's Exhibit X demonstrates that Mr. Saltiel did intervene by refusing to allow Ms. Freckleton to go around Plaintiff and requiring her to resolve it with Plaintiff. "She tried to go around you and I told her she needs to address it with you as the direction came from you. I hope you responded to her or called her and discussed it with her."

**PLAINTIFF STATES:**

167. Even other partners and Wenig Saltiel, Nicholas Moccia, undermined Plaintiff's directives to her subordinates, cancelled training sessions scheduled by Plaintiff for the subordinate employees, and told Plaintiff's subordinates that they did not have to follow Plaintiff's orders. (Exh Y, email from N Moccia, dated 2/21/2019, re: "cross training"; *see also* Exh AA Fernandez Declar. ¶¶31-33)

**DEFENDANTS RESPOND:**

**MISCONTRUES EVIDENCE.** Plaintiff Exhibit Y demonstrates that Plaintiff refused to accept a directive from a partner in the firm and that after he repeated the directive in response to her refusal, she hyperbolically called it harassment when it was not. Also paragraph 32 of Plaintiff's declaration is particularly disconnected from fact. Plaintiff claims that because Mr. Moccia cancelled a cross training on 2/21/2019 "we did not have proper coverage when employees were out of the office and many tasks were not being done." However, Plaintiff was terminated a week later. It strains all credulity to believe that this cross-training had a significant impact on one week of work.

**PLAINTIFF STATES:**

168. As for employee Ming Davis, Plaintiff complained to Defendant Wenig Saltiel that Ms. Davis, who was Plaintiff's subordinate, was being insubordinate to Plaintiff (Exh. F, Wenig Depo. 35:22 – 36:10). Plaintiff also complained to Defendant Saltiel on 9/12/2018 about Ms. Davis outright refusal to follow Plaintiff's orders and her brazen insubordination, which included hanging up on Plaintiff and being disrespectful. (Exh. V). This was an issue that Defendants were well aware of (Id.)

**DEFENDANTS RESPOND:**

**NOT DISPUTED** that Plaintiff had apparently alienated a direct report in her first month of work. **MISCONSTRUES EVIDENCE** as nothing in exhibit V states that Ms. Davis refused to follow orders.

**PLAINTIFF STATES:**

169. As for Wenig Saltiel former employee Ming Davis, Ms. Davis complained to Defendants that Plaintiff was "harassing" when Plaintiff assigned tasks or work to Ms. Davis. (Exh E. Saltiel Depo. 128:1-19) Defendant Saltiel recognized that Ms. Davis refused to take orders from Plaintiff and referred to Plaintiff's orders as "harassment." (Exh E. Saltiel Depo. 128:10-19)

**DEFENDANTS RESPOND:**

**NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

170. Ms. Davis spoke to Defendant Saltiel in an insubordinate and disrespectful manner as well (Exh. V, texts between Fernandez and Saltiel, dated 9/15/2018)

**DEFENDANTS RESPOND:**

**CITED EVIDENCE DOES NOT SUPPORT CLAIM.** Plaintiff's Exhibit V doesn't show this in any way.

## PLAINTIFF STATES:

171. Defendant Saltiel spoke to both Ms. Fernandez and Ms. Davis about their issues (Exh E.

Saltiel Depo. 133) Defendant Saltiel resolved the disagreement between Plaintiff and Ms. Davis

but **Defendant Saltiel knows that Ms, Davis did not like his resolution**. (Id. 133: 3-14) As per

Defendant Saltiel, "this was the type of meeting where you have a discussion and people tell you

'*this is worked out and this is what we'll do'*." (Id.)


### DEFENDANTS RESPOND:

**MISCONSTRUES TESTIMONY.** Saltiel actual testified as follows:

Q:  Sir, with regard to Ming, did she specifically tell you what she believed was harassment by Ms. Fernandez?
A:  I believe so.
Q: Can you recall what they are at this time?
A:  I think it was the tone of being spoken to, and maybe the intonation of how she was sp0oken to.  I don't necessarily want to use the word aggressive.  But just not - - a quiet person, kind of saying, Why is she bothering me?  Why is she doing this to me, type of scenario.
Q:  Did you ever speak to Ms. Fernandez about your meeting with Ming?
A:  Yes.
Q:  Can you recall how long it was after you spoke to Ming?
A:  Immediately.
Q:  What, if anything, did you discuss with Ms. Fernandez relating to her involved interactions with Ming?
A.  The same issues, as far as what had to be done.   And that was followed by a meeting with both of them to try to work it out.  Again, this was the type of meeting where you have a discussion and people tell you, "okay, this is worked out and this is what we will do."  People, I think, always harbor some discontent on it, which eventually lead to Ms. Davis resigning and siting the reason for resigning as Ms. Fernandez.
Q:  When Ms. Davis resigned, siting Ms. Fernandez as the reason, did you have any discussions with her about that, Ming?
A:  With who?
Q:  I'm talking about Ming, about her resignation.
A. Yes.
Q:  Can you tell me when, in relation to her resignation, that you had a discussion with her?
A:  I think it was that day that she e-mailed me, while she was in the office.
Q:  Was that meeting in person, by phone, or some other manner?
A:  I think in person.
Q:  Did you document your discussions with her on that issue, during that meeting?

