UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                                                                 :
**SHONDA FERNANDEZ,**                                            :
                                                                 :
                                        Plaintiff,               :
                                                                 :     **MEMORANDUM DECISION AND**
                                                                 :     **ORDER**
                          – against –                            :
                                                                 :     19-CV-1979 (AMD) (MMH)
**WENIG SALTIEL LLP**, **IRA GREENE**,                           :
**JEFFREY L. SALTIEL**, and **MERYL L.**                         :
**WENIG**,                                                       :
                                                                 :
                                        Defendants.              :
---------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

   The plaintiff brings this action against her former employer, Wenig Saltiel LLP, and

former supervisors Jeffrey L. Saltiel, and Meryl L. Wenig (together, the "Wenig Saltiel

defendants"), as well as another former colleague, Ira Greene. (ECF No. 1.) The plaintiff

alleges race discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981"), the New

York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law

("NYCHRL"). Before the Court is the Wenig Saltiel defendants' motion for summary judgment

on all claims. (ECF No. 86.)[1] As explained below, the motion is granted in part and denied in

part.

## BACKGROUND[2]

   From August 2018 to March 1, 2019, the plaintiff, a Black woman of Hispanic descent

(ECF No. 1 ¶ 2), was the office manager of Wenig Saltiel LLP, a Brooklyn law firm. (ECF No.

---

[1] Greene is not moving for summary judgment.

[2] Unless otherwise noted, the factual background is based on the Court's review of the entire record,
  including the parties' Rule 56.1 statements. The Court construes the facts in the light most favorable to

86-48, Defendants' Rule 56.1 Statement ¶¶ 1, 2, 23; ECF No. 88-1, Plaintiff's Rule 56.1

Counterstatement ¶¶ 1–2.)  The plaintiff's primary responsibilities were to "follow-up with

attorneys" about the status of cases, "manage the paralegal staff" and "ensure timely completion

of work deadlines for all."  (ECF No. 86-48 ¶ 3.)

 Ira Greene, a named partner of the firm until 2009, kept an office at Wenig Saltiel for

most of the plaintiff's time at the firm.  (*Id.* ¶¶ 2, 24.)  From 2015 until about February 12, 2019,

the firm and Greene agreed that Greene could use the firm's office equipment, including a

computer with internet access and a phone, and the firm would pay for his overhead expenses

and certain other office expenses; in exchange, Greene agreed to transfer some of his cases to the

---

the plaintiff, the non-moving party.  *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir.
2005).

On a motion for summary judgment, "the Court's consideration is limited to factual material that would
be admissible in evidence at the trial."  *Local Unions 20 v. United Bhd. of Carpenters & Joiners of Am.*,
223 F. Supp. 2d 491, 496 (S.D.N.Y. 2002).  Factual allegations that are disputed without a citation to
admissible evidence are deemed admitted, as long as they are supported by the record.  Local Civ. R.
56.1; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).  Factual allegations that are not
disputed are deemed admitted, as long as they are also supported by the record.  *Id.*  The Court
disregards any arguments in the Rule 56.1 statements, of which there are many.  *Pape v. Dircksen &
Talleyrand, Inc.*, No. 16-CV-5377, 2019 U.S. Dist. LEXIS 17717, at *5 (E.D.N.Y. Feb. 1, 2019), *report
and recommendation adopted*, 2019 U.S. Dist. LEXIS 55158 (E.D.N.Y. Mar. 31, 2019).

The parties' Rule 56.1 statements lack details about when certain conduct occurred, and the context of
the facts is often unclear.  The parties frequently employ the passive voice in describing events, which
makes it difficult to determine who actually did what.  The plaintiff frequently disputes the defendants'
factual statements when there is no genuine dispute.  For their part, the defendants' challenges to the
plaintiff's statements of fact as "not material" or "not a genuine dispute" often establish that a genuine
dispute indeed exists.

The 56.1 statements' argumentation, lack of precision, and tendency to dispute assertions simply for the
sake of disputing them violates the Federal Rules of Civil Procedure, the local rules of this District, and
is of no help to the Court, since it requires the Court to sift through deposition transcripts and other
exhibits in order to determine the factual basis, if any, for the parties' claims; this is inefficient, and a
waste of resources.  *See Watson v. Grady*, No. 09-CV-3055, 2015 U.S. Dist. LEXIS 60719, at *5 n.2
(S.D.N.Y. May 7, 2015) ("The failure of . . . counsel to follow the simple mandates of Local Rule 56.1
renders it difficult for the Court to determine which facts are actually in dispute based on evidence
versus which facts are simply 'disputed' because [the parties] allege[] that they are in dispute.").
Although a court is not required to search the record, *Risco v. McHugh*, 868 F. Supp. 2d 75, 86, n.2
(S.D.N.Y. 2012) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)), the Court has done
a thorough review of the entire record.  In short, there are many genuine disputes of material fact.

firm, assign the firm 100 percent of legal fees he received, and name the firm as "attorney of record" in his cases.  (ECF No. 88-1 ¶¶ 5, 9–20; *see also* ECF No. 88-16 (2015 Wenig Saltiel LLP-Greene Agreement).)[3]  The defendants considered Greene to be an "employee" of Wenig Saltiel.  (ECF No. 93-1 at 4 ("Defendants accept for purposes of Summary Judgment that Defendant Greene was an employee of Wenig Saltiel.").)

## I.    Wenig Saltiel Hires the Plaintiff

The plaintiff had three interviews for the office manager job.  (ECF No. 88-1 ¶ 25.)  The first interview was with Saltiel and the second was with Saltiel and Wenig.  (*Id.* ¶ 26.)  The plaintiff maintains that the third interview was with Saltiel and Greene (*id.* ¶ 27 (citing ECF No. 88-3 at 72:18-24, 271–72; ECF No. 88-29 ¶¶ 4)); in the interview, Saltiel introduced Greene as "one of the original owners of the firm" (*id.* ¶ 31 (citing ECF No. 88-3 at 73:5–74:12).  Greene read her resume and told Saltiel, "She looks real good."  (*Id.* ¶ 28 (quoting ECF No. 88-3 at 272–73).)[4]  Wenig Saltiel LLP hired the plaintiff the day after the third interview.  (*Id.* ¶ 30.)

The plaintiff understood that Greene was at "basically the same level as [Wenig and Saltiel] as far as running the office" (*id.* ¶ 33 (quoting ECF No. 88-3 at 248:3–249:6)), and that Greene could cause employees to get fired (*id.* ¶ 36 (citing ECF No. 88-3 at 252–55)).  Saltiel told her that Greene was "a fixture" at the firm and that he was "not going anywhere" because Wenig would "never allow that to happen."  (*Id.* ¶ 34 (quoting ECF No. 88-3 at 250:2-16).)

---

[3] At some point during this period, Greene "performed . . . 'editing services'" for the firm (ECF No. 86-48 ¶ 21); he testified that he sometimes "made court appearances for [the firm] if there was no one available to do it," but did not remember the details (ECF No. 93-1 ¶¶ 21–22; *see* ECF No. 88-5 at 135:2–7).

[4] The defendants maintain that Greene "was not involved in the hiring process."  (ECF No. 93-1 at 15 (citing ECF No. 86-9 ¶ 16; ECF No. 86-12 ¶ 6; ECF No. 86-19 ¶ 10).)

Saltiel also told her to "[b]e very careful because if [Greene] gets in the ear of [Wenig], then [Wenig] will put you out."  (*Id.* (quoting ECF No. 88-3 at 250:11-16).)[5]

The plaintiff's office was next to Greene's.  (*Id.* ¶ 39.)  Greene gave her assignments every day, including "calling the banks" and "speaking with his clients" (*id.* ¶ 37 (quoting ECF No. 88-3 at 256)); she worked for Greene more than she worked for other attorneys in the office (*id.* ¶ 38 (citing ECF No. 88-3 at 257:3); *see also* ECF No. 88-3 at 257:3-9).[6]

## II.    Wenig Saltiel's Antidiscrimination Policies

When the plaintiff started at Wenig Saltiel, the firm's employee handbook included a policy for "workplace threats and violence," including sexual harassment.  (ECF No. 88-1 ¶ 183; *see also* ECF No. 88-11.)  The policy directed employees to give their complaints to the office manager — the plaintiff — who would pass them on to Saltiel.  (ECF No. 88-1 ¶ 182.)  One of the plaintiff's responsibilities was to "update and revise" the policies, including the antidiscrimination policy, which was not "clear" or "up to date" when she joined the firm.  (*Id.*

---

[5] The defendants contend that Wenig's and Greene's testimony, as well as the testimony of Nicholas Moccia, a junior partner at the firm, Carleen Freckleton, Wenig's assistant, and Natasha Mitchell, Saltiel's assistant, contradict the plaintiff's characterization of Greene's authority at the firm.  (*See* ECF No. 93-1 at 18–21 (citing ECF No. 86-7 ¶¶ 19–20, ECF No. 86-9 ¶¶ 16–18; ECF No. 86-11 ¶¶ 7–9; ECF No. 86-12 ¶¶ 9–10; ECF No. 86-19 ¶¶ 8–9).)  The defendants also maintain that the record shows that Greene was "not included on the email of either resignation letter sent while he was there," he "did not occupy one of the larger corner offices," and did not attend "partner meetings []or performance reviews for [the p]laintiff."  (*Id.* at 20 (citing ECF Nos. 29, 30, 32, 37, 41; ECF No. 88-3 at 257:16-19).)

[6] The defendants argue that the plaintiff's statements that she worked with Greene are "belied" by the testimony of Wenig, Greene, Freckleton, Moccia, and Mitchell (ECF No. 93-1 at 22); the plaintiff's time sheets, which do not refer to Greene at all (*id.* (citing ECF No. 86-36)); and the notes from a January 28, 2019 meeting about the plaintiff's work performance, which do not mention Greene (*id.* (citing ECF No. 86-41)).

¶ 176.)[7]  At one point she led a meeting with the firm's employees about sexual harassment.  (*Id.* ¶ 181.)[8]

Saltiel was responsible for addressing Wenig Saltiel employees' "complaints of discrimination."  (*Id.* ¶ 134.)  A complaint did not need to include the word "discrimination," or be "artfully stated," "for him to identify it as a discrimination complaint."  (*Id.* ¶ 148.) According to Saltiel, an employee "never made" an internal complaint of discrimination, so he never had to determine "whether the policy was violated."  (ECF No. 86-3 at 78:11-18.)  He acknowledged, however, that "there was a discussion that took place that was raised by [the plaintiff]"[9] in December 2018 about comments that Greene made about the Civil Rights Movement, discussed in detail below, but he was "not sure if [the discussion] was considered a complaint."  (*Id.* at 79:11-15.)