A:  I don't recall, but I doubt it.
Q: Do you think you would have put some notations in your book regarding that?
A:   Probably not.   Because I knew from the prior conversations, that there was a situation there.
Q:  Can you tell me if you recall anything that Ming might have said specifically on the day she was resigning, about Ms. Fernandez?
A:  Specifically, no.  Just didn't like the way she was treated.  And I believe that, you know, she basically said that she didn't like the way she was treated in the firm since Ms. Fernandez started as the office manager.
(Plaintiff's Ex. E Salitel Dep. 132:4 – 134:24)


**PLAINTIFF STATES:**

172. According to Defendant Saltiel, Ms. Davis "***harbored discontent***" about the way Defendant Saltiel resolved her complaint about Plaintiff "***which eventually lead to Ms. Davis resigning and siting the reason for resigning as Ms. Fernandez***." (Exh E. Saltiel Depo. 133:3-13). Davis resigned due to Saltiel's handling of the situation, not due to Plaintiff's actions. (Id)


 **DEFENDANTS RESPOND:**

 **BAD FAITH INTERPRETATION OF TESTIMONY.** This interpretation of Mr. Saltiel's testimony is not a remotely reasonable interpretation of what he stated which can be read in response to Number 71.


**PLAINTIFF STATES:**

173. As per Defendant Saltiel's admission, Ms. Fernandez' termination **had nothing to do** with her interactions with employee Ming Davis (Exh E. Saltiel Depo. 135:18-21)


 **DEFENDANTS RESPOND:**

 **MISCONSTRUES TESTIMONY.** Saltiel testified that Plaintiff's termination had nothing to do with what he learned from Ming on the day Ming quit, which was the

day before Plaintiff was terminated.

**PLAINTIFF STATES:**

174. Defendant Saltiel testified that Plaintiff's termination "***didn't hinge upon a dissatisfaction of an employee***." (Exh E. Saltiel Depo. 135:22-136)

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** that no one employee's dissatisfaction was dispositive in the decision to terminate Plaintiff.

**PLAINTIFF STATES:**

175. Defendant Saltiel did not terminate Plaintiff for allegedly claiming that she was working from home when she was not. Defendant Saltiel claimed to find out that Plaintiff was not working from home when she alleged that she was, only "*after Plaintiff was fired already" or "after she retained an attorney."* (Exh E. Saltiel Depo. 167-168:4 and 173:5-12)

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED** that Plaintiff was not terminated for lying about working from home on the day she was terminated as that was not known to Defendants when they made the decision to terminate Plaintiff.

**PLAINTIFF STATES:**

176. At the time that Plaintiff began working at Wenig Saltiel, the firm did not have a clear and up to date antidiscrimination policy in place. (Exh A, Fernandez Depo. 89:13-90:5) One of Plaintiff's

duties was to update and revise the policies and manuals of Wenig Saltiel (Id. 89)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** and thus **NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

177. According to Defendant Greene, Wenig Saltiel did not have antidiscrimination policies until Plaintiff started working at Wenig Saltiel. (Exh B. Greene Dep., 4/27/2021, p. 66)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** and thus **NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

178. If there were antidiscrimination policies at Wenig Saltiel before Plaintiff began working there, Defendant Greene never saw it. (Exh B. Greene Dep., 4/27/2021, p. 72:14 and 74:14) Defendant Greene does not recall seeing the existing antidiscrimination policy that was in effect when Plaintiff was employed at Wenig Saltiel (Id. 75:9)

**DEFENDANTS RESPOND:**

**NOT MATERIAL** and thus **NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

179. When asked if he, as an alleged non-employee, was required to follow the antidiscrimination and harassment policies of Wenig Saltiel, Defendant Greene answered: "***I don't know***." (Exh B. Greene Dep. 98:20)

       **DEFENDANTS RESPOND:**

       **NOT MATERIAL** and thus **NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

180. Defendant Greene was aware that Plaintiff "*wanted to make sure that everybody was protected against discrimination*" while Plaintiff was an office manager at Wenig Saltiel (Exh B. Greene Dep., 4/27/2021, p. 69)

       **DEFENDANTS RESPOND:**

       **NOT MATERIAL** and thus **NOT DISPUTED** for the purposes of Summary Judgment.

**PLAINTIFF STATES:**

181. Plaintiff was instructed to hold a meeting with the Wenig Saltiel employees regarding sexual harassment only. Racial discrimination was not discussed. (Exh A. Fernandez Depo. 92).