Greene was required to follow the firm handbook's "procedures and policies" (ECF No. 88-1 ¶ 20), but Saltiel did not tell him to review the antidiscrimination policies (*id.* ¶ 151 (citing ECF No. 88-5 at 261:2-8)).  Saltiel required Greene to attend the plaintiff's sexual harassment policy training.  (*Id.*).

---

[7] Greene testified that Wenig Saltiel did not have antidiscrimination policies until the plaintiff started working there.  (ECF No. 88-1 ¶ 177.)  The defendants do not dispute this.

[8] "Racial discrimination was not discussed" at the meeting.  (*Id.* ¶ 181.)

[9] The defendants refer inconsistently to the plaintiff's December 2018 report about Greene's conduct as either a "complaint," a term which they seem to define as a more formal report, or a "discussion."  (*See, e.g.*, ECF No. 93-1 at 72 (quoting ECF No. 88-5 at 79:5-15).)  (*Compare, e.g.*, ECF No. 86-48 ¶ 31 ("[The p]laintiff never made a complaint of discrimination or violations of the EEO policy at Wenig Saltiel."), *with* ECF No. 93-1 at 50 (the defendants do not dispute that the plaintiff "made a complaint to Saltiel about comments made by [Greene] on or about December 10, 2018").)  The defendants also state that the plaintiff has not "produced written copy of any notice" that "there was an incident of discrimination or violations of the EEO policy" (ECF No. 86-48 ¶ 35; *see also id.* ¶¶ 43, 48), although the plaintiff testified that she emailed and texted Saltiel about Greene's behavior (*id.* ¶¶ 39, 41, 44–45).

### III.    Racist Conduct at Wenig Saltiel

Greene was "very interested in the period of the Civil War" and "may have" discussed the Civil War with the plaintiff and other Wenig Saltiel employees.  (*Id.* ¶¶ 49–50.)  Greene sometimes participated in Civil War reenactments, in which he usually played a Confederate soldier.  (*Id.* ¶¶ 51–52.)[10]  Greene used his work computer to play "[C]onfederate songs out loud in his office," which the plaintiff heard and recognized.  (*Id.* ¶¶ 59, 69.)[11]  These songs included "Dixie," the "unofficial confederate anthem" (*id.* ¶ 63),[12] and "Bonnie Blue Flag," a "well known Confederate marching song" (*id.* ¶ 68).[13]  Saltiel once saw Greene "with a book or picture related to the [C]onfederacy."  (*Id.* ¶ 89.)

During the plaintiff's first week at the firm, Greene told her about "his relatives who, to this day, sat on their porch in Virginia with their shotguns just like the good old days."  (*Id.* ¶ 40

---

[10] Greene testified that he went to Civil War reenactment events "one or two" times a year and "minor events" frequently every year, but that he "might have gotten out of the hobby before" 2018, though he was "not sure."  (ECF No. 88-5 at 158:13-18.)  Later, he testified that he had not attended any of these events in the past five years (since 2016).  (*Id.* at 159:20–160:2.)

[11] Citing Mitchell's and Freckleton's testimony that they never heard music coming from Greene's office, the defendants maintain that the plaintiff must also not have heard the music.  (ECF No. 93-1 at 35 (citing ECF No. 86-7 ¶ 17; ECF No. 86-9 ¶ 10).)  They also say that the office had "sound proofing between the walls, and a sound masking system installed in every office to ensure privacy;" accordingly, "[e]ven if [Greene] did play loud music, it would be impossible for [the plaintiff] to have heard" the music or its lyrics from Greene's office.  (*Id.* (quoting ECF No. 86-8 ¶¶ 22–23).)  (*Compare, e.g.*, ECF No. 86-48 ¶ 25 ("The office was built with a Voice Arrest Sound masking system in the hallways and individual offices to maximize privacy, resulting in 'white noise' to prevent anyone from hearing conversations in individual offices from the office or hallways.  This system was in place for the entire duration of [the p]laintiff's employment."), *with* ECF No. 88-1 at 11 (the plaintiff disputed this fact, stating that "[t]here was 'absolutely no' soundproofing or alleged voice arrest system at the Wenig Saltiel office while [the p]laintiff worked there," and she could "clearly hear" Green and Saltiel's conversations "through the walls" because their offices were next to hers).)

[12] The plaintiff testified that Greene played the song "Dixie."  Greene testified both that he "didn't think he had" played it and that he "may have" played it.  (ECF No. 88-5 at 167:16-19.)

[13] The defendants do not dispute this fact but argue that it is "not material" because the plaintiff "could not have heard songs Greene played in his office."  (ECF No. 93-1 at 36.)

(quoting ECF No. 88-3 at 259–60).)[14]  He called his relatives "good old boys" and "continued to talk about what goes on there in the south."  (*Id.* (quoting ECF No. 88-3 at 259–60).)  The plaintiff "did not want to discuss 'racism or race' with [Greene]" and "ended the discussion." (*Id.* ¶ 41 (citing ECF No. 88-3 at 260).)  She "immediately" told Saltiel about Greene's statements because she "believed [that] they had racial connotations."  (*Id.* ¶ 42 (citing ECF No. 88-3 at 260:17-23).)[15]  She described the comments as "very disturbing" and said that she "didn't understand what was going on."  (*Id.* ¶ 43 (citing ECF No. 88-3 at 261:6); *see also* ECF No. 88-3 at 260:17–261:11.  She said that it was "very offensive to be told that people are sitting on porches with shotguns like the good old days.  It's very offensive to me.  Speaking about the confederate flag flying high . . . that's unacceptable."  (ECF No. 88-1 ¶ 45 (quoting ECF No. 88-3 at 264:5).)  Saltiel "laughed and downplayed it" (*id.* ¶ 44 (quoting ECF No. 88-3 at 262:11–263)) and "did not take it seriously" (*id.* (quoting ECF No. 88-3 at 263)).  He told the plaintiff that she should "just put [Greene] out of your office."  He also said that he would "speak to [Greene]" but that she would "get to know old Ira."  (*Id.* (quoting ECF No. 88-3 at 261:6); *see also* ECF No. 261:8-15.)

---

[14] The defendants contend that this statement, and every subsequent fact cited in this paragraph, is "not a genuine dispute of fact" because Mitchell, Freckleton, Nathaniel Farley, and Angelyn Johnson — former Wenig Saltiel employees, all of whom are Black — dispute ever "observ[ing]" Greene's "alleg[ed] racist behavior."  (*See, e.g.*, ECF No. 93-1 at 23 (citing ECF No. 86-7 ¶ 9; ECF No. 86-8 ¶ 14; ECF No. 86-9 ¶ 13; ECF No. 86-10 ¶ 13).)  Saltiel and Wenig also deny ever observing Greene exhibit racist behavior.  (*See* ECF Nos. 86-12, 86-19.)  The defendants also note that Greene "denies that these events took place."  (ECF No. 93-1 at 23 (citing ECF No. 86-12 ¶¶ 13–14).)  They respond to each of the plaintiffs' facts "claim[ing] that [Greene] engaged in such blatant racism" with this same blanket contention.  (*Id.*)

[15] The defendants dispute this statement because "nothing supports the contention that [the p]laintiff spoke to [Saltiel] about any . . . alleged incidents" besides the incident that occurred in early December, and that because Saltiel "responded to [her] complaint" about the December incident, "his supposedly flippant responses" to this complaint "never occurred."  (ECF No. 93-1 at 24 (citing ECF No. 86-12 ¶ 22).)

The plaintiff and Greene sometimes had "non-work-related discussions about politics," including about then-President Trump and a senator from New Jersey.  (*Id.* ¶ 47.)  At one point, Greene told the plaintiff that attorneys "born in other countries" often "offer full services in all kinds of areas" of law, and that "sometimes lawyers take on landlord-tenant cases when they don't know the law very well, and Wenig Saltiel winds up inheriting a lot of those cases because the initial lawyers have made mistakes."  (ECF No. 88-5 at 143–44.)

On "more than five" separate occasions, the plaintiff saw Greene watching videos in his office (ECF No. 88-1 ¶¶ 74, 80 (citing ECF No. 88-3 at 279:10–280)); he watched them with his door open and with his computer screen facing the door, so that the plaintiff could see it when she walked by (*id.* ¶ 81; *see* ECF No. 88-3 at 282–83).[16]  The first time, he "called [her] over" and told her to "take a look."  (ECF No. 88-1 ¶¶ 74, 80.)  The videos showed "a man hanging from a tree with his testicles and his penis cut off and shoved in his mouth, from a noose and they set him on fire;" "a woman running through the woods, pregnant, by a group of white men who gang raped her, tied her to a tree, cut the baby from her and bounced it around like a football;" or a "little boy, running . . . who [was] grabbed and assaulted by a group of white men."  (*Id.* ¶ 74 (citing ECF No. 88-3 at 277:17–278; ECF No. 88-29 ¶¶ 13, 17, 18).)[17]  The first

---

[16] The defendants maintain that this statement, and all others in this paragraph, are not "genuine dispute[s] of fact" because Benjamin Serebin, who runs the company that maintains Wenig Saltiel's "computer systems," said in an affidavit that he "produced a list of all [the] websites" that Greene visited based on ESI search protocol, reviewed them, and found that "none of them contained racially discriminatory material."  (ECF No. 93-1 at 41 (citing ECF No. 86-13 ¶¶ 1, 7, 8).)  Serebin also stated that Wenig Saltiel used a "content filter" for its internet access "that would have prevented [Greene] from accessing websites containing the content . . . alleged by [the p]laintiff."  (*Id.*)

The defendants also respond to all statements in this paragraph with the same blanket response that Black Wenig Saltiel employees never saw Greene exhibit racist behavior.  (*See supra* note 14.)

[17] *See supra* note 16.  The defendants also note that Morgan Mindell, a former Wenig Saltiel employee during the time the plaintiff worked there, testified that he "never observed [Greene] make any racist comments or witnessed him watching any of the types of video" that the plaintiff describes.  (ECF No. 86-48 ¶ 33; *see also id.* ¶ 34 ("[T]o the best of my recollection I don't think there was the atmosphere

time this happened, the plaintiff "screamed, 'Ira, what are you doing?  Are you crazy, what are you doing, what are you watching?'"  (*Id.* ¶ 75 (quoting ECF No. 88-3 at 283:14-18).)  Greene responded, "Oh, it's not me.  It's the website.  This is what they post."  (*Id.* ¶ 76 (quoting ECF No. 88-3 at 283:19-24).)  Other employees knew that Greene watched these videos and told the plaintiff to walk by Greene's office to see.  (*Id.* ¶ 82 (citing ECF No. 88-3 at 280–81).)