       **DEFENDANTS RESPOND:**

       **NOT MATERIAL** and thus **NOT DISPUTED** for the purposes of Summary

Judgment.

**PLAINTIFF STATES:**

182.   Plaintiff knew to provide all employee complaints (including discrimination complaints) to Defendant Jeffery Saltiel to resolve. (Exh A. Fernandez Dep. 93)

    **DEFENDANTS RESPOND:**

    **NOT DISPUTED.**

**PLAINTIFF STATES:**

183. Defendant Wenig Saltiel's handbook contains a policy for workplace threats and violence. (Exh I, Workplace Violence Policy and Exh B., Greene Dep 4/27/21, 92). Defendant Greene (who watched violent racist videos in his office) **did not know** that Wenig Saltiel had a Workplace Violence Policy and never saw same before. (Id. p. 92).

    **DEFENDANTS RESPOND:**

    **NOT MATERIAL** whether Defendant Greene knew about the Workplace Violence Policy and thus **NOT DISPUTED** for the purposes of Summary Judgment. **NOT A GENUINE DISPUTE OF FACT** regarding whether Greene watched violent racist videos in the office for the same reasons stated in response to Number 40 and Number 73.

**PLAINTIFF STATES:**

184. While asking Defendant Greene about Wenig Saltiel's antidiscrimination policies and any

training that took place at the firm related to same, and what was discussed at this meeting, Defendant Greene stated: "*They talked about things that are not supposed to happen in offices in relationship between employees and supervisors and . . . Not violating people's space, not touching them, not using certain kinds of language, not talking down to people, **all the things that were accepted 30, 40 years ago in American business places, and happened all the time**. But those days are gone forever. And that was the purpose of this stuff, to make sure that this would be on our minds and should never happen*." (Exh B. Greene Depo. 77:11-78:5)

**DEFENDANTS RESPOND:**

**NOT DISPUTED.**

**PLAINTIFF STATES:**

185. According to Defendant Greene: "*I think the intention of the meetings was that the staff, everyone in this office would have a knowledge of what the policy is at present and we have to live by it. **That was the purpose of this, that we should all know that this stuff is not acceptable anymore***." (Exh B. Greene Depo. 84:25 – 85:5)

**DEFENDANTS RESPOND:**

**NOT DISPUTED.**

**PLAINTIFF STATES:**

186. Defendant Greene continued some of his discriminatory commentary in his own deposition in this case. (Exh B., Green Depo., dated 4/27/2021, 111). When talking about "*attorneys from foreign countries,*" Defendant Greene opined that they "***bit[e] off more than they could chew***

*because this is their practice. People were still practicing, taking everything that comes in the door. You can't do that anymore, it's too dangerous, but that's what they do. So we pick up that wreckage*." (Id. 111)

<u>**DEFENDANTS RESPOND:**</u>

**NOT DISPUTED** that Greene testified that "attorneys from foreign countries sometimes bit off more than they could chew because this is their practice." Plaintiff appears to have intentionally excluded the word "sometimes" from the quote. Defendant Greene appears to have been discussing a common situation faced by practitioners from insular communities or communities in which English is not the primary language spoken. Members of those communities prefer attorneys who are members of the communities. As a result "sometimes" those attorneys end up taking cases in which they lack subject matter expertise. In that context, although Mr. Greene's phrasing may have been inartful, it was not xenophobic or racist.

<u>**PLAINTIFF STATES:**</u>

187. This testimony is consistent with what Plaintiff and Non Party Witness Javon Blackmon complained about, which Defendant Greene wrote apologies for. (*See* Exhs K, L, M) Witness Javon Blackmon specified that Defendant Greene made these kinds of statements in the workplace and Mr. Blackmon complained to Plaintiff about same (*See* Exh M, Blackmon Affid. ¶¶7-9).

<u>**DEFENDANTS RESPOND:**</u>

**NOT DISPUTED** that Greene's testimony may reflect the exact statement for which Plaintiff initiated her December Complaint. In this context, it is understandable why Mr.

Greene did not fully comprehend why Plaintiff found it upsetting. Moreover, it quite evidently does not rise to the level of a hostile work environment. And while it is understandable why Plaintiff could be offended about such a statement, especially if she didn't agree with the sentiment or thought the Defendant Greene held that belief out of some animus for immigrant attorneys, a complaint over such a statement seems highly unlikely to result in a concerted effort to retaliate against Plaintiff. It also helps explain why the Partners in the firm thought an apology letter would be appropriate but that further action was not necessary.

Dated:  New York, New York
     June 2, 2023

**WENIG SALTIEL LLP**
*Attorneys for Moving Defendants*

By: /s/ Geoffrey Bowser
321 Broadway, 2nd Floor
New York, New York 10007