Greene accessed his Facebook account "almost every day" from his work computer.  (*Id.* ¶¶ 53, 55; *compare* ECF No. 88-5 at 179:11-16 (Greene testifying that he accessed Facebook from his work computer at the Wenig Saltiel office "[n]ot that often" in 2018), *with* ECF No. 88-6 at 16:6-13 (Greene testifying that he "looked at [Facebook] almost every day to see what messages came in," and that the messages "involv[ed] politics[ and] history".)[18]  His Facebook page listed "Confederate materials, groups and images" among his "Likes."  (ECF No. 88-1 ¶ 53; ECF No. 88-22 (Ira Greene's "Likes" on his Facebook Page).)  Greene also looked at "content" on the internet that related to "politics and history."  (ECF No. 88-1 ¶ 55 (quoting ECF No. 88-4 at 16:6-9); *cf.* ECF No. 88-6 (Greene's testimony on his Facebook likes and messages, Civil War reenactments, and related news articles he read from his work computer).)[19]  In December 2018,

---

of discrimination and that's why I said the lawsuit seemed ridiculous." (quoting ECF No. 86-5 at 76:11-20)).)

[18] Wenig Saltiel had a "[c]yber [p]olicy" that forbade employees to use the internet for "nonbusiness" reasons and allowed internet use only "within the scope of [their] employment" (ECF No. 86-48 ¶ 54), but the defendants do not appear to assert that the firm blocked Facebook.  The firm also had a "Sonicwall content filter router" for "at least" the past 15 years that "prevents anyone in the office from accessing any website that contains any one of a number of subjects including those that contain racially discriminatory material."  (*Id.* ¶ 28.)  The plaintiff maintains, however, that Greene and other employees' computers did not have a "content filter."  (ECF No. 88-1 at 13.)

[19] The defendants state that Serebin "determined a list of all the websites" that Greene accessed "that contained a number of keywords" that the plaintiff's attorney identified; "none of the websites contained any racially discriminatory material" like that described in the complaint.  (ECF No. 86-48 ¶ 27 (citing ECF Nos. 86-13, 86-16, 86-17).)  The plaintiff maintains that the defendants "did not turn over the discriminatory materials" that Greene watched because Serebin, as the defendants' own IT personnel, "was allowed to filter what was turned over to [the p]laintiff."  (ECF No. 88-1 at 12.)

the plaintiff "began noticing that [Greene] was accessing white supremacist websites" on his work computer.  (ECF No. 88-1 ¶¶ 77–78 (citing ECF No. 88-3 at 123:3-21, 124:5-12, 279:2; ECF No. 88-29 ¶¶ 13–20).)  She asked Ben Serebin, who ran the firm's IT, to block Greene's access to those sites and to the internet generally (*id.* ¶ 85 (citing ECF No. 88-3 at 119–120)); she also "terminated his access" to the internet herself, but "was told that [she] [couldn't] do that because he needs his internet access to work" (*id.* ¶ 86 (quoting ECF No. 88-3 at 284:4-12)).[20] On one occasion, after she saw Greene watching the videos again, she asked Saltiel, "Why can't we terminate his internet access?" and asked him to speak with Wenig; she said she "[couldn't] take this anymore." (*Id.* ¶ 88 (citing ECF No. 88-1 at 267; ECF No. 88-29 ¶¶ 19–21).)[21]

In December 2018, "while waiting in the building's lobby for the elevator, [Greene] engaged in a political discussion with [the plaintiff] and opined that the current political movement for racial equality lacked the leaders such as Martin Luther King Jr[.] that the Civil [R]ights groups of the [19]60s had."  (ECF No. 86-12 ¶ 27 (Greene's affidavit).)  Greene also told the plaintiff that "black people, Hispanics, Middle Easterners, [and] Asian people are not as smart as white people."  (*Id.* ¶¶ 83, 91, 93 (quoting ECF No. 88-3 at 127:21–128:4, 286:25–287, 293:6).)[22]  He said that "[B]lack people, especially women" — including a New York state court judge — "have to be sleeping with someone in order to get ahead."  (*Id.* ¶ 93 (quoting ECF No.

---

[20] In their Rule 56.1 statement, the defendants note that the plaintiff testified that "she was not aware of or had knowledge [of] whether" the firm's "technology team" could block any websites on the firm computers.  (ECF No. 86-48 ¶ 26.)  The plaintiff disputes that "internet sites were actually blocked." (ECF No. 88-1 at 11.)

[21] The defendants note that Mitchell, who had access to Saltiel's email, stated in her affidavit that she never saw an email from the plaintiff to Saltiel asking him to "alter [Greene's] computer access" and did not hear the plaintiff make that request.  (ECF No. 93-1 at 47 (citing ECF No. 86-9 ¶ 15).)

[22] *See supra* note 14.  It is not clear from the parties' Rule 56.1 statements whether Greene commented on the intelligence of different races in the same conversation as his comments about the Civil Rights Movement.  (*See* ECF No. 93-1 at 61–62, ¶¶ 117–19.)

88-3 at 293:6-15).)[23]  Greene was in the doorway of the plaintiff's office, and "would not move"

so that she could get past him.  (*Id.* ¶ 92 (quoting ECF No. 88-3 at 288–89)).  When she was able

to leave her office, she went to Saltiel's office to "complain about [Greene's] statement and

conduct."  (*Id.* ¶ 94 (citing ECF No. 88-3 at 289); *see also id.* ¶ 96 (citing ECF No. 88-3 at

186:23–187:3, 189:8-11); ECF No. 86-48 ¶ 11.)[24]  Saltiel "laughed at the situation" and said,

referring to Greene, "[B]oy, the old timer is really on a rampage this morning."  (*Id.* ¶ 97

(quoting ECF No. 88-3 at 186:23–187:3).)[25]  The plaintiff also emailed Wenig and Nicholas

Moccia, a junior partner at the firm, complaining about Greene's "discriminatory

comments/conduct."  (*Id.* ¶ 98 (citing ECF No. 88-3 at 190–91).)

---

[23] Javon Blackmon, another former Black employee of Wenig Saltiel LLP, said in an affidavit that Greene also said that "he didn't believe that [the plaintiff's] daughter, who is African American, was an attorney or graduated from Harvard Law [School]."  (ECF No. 88-1 ¶ 107 (quoting ECF No. 88-15 ¶ 6); *see also id.* ¶ 92 (quoting ECF No. 88-3 at 288–89).)  Though the affidavit was not sworn, it includes a sworn attestation on the final page: "I swear, under penalty [of] perjury and under [the] laws of the United States of America, that the foregoing is /true and correct to the best of my knowledge." (ECF No. 88-15 at 4.)  "[U]nder 28 U.S.C. § 1746, an unsworn declaration, which is dated and signed by the declarant 'under penalty of perjury,' and verified as 'true and correct,' may be used in lieu of a sworn affidavit."  *Grain D'Or LLC v. Wizman*, No. 21-CV-10652, 2023 U.S. Dist. LEXIS 152404, at *40 (S.D.N.Y. Aug. 30, 2023) (citation omitted).

However, "[a] party may not oppose a summary judgment motion on the basis of inadmissible evidence, unless the party can 'show[] that admissible evidence will be available at trial.'"  *Wall St. Entm't, LLC v. BuVision, LLC*, No. 13-CV-1265, 2014 U.S. Dist. LEXIS 163736, at *9 (S.D.N.Y. Oct. 31, 2014) (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)).  "When an affidavit itself is not admissible, then 'an implicit or explicit showing that the affiant is prepared to testify in a manner consistent with [the] affidavit is required to oppose summary judgment.'"  *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001).  The plaintiff has not made an explicit showing or addressed the affidavit's admissibility at all.  The defendants argue that there is also no implicit showing that Blackmon is prepared to testify because the affidavit "was not provided specifically for this motion" and Blackmon told defense counsel that he "lived in Atlanta, Georgia," outside the subpoena power of this Court, he "no longer spent time in the New York City area," and he "did not want to be a witness in this case and would not appear voluntarily."  (ECF No. 93 at 6 (citing ECF No. 93-2 ¶¶ 8–10).)  Accordingly, the affidavit is not admissible and is not dispositive in any event.

[24] The defendants dispute Greene's alleged racist behavior for the same reasons stated in note 14, but do not dispute that the plaintiff "made a complaint to Saltiel about comments made by [Greene] on or about December 10, 2018."  (ECF No. 93-1 at 50.)

[25] *See supra* note 14.

"[S]hortly thereafter," Wenig, Saltiel and Moccia met with Greene, told Greene about the plaintiff's complaint about his conduct (*id.* ¶ 138; *see also id.* ¶ 135), and "made clear that [the plaintiff] was troubled by the conversation" and that Greene "should avoid having such conversations" (*id.* ¶ 99 (quoting ECF No. 88-8 at 150:8-16).[26]  Greene denied the plaintiff's "claims of discrimination."  (*Id.* ¶ 139.)  Wenig, Saltiel, and Moccia told Greene that "he should apologize for offending her in whatever manner it was," and "to please not have history discussions . . . to avoid it."  (*Id.*; *see also id.* ¶ 141.)  Greene testified that Wenig told him, "I know you didn't say anything awful to this person, you're not a racist, but you got to get this thing smoothed over."  (*Id.* ¶ 140 (quoting ECF No. 88-3 at 119:8–120:8).)  She also told him, "You did something to hurt her feelings.  You must have."  (ECF No. 93-1 at 71.)

For her part, Wenig did not "presume" that the plaintiff was making a "discriminatory complaint."  (ECF No. 88-1 ¶ 147 (quoting ECF No. 88-6 at 157:19-23).)  She thought that if the plaintiff believed the incident was "serious," she would have "documented it as a complaint of discrimination," which she knew how to do because it was part of her job description.  (*Id.* ¶ 147; *see also* ECF No. 88-6 at 157:7-23.)  The plaintiff also did not "indicate" that Greene's conduct was "discriminatory" (ECF No. 88-1 ¶ 145); Wenig understood that the plaintiff was "offended" by Greene's comments, and that "people get offended by all sorts of things," so the comments were not necessarily discriminatory (*id.* ¶¶ 145–46 (quoting ECF No. 88-6 at 155:13–156:9)). (*See also id.* ¶ 146 (Wenig "treated it as, [the plaintiff] had a conversation with [Greene] that she

---

[26] Wenig testified that the plaintiff complained to her and Saltiel only about Greene's comments about the Civil Rights Movement and "how it differed from movements of today," that the conversation was not "appropriate for some of the commentary," and that the plaintiff "was offended by it in some manner." (ECF No. 93-1 at 52–54.)  Wenig did not document her conversation with the plaintiff about this incident.  (*Id.* at 52.)

thought was inappropriate and she brought it to our attention." (quoting ECF No. 88-6 at

156)).)[27]

On December 11, 2018, Greene gave the plaintiff an "apology letter" in which he wrote,

"After yesterday's meeting, I had to come to terms that I had said something hurtful to

you. . . . [I] understood why you felt offended."  (*Id.* ¶¶ 100–01; *see also* ECF No. 88-13

(Apology Letter).)  He admitted to using "hurtful language that demeans people of foreign origin

who now live here" and said that "demeaning statement[s] about any group of professionals

based on race or ethnic origin are always wrong and clearly inappropriate."  (*Id.*)  He said, "I

sincerely apologize for my error and will do my best to never again make statements about others

that are clearly out of line, derogatory and completely inappropriate."  (*Id.*)  Greene gave a

nearly identical apology letter to Javon Blackmon, another Black employee at Wenig Saltiel.

(*Id.* ¶¶ 103–04.)[28]

After the plaintiff complained about Greene's statements in December 2018, the plaintiff

contends that the "whole office turned on her" (*id.* ¶ 125 (citing ECF No. 88-3 at 292:8)) and

Greene's behavior toward her "became more vulgar" (*id.* ¶ 121 (quoting ECF No. 88-3 at

292:19–293:17)).  The plaintiff gives one example of this behavior:  At some point, Greene said

to the plaintiff, "I'm going to hit the head, you wanna join me?"  (*Id.* ¶ 122 (quoting ECF No.

88-3 at 293:18–294, 296).)  The plaintiff interpreted this comment to mean that he was asking

her "to go to the bathroom with him."  (*Id.*)[29]  She was "disgusted and appalled that [Greene had

---

[27] For example, Wenig testified that neither Greene nor the plaintiff mentioned to her that Greene had
made comments "demeaning people of foreign origin" in the conversation.  (ECF No. 88-6 at 167:14-
17.)

[28] Though Blackmon's statements in his declaration that he received this apology letter are not admissible,
Greene, Wenig and Saltiel agreed that Greene indeed gave an apology letter to Blackmon that was
nearly identical to the one he gave Greene.

[29] *See supra* note 14.

begun] to degrade [her] in every way possible." (*Id.* ¶ 123 (citing ECF No. 88-13 at 295:8).)
Despite the plaintiff's multiple complaints about Greene's behavior, aside from talking to Greene
in December 2018, Wenig and Saltiel "took no action" to "stop the retaliation and harassment."
(*Id.* ¶¶ 125–26).[30]

     At one point, the plaintiff led a sexual harassment training for Wenig Saltiel employees.
(*Id.* ¶ 90.)  Greene attended, and "made a comment that [the plaintiff] did not think was
necessarily appropriate for the discussion;" the plaintiff told him to "shut up." (*Id.* ¶ 90.)
Another employee, Morgan Mindell, testified that nothing "out of the ordinary occurred at the
sexual harassment training." (*Id.* ¶ 132 (citing ECF No. 88-9 at 83:3).)[31]

## IV.  The Plaintiff's Performance at Work

     According to the defendants, the plaintiff had "issues" with her job performance "[f]rom
the beginning of [her] employment." (ECF No. 86-48 ¶ 4 (citing ECF No. 86-4 at 15–28, 59–
60).)  She did not "follow up with attorneys [or] support staff," "update the reports necessary to
ensure the timely completion of work deadlines or the necessary paper flow," or "put her notes in
to [sic] the [f]irm's case database." (*Id.*)  She also "delegate[d] work assigned to her." (*Id.*)
Partners at the firm told the plaintiff numerous times that reports listing the firm's cases,
deadlines, and tasks "were not being updated" in "pro-law," the office's "computer case
management system." (*Id.* ¶ 13.)[32]  Saltiel met with the plaintiff on August 22, 2018 — less than

---

[30] *See supra* note 14.  The defendants also contend that the record does not show that the plaintiff
complained more than once about Greene. (ECF No. 93-1 at 65.)

[31] The plaintiff says that Morgan Mindell, a former Wenig Saltiel employee, admitted to her previous
lawyer that Greene said something offensive at the training, but Mindell did not sign an affidavit to that
effect. (ECF No. 88-1 ¶¶ 128–31.)  The unsigned affidavit is not admissible, so the Court does not
consider it.

[32] The plaintiff maintains that the defendants did not require that she record her time in "pro-law" until
"toward[] the end of December," "after she complained about Greene" and Greene gave her the
apology letter. (ECF No. 88-1 at 6 (quoting ECF No. 88-3 at 165:12).)  She also denies that she was

a month after the plaintiff started — and discussed her "sub-standard performance" maintaining the firm's "paper flow and deadlines." (*Id.* ¶ 5.) The firm "received complaints from employees a few times per week about [the p]laintiff's mannerisms;"[33] employees complained that she was "rude and condescending to them." (*Id.*) Nevertheless, even though her job performance was "subpar," the defendants maintain that they "continued to support [her] in her position . . . until she was terminated." (ECF No. 93-1 at 78 (citing ECF No. 86-9 ¶ 21; ECF No. 88-26).) The plaintiff claims that the defendants gave her additional responsibilities "on top of [her] duties as office manager" after she complained about Greene, including "legal assistant, legal secretary and licensed attorney tasks." (ECF No. 88-1 at 13–14 (quoting ECF No. 88-29 ¶¶ 43–45).) The defendants say that her duties and salary did not change, even after she complained about Greene's behavior. (ECF No. 86-48 ¶ 30 (citing ECF Nos. 86-7, 86-9, 86-11, 86-19, 86-26).)

According to the plaintiff, the defendants prevented her from doing her job "based on her race/color." (ECF No. 88-1 ¶ 153 (citing ECF No. 88-3 at 117:6); *id.* ¶ 155 (citing ECF No. 88-3 at 118).) Additionally, the employees she supervised were insubordinate and disrespectful to her. (*Id.* ¶ 156 (citing ECF No. 88-7 at 91:11-18; ECF No. 88-19 at 1)).[34] The plaintiff showed Saltiel emails from staff in which they "refus[ed] to do work" or follow her instructions. (ECF No. 88-1 ¶ 159; ECF No. 93-1 at 80 (quoting ECF No. 88-8 at 92:20–95:14).) Saltiel testified that he "[a]lways" "deal[t]" with those issues. (ECF No. 88-8 at 94:17-19.) Sometimes, he

---

"responsible for uploading any reports;" rather, she "ran reports on every employee" in the mornings "to ensure all tasks were being completed and deadlines were not missed." (*Id.* (citing ECF No. 88-29 ¶ 34).)

[33] Saltiel testified that the "disputes" between the plaintiff and her subordinates were "not something that would happen every day" or "something that would regularly repeat itself." (*Id.* ¶ 157.) However, Wenig testified that she "heard a complaint" about the plaintiff's treatment of the employees "on average, at least a few times a week." (ECF No. 86-4 at 31:10-12.)

[34] The defendants do not dispute that the plaintiff "admitted that she was struggling to manage the staff and did not have their respect." (ECF No. 93-1 at 79.)

"allow[ed] a manager to manage;" other times, he "met with" the plaintiff and the employee and helped them come to "an understanding of how things needed to be done."  (ECF No. 88-1 ¶ 159; ECF No. 93-1 at 80–81 (quoting ECF No. 88-8 at 92:20–95:14).)

At one point, the plaintiff "raised concerns" with Saltiel that the employees were "refusing to follow [her] orders," including "complaining when they were told they had to be cross trained" on some new task.  (ECF No. 88-1 ¶ 160.)  Saltiel did not "look into" the disagreement because the employees were "not allowed to complain" about their "job duties," and it was the plaintiff's "job to . . . organize the employees, assign the [employees] duties[, a]nd if they are not doing what they are supposed to do . . . [she could] take remedial steps."  (*Id.* ¶ 162; ECF No. 93-1 (quoting ECF No. 88-8 at 112:15–113:11).)  According to Saltiel, the plaintiff "knew that she had our backing;" "[w]hen these things came up, they were addressed immediately and they weren't tolerated."  (ECF No. 88-1 ¶ 163 (quoting ECF No. 88-8 at 127:4).)[35]

On September 12, 2018, the plaintiff complained to Wenig and Saltiel about Ming Davis, one of her "direct reports," who "outright refus[ed] to follow [the plaintiff's] orders" and was "brazen[ly] insubordinate[e]," including by "hanging up on [the p]laintiff and being disrespectful."  (ECF No. 93-1 at 86; *see also* ECF No. 88-1 ¶ 168 (citing ECF No. 88-24).)[36] Davis, in turn, complained to Wenig and Saltiel that the plaintiff "was 'harassing'" her when she

---

[35] Frances Smieya, an employee who had "disputes" with the plaintiff, was Moccia's assistant (ECF No. 86-11 ¶ 10); Smieya believed that Moccia, not the plaintiff, was her supervisor (ECF No. 88-1 ¶ 164). When the plaintiff gave her orders, Smieya "questioned who she should be taking orders from."  (*Id.*) "The issue was resolved when it was decided that [the p]laintiff would be able to give orders to" Smieya on "certain task[s]."  (*Id.*)

[36] The defendants argue that the cited exhibit does not show that Davis refused to follow orders, but do not dispute that the plaintiff "had apparently alienated a direct report in her first month of work."  (ECF No. 93-1 at 86 (citing ECF No. 88-24).)

assigned her work.  (*Id.* ¶ 169 (quoting ECF No. 88-8 at 128:1-19).)  Saltiel met with both the

plaintiff and Davis "to try to work it out."  (ECF No. 88-8 at 132:4-24.)

On October 29, 2018, Natasha Laughton, also the plaintiff's direct report, resigned from

the firm.  (ECF No. 86-48 ¶ 7.)[37]  She wrote in her resignation letter that she raised "issues" in a

meeting with staff and management on September 13, 2018.  (*Id.*)  After that meeting, the

plaintiff "created a very hostile work environment for [Laughton] which has not subsided."  (*Id.*)

At Saltiel's direction, Laughton met with the plaintiff on October 25, 2018 "to discuss issues

[she] was having with [her] work load."  (*Id.*)  The plaintiff "offered no solutions," and accused

Laughton "of inaccurate/inflated billing of [her] time."  (*Id.*)  Laughton could "no longer work in

an environment where [she was] continually berated at will in front of other employees by [her]

office manager."  (*Id.*)

George Lopez, another of the plaintiff's subordinates, resigned from the firm on

November 26, 2018.  (*Id.* ¶ 9.)  He wrote in his resignation letter that "[his] office manager"

"asked [him] for blowjob tips."  (ECF No. 86-29.)  She also called him "unprofessional" because

he did not stay at the office longer than 45 minutes after he was allowed to leave, even though

"[his] boss takes [him] out for lunch for two hours to do her eyebrows and eye lashes."  (*Id.*)[38]

The plaintiff claims that Lopez "had no problems with [her] and came to her [about] all of [his]

in-office confrontations with multiple employees."  (ECF No. 88-1 at 5 (citing ECF No. 88-16).)

Also, on November 19, 2018 — a week before his resignation — the plaintiff "wrote [him] up"

for using "sexual language in the workplace."  (*Id.*)

---

[37] The plaintiff disputes the statements in this paragraph, but she does not cite evidence that would create
a genuine dispute.

[38] He also claimed that his coworkers accused him of "trying to sabotage" their work, threw a pen "at
[his] face twice," refused to help him with work, and made fun of him when he "show[ed] empathy
toward other coworkers."  (ECF No. 86-29.)

In November and December 2018, Wenig took medical leave.  (ECF No. 86-19 ¶ 30.)

During that period, when Wenig was not able to communicate, "it became readily apparent" that

the plaintiff was not fulfilling her responsibilities.  (ECF No. 86-4 at 13:2-5, 16–17; *see also*

ECF No. 86-19 ¶ 32 ("My hospitalization brought home the fact that [the plaintiff] was inept and

was not performing her job.").)

In her December 2018 performance review, "the [f]irm" "advised" the plaintiff that there

were "issues with her mannerisms," and that employees complained that "she was rude and

condescending."  (ECF No. 86-48 ¶ 12.)[39]

Carleen Freckleton, Wenig's executive assistant, "outright refused to follow" the

plaintiff's orders, and told Wenig and Saltiel that "she would not do what the plaintiff

instructed."  (ECF No. 88-1 ¶ 165.)[40]  Saltiel told the plaintiff that Freckleton "tried to go around

[her];" he also said that he told Freckleton to "address" the issue with the plaintiff instead.  (ECF

No. 93-1 at 84 (quoting ECF No. 88-26); *see also* ECF No. 88-1 ¶ 166.)  In a January 12, 2019

email to Saltiel, Freckleton asked "why [the plaintiff wasn't] doing her job" and why she was not

"in the file room with staff" doing filings with them.  (ECF No. 93-1 ¶ 15 (citing ECF No. 86-

43).)  In a February 14, 2019 email to Saltiel, Freckleton wrote:

> If the staff rebels it's not because they are stubborn and do not want
> to work, but we are being treated as if we are second class citizens
> when it comes to the office manager.  Her behavior is putting the
> firm at risk for valuable employees to seek employment elsewhere.
> It is unfair to ask people to work in this type of environment and not
> expect rebellion or repercussions.  The work place will continue to
> be divided and hostile if the situation [is not] rectif[ied].

---

[39] The plaintiff disputes this statement of fact, but she does not cite evidence that would create a genuine
dispute.

[40] The defendants do not dispute that this happened, but add that Freckleton "initially objected" when the
plaintiff assigned her a filing task because the plaintiff did not help with filing, which was one of her
assignments.  (ECF No. 93-1 at 84; *see* ECF No. 88-26.)

(*Id.* ¶ 19 (quoting ECF No. 86-17).)[41]

Starting in January 2019, Moccia "advocated to the partners" for the plaintiff to be terminated because "her job performance was lackluster and her managerial style . . . resulted in the troubling loss of many good employees [from] the [f]irm."  (ECF No. 86-11 ¶ 33.)

On about January 14, 2019, the plaintiff "was advised of changes needed to the case management system" because she did not make "pro-law reports."  (*Id.* ¶ 14.)  She was reminded again on January 21, 2019 and January 28, 2019 that she "failed to make" "these changes." (*Id.*)[42]

In a January 28, 2019 meeting, Saltiel, Wenig, Freckleton, and the plaintiff went over seven "major issues" that "[had been] identified" with the plaintiff's job performance.  (*Id.* ¶ 16.)[43]

On February 1, 2019, the plaintiff "was reminded that processing the intake of newly received items" was "part of her job description," and "she should not pass off her tasks to other employees."  (*Id.* ¶ 17 (citing ECF No. 86-45).)[44]

Saltiel met or spoke with the plaintiff on February 5, 2019, February 15, 2019, February 18, 2019, and February 27, 2019 "to advise her that she still was not meeting the goal of updating records and having staff perform their duties."  (ECF No. 86-26 ¶ 63; *see also* ECF No.

---

[41] The plaintiff does not dispute that Freckleton wrote the email but argues that it "demonstrates the insubordination that [the plaintiff] had to put up with."  (ECF No. 86-48 at 8.)

[42] The parties do not identify the person who issued these directives.

[43] The plaintiff maintains that this meeting "was not for the purpose of disciplining [her];" rather, the meeting was intended to "identify office-wide issues and to devise a plan to address [them]," and the plaintiff "was given items to perform as a result of the meeting."  (ECF No. 88-1 at 7.)

[44] The plaintiff says that "[p]rocessing intakes was not a part of [her] job duties."  (ECF No. 88-1 at 7.) Freckleton and Davis were responsible for doing them, but they "started refusing to" do them, "saying things like[,] 'what makes [the plaintiff] so special that she can't do intakes?'"  (*Id.*)  Ultimately, Freckleton and Davis "stopped processing intakes," and the defendants "just allowed them to do so." (*Id.* (citing ECF No. 88-29 ¶¶ 41–42).)

86-48 ¶ 20 (Saltiel asked the plaintiff to meet with him to discuss 13 of her "job duties" that he believed were "not being sufficiently addressed" (quoting ECF No. 86-42)).)

On February 21, 2019, the plaintiff emailed the firm's support staff to inform them of a February 25, 2019 "[c]ross [t]raining" session. (*Id.* ¶ 167 (support staff would be trained "to perform duties of fellow co-workers['] departments" "to ensure adequate coverage/support in the event of any absences").) Moccia responded that the training was cancelled, and that "the question of cross training [would] be revisited" when Wenig and Saltiel returned to the office from vacation. (ECF No. 88-27 at 2; *see also* ECF No. 88-1 ¶ 167; ECF No. 88-29 ¶¶ 31–33.) The plaintiff explained that she and Saltiel scheduled the training; Moccia emailed back that he "[had] an issue" with it, to which the plaintiff responded, "Nick DO NOT speak to me WITHOUT Jeffrey on the email. This is harassment from you to me." (ECF No. 88-27 at 2.)

On February 26, 2019, Freckleton emailed Wenig about the plaintiff's management of the staff during the time that Wenig and Saltiel were on vacation. (ECF No. 86-44; *see* ECF No. 86-48 ¶ 21.) Freckleton wrote,

> There is no clarity on anything when it comes to her but she wants to pretend as if she is managing the staff. It might seem minor but this kind of structure is not working. While you and [Saltiel] are away, who is running the office? Now should be the time for her to shine and show you guys what she is made of instead but she is not doing it. If she doesn't care enough to do this job I do not want her giving me any king [sic] of instructions no matter how simple it is.

(ECF No. 86-44.)

Davis resigned on February 28, 2018 — the day before the plaintiff was fired — and wrote in her resignation letter that "[t]he past approximately [six] months" since the plaintiff was hired, she "experienced constant harassment and . . . disrespectful treatment" from the plaintiff.

(ECF No. 86-31.)  According to Davis, "upper management . . . constantly ignored" "the issues that were the cause of the problem."  (ECF No. 86-48 ¶ 22 (citing ECF No. 86-31).)[45]

## V.    The Plaintiff's Termination

Saltiel fired the plaintiff on March 1, 2018.  (ECF No. 86-48 ¶ 23.)  Saltiel testified that her termination did not "hinge upon" one employee's dissatisfaction with her (ECF No. 88-1 ¶ 174), but that it was cumulative — staff was "constantly leaving the office based upon her conduct" (ECF No. 86-48 ¶ 24 (citing ECF No. 86-3 at 103–04).)  Saltiel also "questioned whether she was working" because "she was not in the office certain days," "certain things that had to be done from an administration level weren't being done," and she was not doing the "substantive paperwork of the firm," which was the "biggest part of her job."  (ECF No. 86-48 ¶ 24 (quoting ECF No. 86-3 at 103–104)).

## LEGAL STANDARD

## I.    Summary Judgment

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits, or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "A fact is material if it might affect the outcome of the suit under governing law."  *Id.*  The movant has the "burden of

---

[45] The plaintiff says that the defendants did not "rely upon" Davis's complaints when they decided to fire her.  She also refers to the facts in her Rule 56.1 counterstatement about Davis's insubordination.  (ECF No. 88-1 at 9; *see also id.* ¶¶ 167–73.)

showing the absence of any genuine dispute as to a material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (cleaned up). A nonmoving party can survive summary judgment only if there is sufficient evidence to permit a rational trier of fact to find in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *see Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) ("Once the moving party has met [its] burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial." (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986))). The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent," because intent can be easily obscured. *Banks v. GM, LLC*, 81 F.4th 242, 258 (2d Cir. Sept. 7, 2023) (quoting *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008)). "Due to the 'elusive nature of intentional discrimination,' plaintiffs must often

'rely on bits and pieces of information to support an inference of discrimination.'" *Id.* (cleaned up) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015)).  Thus, "[b]ecause of the likelihood that 'direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* (cleaned up) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).  "The resulting 'mosaic of intentional discrimination' may be sufficient to show discrimination." *Id.* (cleaned up) (quoting *Vega*, 801 F.3d at 86).  "Nonetheless, even in the discrimination context, a plaintiff must still present more than conclusory allegations to survive a motion for summary judgment." *Id.* (citing *Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 92 (2d Cir. 1996)).

## II.    Section 1981 and NYSHRL[46]

Section 1981 "outlaws discrimination with respect to the enjoyments of benefits, privileges, terms, and conditions of a contractual relationship, such as employment," and provides a cause of action against private actors who violate the statute.  *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004).  The NYSHRL similarly protects employees against discrimination based on age, race, creed, color, national origin, sexual orientation, military status, sex, marital status, or disability.  N.Y. Exec. L. § 291(1).

### a.  Hostile Work Environment

To establish a hostile work environment claim under Section 1981 and the NYSHRL for conduct before October 2019,[47] a plaintiff must produce evidence that (1) "the workplace is

---

[46] The Court addresses the Section 1981 and NYSHRL discrimination and retaliation claims together because they are analyzed using the same framework.  *Orrego v. Knipfing*, 564 F. Supp. 3d 273, 283 (E.D.N.Y. 2021).

[47] The NYSHRL was amended in October 2019 to eliminate the "severe or pervasive" requirement in favor of a more lenient standard of liability.  *LeTtieri v. Anti-Defamation League Found.*, No. 22-CV-9889, 2023 U.S. Dist. LEXIS 141914, at *34 n.15 (S.D.N.Y. Aug. 10, 2023) (citation omitted).

permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), and (2) "a specific basis exists for imputing the objectionable conduct to the employer," *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). *See also Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 69 (2d Cir. 2023) ("A hostile work environment is shown when 'a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted' to be deemed 'pervasive.'" (quoting *Alfano*, 294 F.3d at 372). "Isolated, minor acts or occasional episodes do not warrant relief . . . a plaintiff must still prove that the incidents were sufficiently continuous and concerted to be considered pervasive, or that a single episode is severe enough to establish a hostile working environment." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (cleaned up). In evaluating the hostile work environment claim, the court looks to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Patterson*, 375 F.3d at 227 (quoting *Harris*, 510 U.S. at 23).

A work environment is considered hostile if "a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Brennan*, 192 F.3d at 318 (citation omitted). It is "'axiomatic' that in order to establish a [race-based] hostile work environment under [Section 1981], a plaintiff must demonstrate that the conduct occurred because of [her]"

---

However, the amendment is "not retroactive," so the "severe and pervasive" standard still applies to claims arising from conduct predating the effective date of the amendments. *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 69 (S.D.N.Y. 2020). Because the plaintiff's claims are based on conduct that occurred from August 2018 to March 1, 2019, the Court applies the "severe and pervasive" standard.

protected status.  *Alfano*, 294 F.3d at 374 (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).  "Favorable or equitable treatment of a protected group as a whole does not preclude a [Section 1981] claim by a member of that group."  *Goffe v. NYU Hosp. Ctr.*, 201 F. Supp. 3d 337, 349 (E.D.N.Y. Aug. 22, 2016); *see Connecticut v. Teal*, 457 U.S. 440, 454–55 (1982) ("Under Title VII, a racially balanced work force cannot immunize an employer from liability for specific acts of discrimination. . . . It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." (citations omitted)).

There are two "specific bas[es] for imputing the conduct creating the hostile work environment to the employer": "negligence if a co-worker who is not a supervisor has created the hostile environment, and the employer, upon becoming aware of the misconduct, fails to remedy it," and "strict vicarious liability if an employer's supervisor has created the hostile environment."  *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019) (citations omitted). If the supervisor's harassment does not culminate in a "tangible employment action," the employer has an "affirmative defense to liability or damages, subject to proof by a preponderance of the evidence."  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  To prevail on the affirmative defense — the "*Ellerth/Faragher* defense" — the employer must establish that (a) it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior," and (b) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Ellerth*, 524 U.S. at 765; *see also Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015).  "No affirmative defense is available,

however, when the supervisor's harassment culminates in a tangible employment action . . . ."
*Ellerth*, 524 U.S. at 765.

### b.   Disparate Treatment

Courts evaluate Section 1981 and NYSHRL discrimination claims using the three-step burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).  First, the plaintiff must establish a *prima facie* case of discrimination by a preponderance of the evidence, by showing that: "(1) she is a member of a protected class; (2) she is competent to perform the job or is performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances supporting an inference of discrimination based on her membership in the protected class."  *Goffe*, 201 F. Supp. 3d at 347 (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997)).

A plaintiff will be considered to have been subjected to an adverse employment action only if she "endures a 'materially adverse change' in the terms and conditions of employment." *Id.* (citation omitted).  For the actions complained of to be materially adverse, "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.*  "A material adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity."  *Parrish v. Sollecito*, 258 F. Supp. 2d 264, 269 (S.D.N.Y. 2003).  "[N]ot everything that makes an employee unhappy is an actionable adverse action."  *Sank v. City Univ. of N.Y.*, 219 F. Supp. 2d 497, 503 (S.D.N.Y. 2002).

"Normal scheduling inconveniences, disciplinary notices, threats of disciplinary action and scrutiny of the employee's actions do not constitute adverse employment actions."  *Goffe*,

201 F. Supp. 3d at 347 (citing *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001)).

The plaintiff may satisfy the fourth prong by : (1) "showing that the employer subjected [her] to disparate treatment, that is, treated [her] less favorably than a similarly situated employee outside [her] protected group;" (2) "demonstrating that the defendants have engaged in a pattern or practice of intentional discrimination," which was their "standard operating procedure;" or (3) showing that an "inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms[,] or its invidious comments about others in the employee's protected group . . . or the sequence of events leading to the plaintiff's discharge." *Joseph v. Marco Polo Network, Inc.*, No. 09-CV-1597, 2010 U.S. Dist. LEXIS 119713, at *24–25 (S.D.N.Y. Nov. 10, 2010) (citations omitted).

Once the plaintiff establishes a *prima facie* case of discrimination, "the burden of production shifts to the defendant to articulate a legitimate, [nondiscriminatory] reason for the adverse employment action." *Lowe v. Mt. Sinai Health Sys.*, No. 16-CV-6074, 2018 U.S. Dist. LEXIS 75921, at *8 (S.D.N.Y. May 4, 2018). The burden is "one of production, not persuasion." *Goffe*, 201 F. Supp. 3d at 348 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).

If the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, "the employee must be afforded an opportunity to prove the existence of factual issues demonstrating that the stated reasons were merely a pretext for discrimination." *Siani v. State Univ. of N.Y.*, 7 F. Supp. 3d 304, 324 (2d Cir. 2014) (quoting *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985)). The plaintiff may do this "by persuading the trier of fact" either

"that a discriminatory reason more likely than not motivated the employer," or "that the employer's proffered explanation is unworthy of belief." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir. 1992) (citations omitted). The issue of pretext "is ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment." *Vohra v. Am. Integrated Sec. Grp.*, No. 16-CV-5374, 2019 U.S. Dist. LEXIS 122007, at *17 (E.D.N.Y. July 22, 2019).

### c. Retaliation

Retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. The plaintiff must first establish a *prima facie* case of retaliation by showing that "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the plaintiff suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Orrego v. Knipfing*, 564 F. Supp. 3d 273, 284 (E.D.N.Y. 2021). A causal connection can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

"The plaintiff's burden in this regard is '*de minimis*,' and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 116, 173 (2d Cir. 2005)).

### III.   NYCHRL

Section 8-107(1)(a) of the NYCHRL "makes it 'an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the [protected characteristic] of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.'" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109–10 (2d Cir. 2013) (quoting N.Y.C. Admin. Code § 8-107(1)(a)). "[T]he challenged conduct need not even be 'tangible' (like hiring or firing)." *Id.* (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 79 (1st Dep't 2009)); *see also Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 696 (2d Cir. 2013) (for a discrimination claim, the plaintiff "must only show differential treatment of any degree based on a discriminatory motive"). Courts must analyze NYCHRL claims "separately and independently from any federal and state law claims" and construe the NYCHRL's provisions "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109 (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)).

At the summary judgment stage, the plaintiff must establish a *prima facie* case of retaliation and discrimination, after which the defendant may offer legitimate reasons for its actions. *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75–76 (2d Cir. 2015). "In light of the broad purpose of the NYCHRL, unlike under state and federal law, [a] plaintiff need not show that an employment action was materially adverse" to make a *prima facie* discrimination claim; she only has to show that "she was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 258 (E.D.N.Y. 2012) (citing *Williams v. Regus Mgmt. Grp.*, 836 F. Supp. 2d 159, 173 (S.D.N.Y.

2011)).  Similarly, the inference of discrimination prong "is satisfied if a member of a protected class was treated differently than a worker who was not a member of that . . . class." *Williams*, 836 F. Supp. 2d at 173.  "Nevertheless, a plaintiff must still link the adverse employment action to a discriminatory motivation." *Sotomayor*, 862 F. Supp. 2d at 258 (citing *Williams*, 61 A.D.3d at 71–72).

The *prima facie* retaliation claim requires the plaintiff to show that "(1) [s]he participated in a protected activity known to the defendant; (2) the employer engaged in some responsive conduct; and (3) there exists a connection between the two actions, such that 'a jury could reasonably conclude from the evidence that [the complained-of] conduct [by the employer] was . . . reasonably likely to deter a person from engaging in protected activity, without taking account of whether the employer's conduct was sufficiently deterrent so as to be material[].'" *Williams*, 836 F. Supp. 2d at 174 (quoting *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010)).  In the summary judgment context, "once the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate, non-retaliatory reason for" its actions. *Id.* (quoting *Kaytor*, 609 F.3d at 552–53).  "If the defendant makes an adequate showing in this step, the plaintiff must demonstrate that the defendant's reasons are actually pretextual, which the plaintiff can do by showing that a 'retaliatory motive played a part in the adverse employment actions even if it was not the sole cause.'" *Id.* (quoting *Hicks*, 593 F.3d at 164).

In other words, "summary judgment is appropriate if 'the record establishes as a matter of law' that discrimination *or* retaliation 'played no role' in the defendant's actions." *Ya-Chen Chen*, 805 F.3d at 76 (citing *Mihalik*, 715 F.3d at 110 n.8).  *See also Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 245 (E.D.N.Y. 2015) ("The Court considers the totality of the

circumstances, and while courts may dismiss truly insubstantial cases, even a single comment

may be actionable in the proper context, for purposes of the NYCHRL." (citations omitted)).

However, while the NYCHRL confers broad protections, it is "not a 'general civility

code.'" *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 40–41). "The plaintiff still

bears the burden of showing that the conduct is caused by a discriminatory [or retaliatory]

motive. It is not enough that a plaintiff has an overbearing or obnoxious boss. She must show

that she has been treated less well at least in part 'because of [her protected characteristic]." *Id.*

(quoting *Williams*, 872 N.Y.S.2d at 39, 40 n.27).

"The standard for maintaining a hostile work environment claim" is also "lower under the

NYCHRL" than Section 1981 and the NYSHRL. *Mondelo v. Quinn, Emanuel, Urquhart &*

*Sullivan, LLP*, 2022 U.S. Dist. LEXIS 31075, at *27 (S.D.N.Y. Feb. 22, 2022) (quoting

*Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011)). Indeed, the

NYCHRL "was intended to be more protective than the state and federal counterpart."

*Bermudez*, 783 F. Supp. 2d at 579 (quoting *Farrugia v. N. Shore Univ. Hosp.*, 820 N.Y.S.2d 718,

724 (N.Y. Sup. Ct. 2006)). The NYCHRL "imposes liability for hostile conduct even where the

conduct does not rise to the level of 'severe or pervasive,' as 'questions of severity and

pervasiveness are applicable to consideration of the scope of permissible damages, but not to the

question of underlying liability.'" *Mondelo*, 2022 U.S. Dist. LEXIS 31075, at *27 (quoting

*Williams*, 61 A.D.3d at 76).

31

**DISCUSSION**

I.     **Section 1981 and NYSHRL Claims**

       a.      **Hostile Work Environment**

       The plaintiff has provided sufficient evidence of racial harassment to create genuine

issues of material fact as to her Section 1981 and NYSHRL hostile work environment claims.

       The plaintiff claims that Greene showed her extremely disturbing videos from a white

supremacist website.  A jury could find that Greene's conduct was sufficiently severe to alter the

conditions of the plaintiff's employment.  The obscene, violent, and racist videos are so plainly

hostile and intolerable that the mere act of showing them to the plaintiff, without more, could

alter the conditions of her employment.  Courts have found that displaying a noose in the office

constitutes "intimidating conduct" sufficient to support a hostile work environment claim;

subjecting the plaintiff to watching what appears to have been a graphic lynching is even more

severe.  *See, e.g.*, *Banks*, 81 F.4th at 265–66 (collecting cases); *Williams v. City of New York*

*Hous. Auth.*, 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) (describing the noose as "among the

most repugnant of all racist symbols, because it is itself an instrument of violence").

       A jury could also find that Greene's discriminatory behavior was pervasive throughout

her employment at Wenig Saltiel.  During the plaintiff's tenure at the firm, Greene denigrated the

intelligence of people of different races, watched obscene and racially offensive videos on his

computer, looked at white supremacist websites on his computer in view of the plaintiff, played

Confederate songs and reminisced about the antebellum South.  These incidents were "more than

episodic; they [were] sufficiently continuous and concerted," *Banks*, 81 F.4th at 264–65, from

August 2018 to at least December 2018 — they were not mere "passing remark[s]" (ECF No.

86-49 at 18).  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102–03 (2d Cir. 2010)

32

(vacating and remanding lower court's grant of summary judgment on hostile work environment claim where defendant made "approximately six" comments "over a period of seven months"). The blatant "offensiveness" of Greene's actions also supports a finding of pervasiveness. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) ("The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive." (quoting *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 578 (2d Cir. 1989)).

The defendants argue that "the admissible evidence does not support the conclusions" that Greene did the things that the plaintiff claims. (ECF No. 93 at 15.) In other words, the defendants dispute the plaintiff's claims. A court cannot grant summary judgment if there are disputes about material facts, which is precisely what this is. The plaintiff testified at a deposition and submitted a declaration. "[A] plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact." *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019). The defendants have not established any reason for the Court to reject the testimony or the declaration. The declaration satisfies all the requirements of Rule 56 — it was "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that [the plaintiff] is competent to testify on the matters stated." *Fantasia v. Rochelle*, No. 19-CV-11054, 2022 U.S. Dist. LEXIS 18058, at *15–16 (S.D.N.Y. Feb. 1, 2022) (quoting Fed. R. Civ. P. 56(c)(4)). Nor is there any reason to reject the plaintiff's deposition testimony. Indeed, the defendants can confront her with any inconsistencies or ambiguities at trial. The plaintiff's evidence is not "so conclusory that it must be disregarded," *id.* (citing *Wright v. N.Y.S. Dep't of Corr.*, 831 F.3d 64, 67 (2d Cir. 2016)), nor does it "inescapably and unequivocally contradict[] her earlier sworn statements," *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 52 n.8 (2d Cir. 2022).

Although it is not necessary to go any further, it is also notable that Greene corroborates the plaintiff's claims in significant ways.  On December 11, 2018 — shortly after the incident about which the plaintiff complained to Saltiel and Wenig — Greene wrote her an "apology letter" on December 11, 2018, stating:

> After yesterday's meeting, I had come to terms that I had said something hurtful to you.  Upon reflection, I now understand why you had felt offended. . . . "There is no excuse for hurtful language that demeans people of foreign origin who now live here. Demeaning statements about any group of professionals based on race or ethnic origin are always wrong and clearly inappropriate. . . . [I] will do my best never again to make statements . . . about others that are clearly out of line, derogatory and completely inappropriate.

(ECF No. 93-1 at 54–55.)  Greene also testified that he was often on Facebook at work, listened to "19th century music" in his office, and sometimes spoke with Wenig Saltiel employees about the Civil War and the Civil Rights Movement.  (ECF No. 88-5 at 148:15-17, 155–156, 168:8-20.)  Saltiel and Wenig also corroborated the details of the plaintiff's December 2018 complaint. To the extent there is contradictory evidence, as the defendants claim (*see* ECF No. 86-49 at 20–21; ECF No. 93 at 15), that is a factual dispute for a jury to resolve, not a court deciding a summary judgement motion.  *See Fantasia*, 2022 U.S. Dist. LEXIS 18058, at *15–16 (the defendant "may well be correct that a finder of fact will find [the plaintiff's] testimony not credible[, b]ut witness credibility must be decided by the fact finder, not by a court on summary judgment"); *Barrows*, 36 F.4th at 51 ("[T]o hold . . . that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off" a motion for summary judgment "would be to thrust the courts — at an inappropriate stage — into an adjudication of the merits." (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998)).

Nor have the defendants established as a matter of law that Greene's conduct may not be imputed to them as his employers.  There is a genuine dispute of material fact about whether Greene was the plaintiff's supervisor or a non-supervisory coworker; if Greene was a supervisor, Wenig Saltiel LLP would be strictly liable for the hostile work environment claim against him. (*See, e.g.*, ECF No. 88-3 at 250–57.)  A jury, not the Court, must evaluate the parties' conflicting testimony to resolve this question.

Individual defendants Wenig and Saltiel are personally liable for the Section 1981 and NYSHRL hostile work environment claims only if "they were personally involved in [the alleged] discrimination."  *Geffner v. Quanta Servs.*, No. 18-CV-3761, 2018 U.S. Dist. LEXIS 216852, at *14–15 (S.D.N.Y. Dec. 27, 2018) (quoting *Philip v. GTECH Corp.*, No. 14-CV-9261, 2016 U.S. Dist. LEXIS 94777, at *36 (S.D.N.Y. June 20, 2016)); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004) ("[A] plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action. . . . Personal liability under [S]ection 1981 must be predicated on the actor's personal involvement.").  A reasonable jury could find that Wenig and Saltiel "kn[ew] of the hostile work environment" — because of the plaintiff's December 2018 complaint, Greene's apology letter, and because the plaintiff told Saltiel multiple times about Greene's various offensive comments and conversation topics — and that they did not take appropriate remedial steps to address it.  A jury could also conclude that the steps Wenig and Saltiel took — meeting with Greene one time and encouraging him to apologize to the plaintiff — were not enough.  *Smith v. Town of Hempstead*, 798 F. Supp. 2d 443, 453–54 (E.D.N.Y. 2011); *see also Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009) ("[E]mployer defendants can . . . be held liable if [the] plaintiff can show that [the employer] knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take

appropriate remedial action."); *Chica v. Shallu Constr. Corp.*, No. 21-CV-869, 2022 U.S. Dist. LEXIS 60359, at *35–36 (E.D.N.Y. Mar. 31, 2022).

Accordingly, the defendants are not entitled to summary judgment on Section 1981 and NYSHRL hostile work environment claims.

### b.     Disparate Treatment

The defendants agree that the plaintiff "is a member of a protected class, was qualified for the position, and that her termination constitutes an adverse employment action."  (ECF No. 86-49 at 5.)  They argue that the plaintiff has not established that she suffered any other adverse employment action or that her termination "occurred under circumstances that give rise to an inference of discrimination."  (*Id.*)

The plaintiff's claim that the hostile work environment at Wenig Saltiel is an adverse employment action for purposes of her *prima facie* discrimination case is not persuasive.  (ECF No. 88 at 16–17 (quoting *Singh v. N.Y.C. Off-Track Betting Corp.*, No. 03-CV-5238, 2005 U.S. Dist. LEXIS 11098, at *34–35 (S.D.N.Y. May 27, 2005)).)  To the contrary, a hostile work environment is "not an adverse action for the purpose of [establishing] a disparate treatment claim."  *Desouza v. Office of Children & Family Servs.*, No. 18-CV-2463, 2019 U.S. Dist. LEXIS 99009, at *13 (E.D.N.Y. June 12, 2019); *see also, e.g.*, *Saliga v. Chemtura Corp.*, No. 12-CV-832, 2015 U.S. Dist. LEXIS 133135, at *21 (D. Conn. Sept. 30, 2015) ("[I]n the context of disparate treatment claims, the creation of a hostile work environment cannot constitute an adverse employment action for purposes of establishing a *prima facie* case of discrimination.").  "Whereas hostile work environment claims consider the 'workplace environment as a whole,' disparate treatment claims require a tangible, 'discrete harm[] such as hiring or discharge.'"  *Saliga*, 2015 U.S. Dist. LEXIS 133135, at *21–22 (quoting *Raniola v. Bratton*, 243 F.3d 610,

617 (2d Cir. 2001)).  Accordingly, the only adverse employment action the plaintiff establishes is her termination.[48]

The plaintiff has not sustained her burden to show that the circumstances of her termination gave rise even to a "minimal inference of discrimination." *Osinoff v. Nuvance Health*, No. 22-CV-2017, 2024 U.S. Dist. LEXIS 38451, at *18 (S.D.N.Y. Mar. 5, 2024).  She argues in her opposition that the evidence establishes that she was "treated 'less well' than her similarly situated non-African American counterparts due to her race/color" (ECF No. 88 at 18), but she does not identify an employee "with whom she seeks to compare herself," or that she was "similarly situated in all material respects" to that employee.  *Harlow v. Molina Healthcare, Inc.*, No. 20-CV-1382, 2024 U.S. Dist. LEXIS 45742, at *15 (N.D.N.Y. Mar. 15, 2024) (quoting *Graham v. Long Isl. R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  Nor does she present any evidence suggesting that Saltiel's and Wenig's decision to terminate her was motivated by discriminatory animus, or that Greene convinced them to fire her.  *Banks v. McGlynn, Hays & Co.*, Nos. 19-CV-5727, 21-CV-679, 2024 U.S. Dist. LEXIS 28804, at *27 (S.D.N.Y. 2024).

Even if the plaintiff had established a *prima facie* case, she has not shown that the defendants' legitimate, nondiscriminatory reason for terminating the plaintiff's employment was pretextual.  By the time of her termination, the defendants had met or spoken with the plaintiff at least eight times about her job performance — specifically, about her "sub-standard performance" maintaining the firm's "paper flow and deadlines" (ECF No. 86-48 ¶ 5), "issues with her mannerisms" and employee complaints that "she was rude and condescending" (*id.* ¶ 12), her failure to submit the "pro-law reports" (*id.* ¶ 14), and other responsibilities that she

---

[48] The plaintiff argues, for purposes of her retaliation claim, that she suffered the adverse employment actions of receiving additional work assignments and having her responsibilities diminished.  She does not make this argument in connection with her discrimination claim.

was not fulfilling (*id.* ¶¶ 16, 17, 20, 63).  Additionally, three employees — Laughton, Lopez, and Davis — resigned from Wenig Saltiel at least in part because of the way the plaintiff treated them.  (ECF No. 86-48 ¶¶ 7, 9, 22).  Two other employees — Smieya and Freckleton — questioned her authority over them.  (ECF No. 88-1 ¶¶ 164–65.)  Freckleton also complained multiple times to Wenig and Saltiel about the plaintiff's job performance and her treatment of the staff.  (ECF No. 86-48 ¶¶ 19, 21; *see also* ECF No. 88-4 at 2.)

The plaintiff does not dispute this.  Instead, she argues that the staff was insubordinate and Wenig and Saltiel did not support her because she complained about Greene.  However, nothing in the record supports this contention.  There is nothing in the record to suggest that the staff knew about Greene's behavior or her complaints about him.  Nor is there evidence that the defendants terminated the plaintiff because they were motivated by racial animus rather than by the plaintiff's management style, dismissive attitude toward other employees, or shortcomings with her job performance.  Similarly, there is no evidence that the plaintiff's subordinates were motivated by racial animus to "sabotage" her work or criticize her in their resignation letters.  (ECF No. 88 at 13, 23.)  The plaintiff cites Saltiel's testimony that her termination did not "hinge upon" a single employee's dissatisfaction with her (ECF No. 88-1 ¶ 174), but this ignores the rest of his testimony on this subject; he also testified that he fired her after multiple staff members quit because of her conduct, as well as her inability to perform crucial office manager duties and her absences from the office (ECF No. 86-48 ¶ 24 (quoting ECF No. 86-3)).  This evidence is sufficient to show that the plaintiff's termination was motivated not by racial discrimination but "by concern for [her] ability to adequately perform her job-related duties" and because of other staff members' complaints about her.  *Lowe*, 2018 U.S. Dist. LEXIS 75921, at *12.

### c.      Retaliation

Similarly, there is no evidence from which a reasonable jury could find that the

defendants' nonretaliatory reasons for firing her were pretextual.[49]  The defendants have

presented unrebutted evidence that they fired the plaintiff for two reasons: because she "was

underperforming and not fulfilling the obligations of her position" and because "multiple

employees had quit" in part because of the way the plaintiff treated them.  (ECF No. 86-49 at 11;

*see also id.* at 11–14.)  The plaintiff does not genuinely dispute that "there were issues with her

job performance" "[f]rom the beginning of [her] employment" (*see, e.g.*, ECF No. 88-1 at 3), or

that the employees cited her behavior as reasons for quitting.  Rather, she maintains that the

defendants "[s]abotaged" her and "[p]revented her from doing her job" "after she began

complaining" about Greene's conduct (ECF No. 88 at 13), and that the employees were

insubordinate and disrespectful to her (*id.*).  Even assuming that she was "sabotaged" and the

---

[49] The plaintiff also argues that the defendants gave her additional work — and assigned her "lower level case management responsibilities" — in retaliation for her complaints about Greene.  (ECF No. 88 at 21.)  Additional work assignments "within an employee's job description are generally not materially adverse," *Forest v. N.Y. State Office of Mental Health*, 672 F. App'x 42, 45 n.3 (2d Cir. 2016), but the assignment of an "excessive" or disproportionate workload may be an adverse action where "it is more disruptive than a mere inconvenience or an alteration of job responsibilities," *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015) (citation omitted); *see McGrier v. Cap. Cardiology*, No. 20-CV-1044, 2022 U.S. Dist. LEXIS 103784, at *29–30 (N.D.N.Y. June 10, 2022) (collecting cases).  Nothing in the record suggests that the defendants assigned the plaintiff less work, or that her "case management responsibilities" were "significantly altered" at all.  *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) ("Changes in assignments or responsibilities that do not radical[ly] change the nature of work are not typically adverse employment actions.  Moreover, a plaintiff must set forth *objective proof* that the alleged action was materially adverse.").  The plaintiff states in her declaration that in December 2018 she was "suddenly assigned 65 cases to work in the capacity of an attorney," despite never having attended law school.  (ECF No. 88-29 ¶ 44.)  Saltiel and Wenig testified that the firm's case management report assigned a "responsible attorney" for each case, who would "keep[] track" of the "upcoming deadlines[ and] tasks" in that case.  (ECF No. 86-3 at 117–120; *see also* ECF No. 86-4 at 71.)  That person "didn't necessarily have anything to do with the preparation" of the legal papers.  (ECF No. 86-4 at 71:20–72:6.)  Sometimes the firm "would have to reassign certain cases" "when an attorney left" until the next attorney could take them on, and some "case matters" would involve internal or administrative tasks that the firm would assign to the plaintiff.  (ECF No. 86-3 at 118:15–119:9.)  The plaintiff does not specify what tasks she was expected to perform or how they were "excessive" or outside of her responsibilities as office manager.

staff was insubordinate, she does not offer more than conclusory statements to show that "more likely than not [retaliation] was the real reason" for her termination. *Banks*, 2024 U.S. Dist. LEXIS 28804, at *28 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). *See also, e.g.*, *Richardson v. Comm'n on Hum. Rights & Opportunities*, 532 F.3d 114, 125 (2d Cir. 2008) ("[W]here there is overwhelming evidence that the employer had a legitimate reason to dismiss an employee, the employee must present more than a few isolated pieces of contrary evidence to survive summary judgment.").

The plaintiff argues that Greene "became harsh to her and began to subject her to vulgar and disrespectful treatment" after her December 2018 complaint, and that this "retaliatory hostility" was "causal[ly] connect[ed]" to the protected activity. (ECF No. 88 at 21.) The only evidence supporting this contention is the plaintiff's testimony that Greene said her, "I'm going to hit the head, you wanna join me?" (ECF No. 88-1 ¶ 122 (quoting ECF No. 88-3 at 293:18–294, 296)), which she interpreted to mean that he was asking her "to go to the bathroom with him" (*id.*). Even if that is what he meant, this comment is not a significant "'ratcheting up' of [Greene's] preexisting behavior," or a sufficiently "new, additional form[] of harassment." *Hall v. Parker Hannifan Corp.*, 824 F. Supp. 2d 464, 469–70 (W.D.N.Y. 2009) (quoting *Quiles-Quiles v. Henderson*, 439 F.3d 1, 8 (1st Cir. 2006)). The comment does not rise to the level of a new or intensified adverse employment action. *Cf. Gregory v. Daly*, 243 F.3d 687, 690 (2d Cir. 2001) (holding that the plaintiff had adequately stated a retaliation claim based on the allegation that her supervisor's conduct significantly worsened after she complained about his sexual harassment, where he allegedly "made hostile comments [about] the lawsuit [she] had filed, started to threaten her job, and subjected her to baseless disciplinary actions," among other things). The plaintiff's conclusory statement that she became "disgusted and appalled that

[Greene was] degrad[ing] [her] in every way possible" does not create a genuine dispute. *Goenaga v. March of the Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.").[50]

Finally, the plaintiff was fired approximately two and a half months after she complained about Greene's conduct.  (*See* ECF No. 88 at 19; ECF No. 93 at 13.)  In the Second Circuit, "a passage of two months between the protected activity and an allegedly retaliatory action seems to be the dividing line," beyond which the "temporal relationship is too attenuated to establish a causal relationship." *Cunningham v. Consol. Edison, Inc.*, 2006 U.S. Dist. LEXIS 22482, at *55 (E.D.N.Y. Mar. 28, 2006) (quoting *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554–55 & n.5 (2d Cir. 2001)).  *See, e.g.*, *Hussein v. Hotel Employees & Rest. Union, Local 6*, 108 F. Supp. 2d 360, 367 (S.D.N.Y. 2000) ("the passage of more than two months defeats any retaliatory nexus"); *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two and a half months is "hardly the close proximity of time contemplated . . . for allowing a plaintiff to establish the 'causal connection' element of [a] retaliation claim").  It is undisputed that the plaintiff complained about Greene's racially offensive comments in early December 2018 (*see* ECF No. 88-1 ¶ 100 (Greene gave her and Blackmon apology letters on December 11,

---

[50] The plaintiff also contends that the "whole office turned on her" (ECF No. 88-1 ¶ 125), but the deposition testimony she cites in support is entirely conclusory (*see id.* (citing ECF No. 88-3 at 292:8)). The only other evidence in the record to support this contention — the plaintiff's statements in her declaration that "after multiple complaints about [Greene], [the d]efendants seemed to get annoyed with my management of the staff and they allowed the staff to start abusing me" (ECF No. 88-29 ¶ 27; *see also id.* ¶¶ 28–29) — are also conclusory and themselves unsupported.  (*See, e.g.*, ECF Nos. 86-3 ¶ 47, 86-20, 86-29, 86-30, 88-24 (the staff complained about the plaintiff before she complained about Greene in December 2018); ECF No. 86-4 at 13:2-5, 16–17 (Wenig's medical leave from the office in November and December 2018 revealed that the plaintiff was not fulfilling her responsibilities); ECF No. 86-19 ¶ 32 (same).)  Therefore, the statement that the "whole office turned on her" is inadmissible, and in any case insufficient to establish the defendants' nonretaliatory reasons for firing her were pretextual.

2018)), and that she was fired on March 1, 2019 (ECF No. 86-48 ¶ 23). Accordingly, there is insufficient evidence of causation.

## II. NYCHRL Claims

Because the plaintiff has raised triable issues of material fact regarding her hostile work environment claims under Section 1981 and the NYSHRL, "it follows that she has done the same under the NYCHRL's more lenient standard." *Williams*, 61 F.4th at 76. *See also Mihalik*, 715 F.3d at 109 (explaining that federal and state law operate "as a floor below which the City's Human Rights law cannot fall" (quoting *Loeffler v. Staten Isl. Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009))). Therefore, the NYCHRL hostile work environment claim must proceed.

However, the plaintiff's NYCHRL discrimination and retaliation claims must be dismissed, even under the statute's lower standard. The plaintiff did not "adduce any evidence that she was treated less well than other similarly situated" Wenig Saltiel employees because of her race, or that she was fired for a discriminatory reason or as the result of her complaints about Greene's behavior. *Tsepenyuk v. Fred Alger & Co., Inc.*, No. 22-831, 2023 U.S. App. LEXIS 25140, at *3–4 (2d Cir. Sept. 22, 2023). She also did not show that the defendants' legitimate, nondiscriminatory and nonretaliatory reasons for terminating her were pretextual. *Id.* at *4 (affirming summary judgment dismissal of NYCHRL retaliation claim where the plaintiff did not show that "her termination was the result of her complaints to the company about [her supervisor's] harassing behavior"); *see also, e.g., Sotomayor*, 862 F. Supp. 2d at 259 (granting summary judgment on NYCHRL discrimination claim because the plaintiff's "subjective

42

disagreement with [her performance] review[] [was] not a viable basis" for the claim).

Accordingly, these claims are dismissed.[51]

---

[51] Because these claims must be dismissed, the Court does not reach the issue of the individual defendants' liability under the NYSHRL and NYCHRL for aiding and abetting discrimination and retaliation.  (*See* ECF No. 88 at 25.)

**CONCLUSION**

For these reasons, the defendants' motion for summary judgment is denied as to the plaintiff's hostile work environment claims and granted as to the discrimination and retaliation claims. The parties are directed to file a joint pretrial order that complies with the Court's Individual Rules within 30 days of the date of this Memorandum and Order.

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
March 29, 2024